**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARMADA (SINGAPORE) PTE LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| AMCOL INTERNATIONAL CORPORATION, | ) | |
| AMERICAN COLLOID COMPANY, | ) | |
| VOLCLAY INTERNATIONAL | ) | |
| CORPORATION, ASHAPURA MINECHEM | ) | |
| LIMITED, and JOHN DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT AT LAW**

Plaintiff, Armada (Singapore) Pte. Limited ("Armada"), by its below signed attorneys, for its Complaint against Defendants, Amcol International Corporation ("Amcol"), American Colloid Company ("ACC"), Volclay International Corporation ("Volclay"), Ashapura Minechem Limited ("Ashapura"), and John Does 1-5 (the "John Doe Defendants"), upon knowledge as to its own acts and otherwise on information and belief, alleges as follows:

**PARTIES**

1.  At all relevant times, Armada was and still is a corporation organized and existing under the laws of a foreign country with an office and place of business located in Singapore, Republic of Singapore.

2.  At all relevant times, Ashapura was and still is a corporation organized and existing under the laws of a foreign country with an office and place of business located at Jeevan Udyog Building, 3rd Floor, 278, Dr D.N. Road, Fort, Mumbai, 400 001, India. Additionally, at all relevant times, Ashapura has been, and continues to be, insolvent, including

within the meaning of 740 ILCS 160/3, because: (a) the sum of Ashapura's debts has exceeded its assets; and (b) Ashapura has generally not been paying its debts as they became due.

3.      At all relevant times, Amcol, ACC and Volclay (collectively, the "Amcol Defendants") were and still are corporations organized and existing under the laws of the State of Illinois with offices and places of business located at 2870 Forbs Avenue, Hoffman Estates, Illinois.

4.      The John Doe Defendants are individuals residing in Illinois or otherwise subject to the jurisdiction of this Court.  The John Doe Defendants are past and/or present senior officers employed by the Amcol Defendants.  The John Doe Defendants have also been appointed by the Amcol Defendants to serve as directors on Ashapura's board of directors in which capacity the John Doe Defendants act(ed) on behalf of, and in accordance with instructions from, the Amcol Defendants.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this dispute pursuant to, 28 U.S.C. §§ 1331 and 1367(a).

6.      This court has personal jurisdiction over each of the Defendants in that the Amcol Defendants are doing business in Illinois;  upon information and belief, the John Doe Defendants reside in Illinois; and Ashapura transacts, and does business, in Illinois (as well as throughout the entirety of the United States).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3).

## FACTUAL ALLEGATIONS

*Relationship Among the Parties*

8.     At all relevant times, the John Doe Defendants (and the Amcol Defendants as their principals) knew that Ashapura was insolvent and that it did not have available funds to rightfully pay any form of dividends to Ashapura's shareholders (regardless of whether structured as ordinary dividends, stock buy-backs, pay-outs from failed joint ventures and other affiliates, or as proceeds funneled through other channels).

9.     Amcol, ACC, Volclay, and the John Doe Defendants are affiliates and/or insiders of Ashapura within the meaning of 740 ILCS 160/2.

10.     Amcol owns 100% of ACC.  Amcol also owns 100% of Volclay.

11.     The Amcol Defendants, via Volclay, currently own approximately 19.9% of Ashapura's stock shares. Until the end of 2009, the Amcol Defendants owned slightly more than 20% of Ashapura.  At all relevant times, the Amcol Defendants have been the single largest, non-"promoter group" shareholders of Ashapura.  (The so-called "promoter group" of shareholders is comprised of members of an Indian family bearing the surname Shah, including Ashapura's managing director Chetan Shah.)

12.     Ashapura is a joint-venture between the Amcol Defendants and the aforementioned Shah family.  Indeed, the Amcol Defendants characterize Ashapura as being one of Amcol's joint-ventures in filings with the US SEC.  A copy, in pertinent part, of a January 31, 2012 filing by Amcol which demonstrates the same, is attached hereto as Exhibit A.  The Amcol Defendants exercise their control over Ashapura via directors whom the Amcol Defendants appoint to Ashapura's board and through close coordination between the respective, senior executives from the Amcol Defendants and Ashapura.

3

13.     Accordingly, at all relevant times, the Amcol Defendants have appointed their senior executives, the John Doe Defendants, to sit as directors on Ashapura's board of directors. The Amcol Defendants have control over the actions of the John Doe Defendants, when they serve as directors of Ashapura.  As such, the John Doe Defendants serve as agents for the Amcol Defendants.

***Background***

14.     During April 2008, Armada and Ashapura entered into two long-term contracts of affreightment (the "COAs") for Armada to provide vessels to transport over 60 cargoes of bauxite for Ashapura.  The first COA was dated April 4, 2008 (the "First COA") and its term ran from April 2008 to April 2012.  The second COA was dated April 12, 2008 (the "Second COA") and its term ran from September 2008 to March 2011.

15.     Ashapura breached the First COA early in its term.  Specifically, an early voyage under the First COA was performed by the MV CAROLA.  Ashapura failed to pay $886,024.00 in amounts which were due to Armada, on account of the CAROLA voyage, by September 16, 2008, at the latest.

16.      Ashapura further failed to nominate or provide any further cargoes for carriage under the First COA when it was obligated to do so.  Ashapura also failed to nominate or provide any cargoes for carriage under the Second COA when it was obligated to do so.

17.     Moreover, by or before September 30, 2008, Ashapura wrongfully repudiated both COAs when it sent a message to Armada stating, in pertinent part, that Ashapura was giving "formal notice that we regard the COA[s] as terminated."  Accordingly, by September 30, 2008, at the latest, Ashapura had wrongfully repudiated the COAs. Also, on information and belief, the

decision that Ashapura would breach and repudiate the COAs was made well prior to September 2008.

18.     Armada therefore commenced two arbitration proceedings (a separate arbitration with respect to each COA) against Ashapura in London.

19.     Armada prevailed in both arbitrations by way of awards issued on February 16, 2010.  A copy of the award issued with respect to the First COA is attached hereto as Exhibit B. A copy of the award issued with respect to the Second COA is attached hereto as Exhibit C.

20.     Both awards were recognized, confirmed and entered as enforceable judgments, in a principal amount that exceeded $70 million, by the United States District Court for the Southern District of New York. A copy of the Order, dated July 29, 2011, which granted the New York judgment is attached hereto as Exhibit D.  The New York judgment was then registered with the United States District Court for the Northern District of Illinois pursuant to an Order, dated October 30, 2012.  A copy of the Order granting Armada's petition to register the New York judgment is attached hereto as Exhibit E.

***Judgment Enforcement Efforts***

21.     Despite holding a judgment in excess of $70 million against Ashapura, Armada has only been able to recover a fraction of that judgment.

22.     Specifically, Armada previously commenced a maritime attachment proceeding against Ashapura in the Northern District of Illinois pursuant FRCP Supplemental Rule B (the "Rule B Action").  The entities which were the garnishees in the Rule B Action included the entities which are named as the Amcol Defendants in this action.  Property (in the form of debts owed by the Amcol Defendants to Ashapura) was successfully garnished and was eventually turned-over to Armada in the amount of approximately $687,000.00.

23.     One of the transactions which gave rise to the debts garnished in the Rule B Action was a stock buy-back (the "Stock Buy-Back").  In connection with that transaction, Ashapura purchased its own stock from the Amcol Defendants at the end of December 2009. , Shortly thereafter, the stock plummeted in value, as reflected in the stock price chart attached hereto as Exhibit F. This date was only a few weeks before issuance of the London arbitral awards which all concerned parties knew, or reasonably expected, would award massive amounts in favor of Armada.

24.     The market price paid for the stock exceeded the price which had been agreed upon by the parties to the transaction.  Amcol therefore owed a refund to Ashapura, which had a follow-on obligation to funnel the same funds to an Amcol subsidiary.

25.     That refund (hereinafter referred to as the "Excess Proceeds") is not at issue in this action but is described for background purposes.  Specifically, as determined by the Court in the Rule B Action, the Excess Proceeds constituted a debt which the Amcol Defendants owed to Ashapura.  Therefore, Armada successfully garnished, and eventually obtained the turn-over of, the Excess Proceeds.

26.     That turn-over did not occur immediately after the time at which the court in the Rule B Action determined that the Excess Proceeds were owed to Ashapura.  Instead, there was a delay occasioned by, *inter alia*, Ashapura's filing of a Chapter 15 bankruptcy petition seeking United States recognition of an insolvency proceeding which Ashapura had commenced before India's Board of Industrial and Financial Reconstruction (the "BIFR").

27.     Ashapura's proceeding before the BIFR was commenced following a determination made in conjunction with the Amcol Defendants.  Such a determination would have required Ashapura to obtain the approval of the director(s) who had been appointed to

Ashapura's board by the Amcol Defendants. Also, that decision was part of a scheme planned by Ashapura and the Amcol Defendants, together with the John Doe Defendants, to hinder, delay and defraud Armada in pursuit of enforcing its judgment.

28.     Ashapura commenced its insolvency proceedings before the BIFR in May 2011 and it did so on the alleged grounds that claims (as Ashapura described them) asserted by shipping companies, including Armada, made Ashapura's losses exceed its net worth. Notably, such "claims" represented debts which Ashapura incurred in 2008 and which have not (as to amounts owed to Armada) been included as debts scheduled for payment in connection with Ashapura's BIFR proceedings. Accordingly, the status of such claims (pursuant to Ashapura's accounting methods) is the same today as it was in 2008. Ashapura's status as an insolvent entity therefore commenced, pursuant to Ashapura's own accounting methods, as early as 2008. That was also, in any event, a time at which Ashapura stopped generally paying its debts as they became due. Ashapura was insolvent in 2008.

29.     After commencing its BIFR insolvency proceeding, Ashapura, via its managing director, Chetan Shah ["Shah"] as its foreign representative, filed, on October 4, 2011, a Chapter 15 bankruptcy petition in the United Stated Bankruptcy Court for the Southern District of New York seeking US recognition of the BIFR proceeding. A copy of the Declaration of Chetan Shah which was filed in support of the Chapter 15 petition is attached hereto as Exhibit G.

30.     At about the same time, on October 5, 2011, Ashapura obtained a temporary restraining order prohibiting creditors, such as Armada, from commencing, continuing, or seeking discovery with respect to Ashapura or its assets in the United States. Ashapura's Chapter 15 proceeding was just the latest salvo in its scheme, planned with the Amcol Defendants, to hinder, delay and defraud Armada. That is so because the determination to seek

Chapter 15 recognition would have required Ashapura to obtain the approval of the director(s) who had been appointed to Ashapura's board by the Amcol Defendants.

31.     That scheme worked.  Although the TRO which Ashapura obtained was terminated on or about October 24, 2011, the bankruptcy court thereafter granted Ashapura's petition and recognized the BIFR proceeding as a foreign main proceeding.  Ashapura's petition and request for recognition were granted on November 22, 2011, giving rise to an automatic stay against creditor actions within the territorial jurisdiction of the United States.  The automatic stay remained in effect until October 5, 2012 when the bankruptcy court terminated recognition of the BIFR proceeding and dismissed the Chapter 15 case.  Termination of the recognition of a foreign insolvency proceeding was an exceptional event in a Chapter 15 case and the record from that case highlights numerous instances of Ashapura's bad faith.

32.     Throughout, the Amcol Defendants were on information and belief, actively coordinating with Ashapura regarding its wrongful conduct in furtherance of their joint scheme to hinder, delay and defraud Armada which had been ongoing since 2008 when it was first determined that Ashapura would breach contractual obligations owed to Armada but would nonetheless wrongfully pay dividends to its shareholders, including the Amcol Defendants.

33.     The purpose underlying the aforementioned scheme was for Ashapura to return capital to shareholders, many of whom, including the Amcol Defendants, were affiliates and insiders of Ashapura, in order to frustrate creditors.

34.     From the time at which Ashapura breached the COAs in 2008 through the present, it has repeatedly and wrongfully made pay-outs to the Amcol Defendants while depleting its own assets and failing to pay Armada.

35.     The Amcol Defendants knew this was occurring.  They also willfully directed and facilitated the same.  This pattern of conspiring with respect to wrongful and deceitful conduct, much of which was carried-out through mail and wire transmissions, began with the decision to breach the COAs and has continued through the present.

*Fraudulent Transfers*

36.     In or about October 2008, Ashapura transferred funds, equal to, at least, $550,000.00, to the Amcol Defendants in connection with the payment of a dividend to Ashapura's shareholders (the "Dividend Fraudulent Transfer").

37.     The Amcol Defendants owned approximately 20% of Ashapura's shares; thus the total amount paid to all shareholders in connection with the aforementioned dividend was upwards of $2,750,000.00 (the "Wrongful Dividend").

38.     Thereafter, in or about December 2009, Ashapura effectively paid a further dividend.  That dividend was only paid to the Amcol Defendants and was made by way of the Stock Buy-Back.  The net amount paid to the Amcol Defendants in connection with the Stock Buy-Back was equal to, at least, $820,000.00 (the "Buy-Back Fraudulent Transfer").

39.     The Amcol Defendants sought to obfuscate the nature of the Buy Back Fraudulent Transfer when they stood as garnishees in the Rule B Action.

40.     The Stock Buy-Back obligated the Amcol Defendants to refund the Excess Proceeds to Ashapura which was to then funnel the same Excess Proceeds to an Amcol subsidiary.

41.     In order to obfuscate the nature of that transaction during the Rule B Action, the garnishees, who are now the Amcol Defendants in this case, contended that the Excess Proceeds

were owed to Ashapura's managing director, Shah, rather than to Ashapura itself.  The court in

the Rule B Action rejected that contention and noted that:

> [The garnishees] would benefit greatly from a determination that the excess stock
> proceeds are not due to Ashapura.  Testimony at the hearing revealed that Shah is
> no longer demanding return of the excess stock proceeds [as the garnishees
> contended he previously was] and that the AMCOL Garnishees would keep this
> amount if [Armada] failed to prove its entitlement to the funds.  (*Armada v.
> Ashapura*, 10 cv 5509, at 5 n. 6 [NDIll Aug. 29, 2011].

A copy of that decision is attached hereto as Exhibit H.

42.     The Amcol Defendants were seeking to conceal the true nature of their dealings

with Ashapura.  Nonetheless, a series of email exchanges  between Ashapura and the Amcol

Defendants (which were quoted by the Court in its August 29, 2011 decision in the Rule B

Action [Exhibit H]) aptly set forth what the Stock Buy-Back entailed by providing, in pertinent

part, that:

> As agreed between AMCOL and Ashapura in 2009 and finalized in December,
> AMCOL's 950,000 shares of Ashapura were sold to Ashapura at Rs38.  The price
> on the open market at the time of the sale was Rs 69.70.  The excess price above
> Rs 38, after adjusting for selling costs, will be transferred to the account identified
> by Ashapura.  AMCOL will absorb the US tax on the gain.  Ashapura will
> forward the same amount [referring to the Excess Stock Proceeds] in USD to
> AANV [a European joint venture between Ashapura and the Amcol Defendants],
> within four weeks of AMCOL's initial transmission to the Ashapura named
> account, and the amount will be applied to debt that AANV has to AMCOL's
> subsidiary, AMCOL Minerals Europe Ltd.  (Exhibit H at 2); and

> On December 30, 2009, Ashapura purchased 950,000 shares from AMCOL at a
> total price of 69.70 rupees before Rs 129,725 in fees.  As agreed by the parties,
> for any price greater than Rs. 38, e.g., Rs 31.70 net of fees, AMCOL would
> forward this amount to Ashapura, who would then remit the amount to AANV to
> pay down debt by AANV to AMCOL.  This amount totals Rs 30,006,782 and is
> referred to as the excess amount or excess proceeds.  (Exhibit H at 3).

43.     In light of the foregoing and related considerations, the Court in the Rule B

Action determined, in pertinent part, that:

As noted above, there are numerous emails, sent after the sale was completed, which state that Ashapura was the buyer of the stock and was owed the excess proceeds. Given that there is no written document to refer to here, I conclude that the emails which post-date the sale more accurately reflect the agreement concerning the stock sale and the excess proceeds. (Exhibit H at 7-8).

44.     Ashapura filed its Chapter 15 proceeding only a few weeks after the Court in the Rule B Action rejected the contention by the garnishees therein (*i.e.*, the Amcol Defendants) that the Excess Proceeds were owed to Chetan Shah and that Chetan Shah had been, but then stopped, claiming those funds. On information and belief, Ashapura and the Amcol Defendants jointly coordinated the timing for filing of the Chapter 15 case in order to cause maximum frustration to Armada by denying Armada recovery of a small amount which it had diligently pursued in furtherance of its judgment. Notably, on day-one of the Chapter 15 case, Chetan Shah filed a declaration which, contrary to the arguments made by the Amcol Defendants in the Rule B Action, specifically described the Excess Proceeds as "belonging to Ashapura." *See* Exhibit G ¶ 15.

45.     Accordingly, if the Amcol Defendants had prevailed on their arguments regarding ownership of the Excess Proceeds, they would have benefitted (to Armada's detriment) by keeping those funds. Once the Amcol Defendants failed in that respect, the defendants engaged in an alternative course of action to prevent Armada's recovery by having Ashapura claim the Excess Proceeds as its own in the Chapter 15 case. This was overtly intended to present Armada with a "heads we win – tails you lose" dilemma which must have been jointly planned by the defendants.

46.     Furthermore, in the short period of time which immediately followed the Stock Buy-Back (i.e., during the early months of 2010), the market value of Ashapura's stock plummeted dramatically. *See* Exhibit F. On information and belief, Ashapura and the Amcol

Defendants expected that Ashapura's stock price was about to collapse and that was, in part, why they arranged for the Amcol Defendants to receive a partial pay-out of their investment in Ashapura.

47. Given the dramatic degree to which the stock price fell (as expected by the defendants) following the Stock Buy-Back, the proceeds paid to the Amcol Defendants were not paid in exchange for a reasonably equivalent value. That is all the more so given that Ashapura could not have rightfully paid any further dividends on account of its stock and the expectation of future dividends is a key factor in valuing stock. The stock declined greatly in value on Indian exchanges and was worthless when considered as constituting the right to receive future dividends because such dividends could not be paid.

48. That is because, prior to the Stock Buy-Back, the Amcol Defendants recorded their investment in Ashapura as an investment in a joint venture having zero value. See Exhibit A. However, after the Stock Buy-Back, the Amcol Defendants recorded that investment as available-for-sale securities valued at market price.

49. This change in accounting represented a $25 million gain for the Amcol Defendants. Attached hereto as Exhibit I is a copy, in pertinent part, of a March 16, 2010 filing by Amcol with the SEC demonstrating the foregoing.

50. That accounting practice is particularly noteworthy because, on information and belief, the Amcol Defendants (which are publicly traded in the US) did not disclose the true nature of the Stock Buy-Back to the public. If they had done so, investors might have questioned whether it was a fair valuation for the Amcol Defendants to value their Ashapura shares at market price when, in fact, the Amcol Defendants had agreed to sell 950,000 Ashapura shares at a price which was substantially below the quoted market price.

51.     Even after the Dividend Fraudulent Transaction (in 2008) and the Stock Buy-Back Fraudulent Transaction (in 2009), as well as their misleading games with the Rule B Action and the Chapter 15 case (2010 and 2011), Ashapura and the Amcol Defendants continued with their scheme to hinder or defraud Armada.

52.     For instance, Ashapura's financial report issued for the period ending December 31, 2012 advised that:

> One of the overseas step-down subsidiary disposed of its shipping vessel during the second quarter and incurred a loss of US$66.99 lacs [Indian numbering for 100,000]. The corresponding liability of $US98.63 lacs on account of the term loan from a banker was settled for US$40.00 lacs as a final settlement of this liability. Based on a Letter of Comfort provided by the Parent Company [i.e., Ashapura], at the instance of the banker and subject to necessary approvals, the said liability of US$40.00 lacs has been included in the Draft Rehabilitation Scheme of the Parent Company to be submitted to the BIFR [sic, generally].

A copy of the Report is attached hereto as Exhibit J.

53.     On information and belief, the foregoing means that Ashapura assumed the debt of a subsidiary and will treat that assumed debt as an amount for payment in connection with Ashapura's Indian insolvency proceedings in which Ashapura has, to date, refused to schedule the debt which it (as opposed to a subsidiary) actually owes to Armada. Notably, Ashapura's failure to schedule its debt to Armada in the BIFR proceeding contributed to dismissal of the Chapter 15 case. Moreover, on information and belief, Ashapura could not have assumed a subsidiary's debts without coordinating the same with, and obtaining the approval of, the Amcol Defendants. Those defendants had, yet again, arranged to hinder or defraud Armada.

54.     There have been further instances of such wrongful conduct and scheming.

55.     Ashapura and the Amcol Defendants have engaged in other joint ventures. One involved a company called Ashapura Amcol NV. In 2010, the Amcol Defendants recorded a loss of $6.9 million on account of that entity. In 2011, they sold their 50% stake and recorded a

gain of $2.1 million. To the extent the sale proceeds were directly paid or otherwise funded by Ashapura, such proceeds (for a worthless investment) were the functional equivalent of a further dividend paid by Ashapura to the Amcol Defendants and constituted a fraudulent transfer, as to Armada.

56. Likewise, the Amcol Defendants continue to receive substantial revenues from another joint venture called Ashapura Volclay Limited ("AVL"). On information and belief, some of the business being performed by AVL is business which Ashapura would have previously performed.

57. For example, attached hereto as Exhibit K is an internet publication concerning AVL which lists bauxite, barytes, and bentonite as products available from AVL. The declaration which Chetan Shah filed in the Chapter 15 proceeding identified Ashapura as being "engaged in the business of mining, processing and trading minerals and ores . . . [including] Bentonite . . . Bauxite . . . [and] Barytes." (*See* Exhibit G ¶ 6).

58. As such, the revenues received by the Amcol Defendants from AVL, to the extent attributable to any such transferred business, are the functional equivalent of further dividends paid by Ashapura to the Amcol Defendants and constitute fraudulent transfers, as to Armada.

**COUNT I**
**Fraudulent Transfers Pursuant to 740 ILCS 160/6(a)**
**(Ashapura and the Amcol Defendants)**

59. Armada repeats and realleges Paragraphs 1 through 58 above, as if fully set forth herein.

60. The Dividend Fraudulent Transfer and the Buy-Back Fraudulent Transfer were fraudulent, as to Armada, and within the meaning of 740 ILCS 160/6(a), because:

        a.    Armada already had a claim against Ashapura at the time when the transfers were made;

14

b.    Ashapura made the transfers without receiving a reasonably equivalent value in exchange; and

c.    Ashapura was insolvent at the time when it made the transfers or became insolvent as a result thereof.

**WHEREFORE**, Armada respectfully requests that the Court issue a judgment: (a) avoiding the Dividend Fraudulent Transfer (equal to a value of, at least, $550,000.00) and the Buy-Back Fraudulent Transfer (equal to a value of, at least, $820,000.00); (b) ordering that Armada may levy execution against the same assets transferred or their proceeds; and (c) ordering that Armada shall have levy of execution against all other funds or property fraudulent transferred by Ashapura to the Amcol Defendants (in amounts to be established); and (d) granting Armada its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

### COUNT II
### Fraudulent Transfers Pursuant to 740 ILCS 160/5(a)(1) and (2)
### (Ashapura and the Amcol Defendants)

61.    Armada repeats and realleges Paragraphs 1 through 58 above, as if fully set forth herein.

62.    The Dividend Fraudulent Transfer and the Buy-Back Fraudulent Transfer were fraudulent, as to Armada and within the meaning of 740 ILCS 160/5(a)(1), because they were made with actual intent to hinder, delay, or defraud Armada as a creditor of Ashapura.

63.    Such intent is evidenced by numerous factors, including that:

a.    Both transfers were made to the Amcol Defendants as insiders;

b.    The Buy-Back Fraudulent Transfer was concealed and opaque in that, amongst other things, Ashapura and the Amcol Defendants endeavored to falsely characterize the Stock Buy-Back as a deal between the Amcol Defendants and Shah when, in fact, it was a deal between the Amcol Defendants and Ashapura. Indeed, the Amcol Defendants failed to

15

disclose the actual price for the deal to the investing public and instead shifted to valuing their Ashapura investment as available-for-sale securities accounted for as an asset at market price (which far exceeded the immediately preceding deal price for the Stock Buy-Back);

c.     Before the Dividend Fraudulent Transfer was made, Ashapura, the John Doe Defendants, and the Amcol Defendants all knew that Armada would commence arbitration proceedings against Ashapura and that Armada would obtain an award and resulting judgment against Ashapura in a massive amount exceeding Ashapura's ability to pay;

d.     On information and belief, Ashapura has removed or concealed assets (including by way of transferring business opportunities to affiliates) in order to hinder Armada's judgment enforcement efforts; and

e.     Ashapura was, at all material times, insolvent.

64.    The Dividend Fraudulent Transfer and the Buy-Back Fraudulent Transfer were also fraudulent, as to Armada and within the meaning of 740 ILCS 160/5(a)(2), because:

a.     Both transfers were made without receiving a reasonably equivalent value in exchange;

b.     Ashapura was engaged or was about to engage in a business or transaction (here, the breach and repudiation of its obligations owed to Armada) for which its remaining assets were unreasonably small in relation to the business or transaction; and

c.     Ashapura intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

**WHEREFORE**, Armada respectfully requests that the Court issue a judgment: (a) avoiding the Dividend Fraudulent Transfer (equal to a value of, at least, $550,000.00) and the Buy-Back Fraudulent Transfer (equal to a value of, at least, $820,000.00); (b) ordering that Armada may levy execution against the same assets transferred or their proceeds; (c) ordering that Armada shall have levy of execution against all other funds or property fraudulent transferred by Ashapura to the Amcol Defendants (in amounts to be established); and (d)

granting Armada its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

## COUNT III
## Wrongful Dividend
## (The Amcol Defendants and the John Doe Defendants)

65.     Armada repeats and realleges Paragraphs 1 through 58 above, as if fully set forth herein.

66.     On information and belief, the dividend which Ashapura paid to all of its shareholders in or about October 2008 was in the total amount of, at least, $2,750,000.00.

67.     Ashapura was insolvent at the time when that dividend was paid. Moreover, the dividend was solely intended to return capital to Ashapura's equity investors before massive debts owed to Armada could be reduced to arbitral awards and enforceable judgments. Indeed, Ashapura did not even make any meaningful attempt to defend its meritless position arising from the breach and repudiation of the COAs.

68.     All of this was intended to wrongfully, illegally, and inequitably benefit investors to the detriment of creditors.

69.     Moreover, on information and belief, the John Doe Defendants (together with the Amcol Defendants as their principals) knew that the 2008 dividend was illegal, wrongful, and/or inequitable.

70.     Nonetheless, on information and belief, the John Doe Defendants (together with the Amcol Defendants as their principals) approved of, and assented to, payment of the 2008 dividend.

71.     As such, the John Doe Defendants (together with the Amcol Defendants as their principals) are liable to Armada in the amount of, at least, $2,750,000.00.

17

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants liable to Armada and award Armada damages in the principal sum of at least $2,750,000.00, together with its reasonable attorney's fees, applicable pre and post judgment interest, and costs and such other and further relief as this Court deems just.

### COUNT IV
### Wrongful Assumption of Debt
### (Amcol Defendants and John Doe Defendants)

72.     Armada repeats and realleges Paragraphs 1 through 58 above, as if fully set forth herein.

73.     Ashapura wrongfully assumed debts (in the amount of, at least, $4,000,000.00) of a subsidiary in order to give the subsidiary's creditor (a bank) preference in Ashapura's insolvency proceedings before the BIFR even though Ashapura continues to refuse to schedule its debt to Armada in those proceedings.

74.     On information and belief, Ashapura has assumed the aforementioned subsidiary debt following coordination with, and approval from, the John Doe Defendants (together with the Amcol Defendants as their principals) because the transaction would have required such approval.

75.     The only reason for such action is to benefit Ashapura and the Amcol Defendants who thereby benefit at the expense of Armada which should certainly be paid, in full, before the creditor of an Ashapura subsidiary is paid, at all.

76.     As such, the John Doe Defendants (together with the Amcol Defendants as their principals) are liable to Armada in the amount of, at least, $4,000,000.00.

18

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants liable to Armada in an amount equal to the sum of subsidiary or affiliate debts which Ashapura wrongfully assumed in its BIFR proceedings (an amount equal to, at least, $4,000,000.00); and award it damages in the principal sum of at least $4,000,000.00, together with its reasonable attorney's fees, applicable pre and post judgment interest, and costs and such other and further relief as this Court deems just.

**COUNT V**
**Injunctive Relief Pursuant to Uniform Fraudulent Transfer Act**
**740 ILCS 160/1 et seq.**
**(All Defendants)**

77.     Armada repeats and realleges Paragraphs 1 through 64 above, as if fully set forth herein.

78.     At any time in the imminent future, Ashapura might pay a dividend, or otherwise transfer the economic equivalent of a dividend, to some or all of its shareholders, including to the Amcol Defendants. On information and belief, this has already happened by way of funds or other proceeds funneled to the Amcol Defendants, or for their benefit, via various Ashapura subsidiaries, affiliates, and joint ventures.

79.     For all of the reasons set forth in Counts I and II, above, any such a dividend would constitute a fraudulent transfer, as to Armada, pursuant to 740 ILCS 160/6(a) and 160/5(a)(1) and (2).

**WHEREFORE**, Armada respectfully requests that the Court issue a judgment, pursuant to 740 ILCS 160/8(a)(3)(A): (a) declaring that any future (or previously made, but currently concealed) dividends (or other payments economically analogous to dividends) paid by Ashapura to the Amcol Defendants shall be deemed fraudulent transfers subject to immediate levy of execution by Armada; (b) permanently enjoining the Amcol Defendants from selling

any of their shares of Ashapura stock until such time as Armada's judgment against Ashapura is satisfied, in full (and subjecting such shares to attachment during the interim); and (c) granting Armada its reasonable attorney's fees and costs and such other and further relief as this Court deems just.

## COUNT VI
## RICO 18 U.S.C. § 1962(c)
## <u>(The Amcol Defendants and the John Doe Defendants)</u>

80. Armada repeats and realleges Paragraphs 1 through 79 above, as if fully set forth herein.

81. This count is against the Amcol Defendants and the John Doe Defendants for violations of 18 U.S.C. § 1962(c).

82. Ashapura is an enterprise engaged in and whose activities affect interstate and foreign commerce. The Amcol Defendants and the John Does Defendants are associated with that enterprise.

83. The Amcol Defendants and the John Doe Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

84. The Amcol Defendants and the John Doe Defendants formed a scheme or artifice to defraud Armada and to obtain funds which should have remained assets of Ashapura, available for payment to, or judgment enforcement by, Armada. They did so by, *inter alia*:

> a. arranging for Ashapura to transfer its property and funds to the Amcol Defendants, which effectively constituted payment of wrongful dividends by an insolvent entity to an insider for no legitimate purpose other than returning capital (or profit) to an insider at the expense of a creditor;
>
> b. obfuscating the nature of such transactions and advancing a ridiculous, and judicially rejected story, that debts were owed to Ashapura's managing director rather than to Ashapura (which theory the managing director himself expressly contradicted in subsequent filings with a US bankruptcy court);

      c.      facilitating the filing of bad faith, insolvency-related proceedings which, as to the US Chapter 15 case, was ultimately dismissed;

      d.      approving Ashapura's assumption of a subsidiary's debt as a debt scheduled for payment in its BIFR proceedings even though Ashapura has continued to refuse to schedule its debt to Armada; and

      e.      misrepresenting the fair valuation of Ashapura's shares held by the Amcol Defendants which was done by representing that a fair valuation could be based on market price when, in fact, the Amcol Defendants and Ashapura had just recently executed an opaque transaction which valued the shares at a fraction of market price.

85.     The foregoing scheme originated as early as mid-2008, or soon thereafter, with the determinations that Ashapura should, and would, breach and repudiate the COAs while continuing to funnel money to the Amcol Defendants.

86.     The Amcol Defendants and the John Doe Defendants, in furtherance of their scheme or artifice to defraud Armada and to enrich the Amcol Defendants, at various times, (a) used and/or caused use of United States mails and/or private or commercial interstate carriers, and/or (b) transmitted or caused to be transmitted various writings by means of wire communications in interstate or foreign commerce, in the forms of faxes and emails.

87.     The foregoing acts by the Amcol Defendants and the John Doe Defendants were committed willfully.

88.     The foregoing acts by the Amcol Defendants and the John Doe Defendants constituted violations of 18 U.S.C. § 1341.

89.     The foregoing acts by the Amcol Defendants and the John Doe Defendants constituted violations of 18 U.S.C. § 1343.

90.     The Amcol Defendants' and the John Doe Defendants' use of the United States mails and/or private or commercial interstate carriers and/or transmittals by means of wire

communications was a natural and probable consequence of their scheme or artifice to deceive or defraud Armada and to obtain property for the Amcol Defendants which should have remained an Ashapura asset available for payment to, or judgment enforcement by, Armada.

91.     The foregoing predicate acts by the Amcol Defendants and the John Doe Defendants constitute racketeering activity as defined by 18 U.S.C. § 1961(1).

92.     The foregoing predicate acts were related and undertaken repeatedly and continuously over the course of several years.

93.     The foregoing predicate acts were undertaken with respect to Armada and for the related purposes of defrauding Armada and obtaining the improper control of property which should have remained an Ashapura asset, available for judgment enforcement.

94.     In view of the foregoing, the Amcol Defendants and the John Doe Defendants have engaged in a pattern of racketeering activity.

95.     The Amcol Defendants and the John Doe Defendants have directly and indirectly conducted, participated in, controlled, directed and managed the foregoing affairs of Ashapura (which is an enterprise engaged in or whose activities affect interstate and foreign commerce) through the above-described pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

96.     But for the Amcol Defendants' and the John Doe Defendants' violations of 18 U.S.C. § 1962(c), Armada would not have suffered damages. Amongst other considerations, but for such violations of 18 U.S.C. § 1962, the aforementioned funds and property would still be held by Ashapura and available for payment to, or judgment enforcement by, Armada.

97.     The Amcol Defendants' and the John Doe Defendants' violations of 18 U.S.C. § 1962(c) proximately caused Armada's damages, with respect to its business and property, which are equal, to at least: (a) all of the funds and property which have been fraudulently and

22

wrongfully transferred from Ashapura's possession to the Amcol Defendants or otherwise paid-out as wrongful dividends plus (b) all of the debts, otherwise owed by affiliates and subsidiaries, which have been wrongfully assumed by Ashapura in its BIFR proceedings or otherwise.

98.     The total principal amount of such damages exceeds $8,120,000.00 and Armada is entitled to an award equal to: (a) at least, $8,120,000.00; (b) together with treble damages yielding, at least, $24,360,000.00; plus (c) reasonable attorney's fees and costs.

99.     The total recovery should equal treble damages on Armada's existing judgment against Ashapura (yielding an amount in excess of $210,000,000.00) because the decision to breach the COAs was part of the scheme to defraud Armada.

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants jointly and severally liable to Armada and award Armada damages in the principal sum of at least $8,120,000.00 together with treble damages in the sum of at least $24,360,000.00, and its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

### COUNT VII
### RICO 18 U.S.C. § 1962(a)
### (The Amcol Defendants)

100.     Armada repeats and realleges Paragraphs 1 through 99 above, as if fully set forth herein.

101.     This count is against the Amcol Defendants for violations of 18 U.S.C. § 1962(a).

102.     Ashapura is an enterprise engaged in and whose activities affect interstate and foreign commerce.

103. The Amcol Defendants used and invested income that was derived from the pattern of racketeering activity described above. Specifically, the Amcol Defendants have used and invested such income in the ongoing business of the Amcol Defendants.

104. The pattern of racketeering activity described above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

105. But for the Amcol Defendants' violations of 18 U.S.C. § 1962(a), Armada would not have suffered damages.

106. The Amcol Defendants' violations of 18 U.S.C. § 1962(a) proximately caused Armada's damages, with respect to its business and property, which are equal, to at least: (a) all of the funds and property which have been fraudulently and wrongfully transferred from Ashapura's possession to the Amcol Defendants or otherwise paid-out as wrongful dividends plus (b) all of the debts, otherwise owed by affiliates and subsidiaries, which have been wrongfully assumed by Ashapura in its BIFR proceedings or otherwise.

107. The total principal amount of such damages exceeds $8,120,000.00 and Armada is entitled to an award equal to: (a) at least, $8,120,000.00; (b) together with treble damages yielding, at least, $24,360,000.00; plus (c) reasonable attorney's fees and costs.

108. The total recovery should equal treble damages on Armada's existing judgment against Ashapura (yielding an amount in excess of $210,000,000.00) because the decision to breach the COAs was part of the scheme to defraud Armada.

**WHEREFORE**, Armada respectfully requests that the Court award it damages in the principal sum of at least $8,120,000.00 together with treble damages in the sum of at least $24,360,000.00, and its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

## COUNT VIII
## RICO 18 U.S.C. § 1962(b)
## (The Amcol Defendants)

109.    Armada repeats and realleges Paragraphs 1 through 108, above, as if fully set forth herein.

110.    This count is against the Amcol Defendants for violations of 18 U.S.C. § 1962(b).

111.    Ashapura is an enterprise engaged in and whose activities affect interstate and foreign commerce.

112.    The Amcol Defendants maintained interests in and control of the enterprise through a pattern of racketeering activity.  Amongst other things, the Amcol Defendants divested themselves of a fractional interest in Ashapura stock which enabled the Amcol Defendants to change their accounting of that interest from being an investment in a joint venture (valued at zero dollars) to being an available-for-sale security (valued at over $25 million, immediately after the aforementioned Stock Buy-Back).

113.    Additionally, by way of the aforementioned pattern of racketeering activity, the Amcol Defendants have also been able to maintain direct or indirect control over the Ashapura enterprise, including direct or indirect control over (and the continued receipt of revenues from) multiple Ashapura joint ventures and affiliates.

114.    The pattern of racketeering activity described above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

115.    The Amcol Defendants have directly and indirectly maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. 1962(b).

116.     But for the Amcol Defendants' violations of 18 U.S.C. § 1962(b), Armada would not have suffered damages.

117.     The Amcol Defendants' violations of 18 U.S.C. § 1962(b) proximately caused Armada's damages, with respect to its business and property, which are equal, to at least: (a) all of the funds and property which have been fraudulently and wrongfully transferred from Ashapura's possession to the Amcol Defendants or otherwise paid-out as wrongful dividends plus (b) all of the debts, otherwise owed by affiliates and subsidiaries, which have been wrongfully assumed by Ashapura in its BIFR proceedings or otherwise.

118.     The total principal amount of such damages exceeds $8,120,000.00 and Armada is entitled to an award equal to: (a) at least, $8,120,000.00; (b) together with treble damages yielding, at least, $24,360,000.00; plus (c) reasonable attorney's fees and costs.

119.     The total recovery should, indeed, equal treble damages on Armada's existing judgment against Ashapura (yielding an amount in excess of $210,000,000.00) because the decision to breach the COAs was part of the scheme to defraud Armada.

**WHEREFORE,** Armada respectfully requests that the  Court award it damages in the principal sum of at least $8,120,000.00 together with treble damages in the sum of at least $24,360,000.00, and its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

**COUNT IX**
**RICO**
**<ins>(The Amcol Defendants and  the John Doe Defendants)</ins>**

120.     Armada repeats and realleges Paragraphs 1 through 119, above, as if fully set forth herein.

121.    This count is against the Amcol Defendants and the John Doe Defendants for violations of 18 U.S.C. § 1962(d).

122.    As set forth above, the Amcol Defendants and the John Doe Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(a), (b), and (c).  Specifically, they agreed and conspired with Ashapura and members of the Shah family, including Chetan Shah, to violated 18 U.S.C. § 1962(a), (b), and (c) in furtherance of a scheme to defraud Armada.  Indicia of the existence of such a scheme can be gleaned from prior judicial decisions addressing the consequences of Ashapura's dealings, including, as follows:

> [T]he case presents a history of Ashapura's active resistance and evasion of payment, played over a world-wide canvas.  (*Americas Bulk Transp. Ltd. v. IMT*, 08 CIV.6970 [AKH], 2010 WL 1047674, 2010 AMC 1629, 1643 [S.D.N.Y. Mar. 19, 2010] [*vacated in part (and on other grounds) sub nom.*, *Eitzen Bulk A/S v. Ashapura Minechem, Ltd.*, 632 F.3d 53 (2d Cir. 2011)]); and

> This Court will not continue to be used as one of Mr. Shah's chess pieces.  (*In re Ashapura Minechem, Ltd.*, Case No. 11-14668 (S.D.N.Y. Bankr. Aug. 21, 2012) (Transcr. at 50:2-3).

123.    The Amcol Defendants and the John Doe Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate and foreign enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

124.    The Amcol Defendants and the John Doe Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

125.    That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. § 1962(d).

126.    But for the Amcol Defendants' and the John Doe Defendants' violations of 18 U.S.C. § 1962(d), Armada would not have suffered damages.

127.    The Amcol Defendants' conspiracy, overt acts in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d) directly and proximately caused Armada damages, with respect to its business and property, which are equal, to at least: (a) all of the funds and property which have been fraudulently and wrongfully transferred from Ashapura's possession to the Amcol Defendants or otherwise paid-out as wrongful dividends plus (b) all of the debts, otherwise owed by affiliates and subsidiaries, which have been wrongfully assumed by Ashapura in its BIFR proceedings or otherwise.

128.    The total principal amount of such damages exceeds $8,120,000.00 and Armada is entitled to an award equal to: (a) at least, $8,120,000.00; (b) together with treble damages yielding, at least, $24,360,000.00; plus (c) reasonable attorney's fees and costs.

129.    The total recovery should, indeed, equal treble damages on Armada's existing judgment against Ashapura (yielding an amount in excess of $210,000,000.00) because the decision to breach the COAs was part of the scheme to defraud Armada.

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants jointly and severally liable to Armada and award Armada  damages in the principal sum of at least $8,120,000.00 together with treble damages in the sum of at least $24,360,000.00, and its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

Respectfully submitted,

ARMADA (SINGAPORE) PTE LIMITED


By:____/s/ Edward W. Floyd_____
Edward W. Floyd
Eaton & Van Winkle LLP
3 Park Avenue
16th Floor
New York, New York 10016
(212) 779-9910
Facsimile (212) 779-9928
efloyd@evw.com
*Pro Hac Vice* to be filed concurrently




*Local Counsel:*


By:____/s/ Dennis Minichello_____
Dennis Minichello (03122059)
Shari L. Friedman(6193095)
Marwedel, Minichello & Reeb, P.C.
10 S. Riverside Plaza
Suite 720
Chicago, Illinois 60606
(312) 902-1600
Facsimile (312) 902-9900
dminichello@mmr-law.com
sfriedman@mmr-law.com