IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARMADA (SINGAPORE) PTE          )
LIMITED,                         )
                                 )
            Plaintiff,           )
     v.                          )     No. 13 C 3455
                                 )
AMCOL INTERNATIONAL              )
CORPORATION ET AL.               )
                                 )
            Defendants.

MEMORANDUM OPINION AND ORDER

Armada (Singapore) Pte. Ltd. ("Armada"), a shipping company,

has filed a nine count complaint against multiple defendants

alleging violations of the Illinois Uniform Fraudulent Transfer

Act, 740 ILCS §§ 160/1 *et seq.* (Counts I, II, and V); wrongful

payment of dividends and assumption of debt (Count III and IV);

and violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* (Counts VI-

IX).

AMCOL International Corporation ("AMCOL") and two of its

subsidiaries, American Colloid Company ("ACC") and Volclay

International Corporation ("Volclay")--collectively, the "AMCOL

Defendants"--have moved to dismiss Armada's complaint on multiple

grounds.[1]  The motions are granted in part for the reasons stated below.

                                I.

     Accepting all well-pled allegations as true and drawing all reasonable inferences in Armada's favor, the following story emerges from the complaint.  Armada and Ashapura Minechem, Ltd. ("Ashapura), an Indian mining company, signed two shipping contracts--known as "contracts of affreightment"--in April 2008. Complaint at ¶ 14.  Under these contracts, Ashapura agreed to provide cargo loads of bauxite, which Armada would ship from India to various foreign ports.  Ashapura provided cargo for an early voyage, but breached the contracts by failing to pay for this voyage or provide any further cargoes.  *Id.* at ¶¶ 15-16. Armada contends that Ashapura's breach of the contracts was foreseeable (and possibly inevitable) as early as July 2008 when Ashapura submitted an untimely application for a necessary license from provincial authorities in Gujarat, India.  *Id.* at Ex. C.  Ashapura formally repudiated the two contracts around September 30, 2008.  *Id.* at ¶ 17.

     On November 4, 2008, Armada appointed an arbitrator in London to resolve disputes under the two shipping contracts.  *Id.*

---

[1] The three AMCOL Defendants filed separate motions to dismiss, but adopted and incorporated each other's arguments in their respective motions.  Accordingly, I will consider each ground for dismissal to be asserted by the AMCOL Defendants collectively.

at Exs. B and C.  The arbitrator warned Ashapura on September 29, 2008, that failing to raise a defense may result in a "draconian penalty."  *Id.* at Ex. B, 4.  Ashapura did not heed this warning and defaulted in the arbitration proceedings.  The arbitrator awarded approximately $70 million to Armada on February 16, 2010. *Id.* at ¶ 20.  Two other shipping companies obtained default arbitration awards against Ashapura for $36 and $24 million, respectively.  *Id.* at Ex. G, ¶ 9.

Armada registered its arbitration award as an enforceable judgment in this court, *see Armada v. Ashapura*, No. 12 C 8518 (N.D. Ill.), but has collected only a small fraction of the amount owed.  The present lawsuit alleges that the AMCOL Defendants engaged in an unlawful scheme to frustrate Armada's collection of its $70 million judgment against Ashapura.  As soon as Ashapura's liability under the shipping contracts was foreseeable, Armada alleges that the AMCOL Defendants launched a scheme to "return capital to [Ashapura's] shareholders, many of whom, including the AMCOL Defendants, were affiliates and insiders of Ashapura, in order to frustrate creditors," including Armada.  *Id.* at ¶¶ 32-33.

The AMCOL Defendants, through the appointment of their senior executives to Ashapura's board of directors,[2] allegedly

---

[2] One of AMCOL's subsidiaries, Volclay, held around twenty percent of Ashapura's stock during all times relevant to this lawsuit.  Complaint at ¶ 11.  This stock ownership allegedly

conducted or participated in the following fraudulent

transactions:

1. Ashapura's payment of a $2.75 million dividend to shareholders in October 2008 even though Ashapura faced significant exposure on the breached shipping contracts;

2. Ashapura's buy back of its own stock from an AMCOL subsidiary for about $820,000 in December 2009, shortly before the stock price dropped;

3. the AMCOL Defendants' unsuccessful attempt to avoid garnishment of excess proceeds from the December 2009 stock buy back, *see Armada (Singapore) Pte. Ltd. v. Ashapura Minechem Ltd.*, 837 F.Supp.2d 880 (N.D. Ill. 2011) ("maritime attachment proceeding");

4. Ashapura's filing of a Chapter 15 bankruptcy petition as a means of staying creditor actions, *see* 11 U.S.C. § 1520(a)(1), shortly after Armada successfully garnished excess proceeds from the December 2009 stock buy back;

5. Ashapura's purchase of the AMCOL Defendants' share in a European joint venture for $2.1 million in 2011 even though the venture recorded multi-million dollar losses in the previous year;

6. Ashapura's assumption of a subsidiary's debt in 2012 and ongoing refusal to schedule its debts to Armada for payment in an insolvency proceeding pending in India; and

7. Ashapura's transfer of its mining business to an Indian joint venture with the AMCOL Defendants and ongoing payment of "backdoor dividends" to the AMCOL Defendants through this business.

Complaint at ¶¶ 36-58.

---

allowed the AMCOL Defendants to appoint their senior executives, the John Doe Defendants, to Ashapura's board of directors and to exercise control over Ashapura through them. *Id.* at ¶ 12-13.

II.

As a preliminary matter, the AMCOL Defendants contend that Armada's present claims are barred by the doctrine of *res judicata* because they were, or could have been, litigated during the maritime attachment proceeding. This argument fails because the parties to the maritime attachment proceeding and this lawsuit are not identical or in privity with one another.

The doctrine of *res judicata* or claim preclusion "bar[s] a second suit in federal court when there exists: (1) an identity of the causes of actions; (2) an identity of the parties or their privies; and (3) a final judgment on the merits." *Kratville v. Runyon*, 90 F.3d 195, 197 (7th Cir. 1996). The AMCOL Defendants concede that they were neither parties to the maritime attachment proceeding, nor in privity with Ashapura. The only case they cite to support their *res judicata* argument, *Michelson v. Schor*, No. 95 C 6573, 1997 WL 282949 (N.D. Ill. May 16, 1997), is inapposite. In *Michelson*, the plaintiffs conceded that the parties in their first and second lawsuits were identical. *Id.* at *2. The only dispute was whether there were identical causes of action. *Id.* at *3-4. Nothing in *Michelson* supports the conclusion that Armada is barred from litigating its present claims because it could have raised these claims in the maritime attachment proceeding against Ashapura.

III.

The AMCOL Defendants' remaining arguments attack the legal sufficiency of Armada's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

A pleading must contain "a short and plain statement of [each] claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must contain "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Claims that "sound in fraud"--i.e., claims "premised upon a course of fraudulent conduct"--must be pled with particularity. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). All of Armada's claims are therefore subject to Rule 9(b)'s heightened pleading requirement. *See Goren v. New Vision Intern, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) ("Rule 9(b) is of course applicable to allegations of fraud in a civil RICO complaint."); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078-79 (7th Cir. 1997) (applying Rule 9(b) to claims under Illinois Uniform Fraudulent Transfer Act). Note, however, that "Rule 9(b) is satisfied by a showing that further particulars of the alleged fraud could not have been obtained without discovery." *Emery v. Am. Gen. Finance, Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1996).

A.

The AMCOL Defendants seek dismissal of Armada's claims on the ground that Armada fails to differentiate among the three AMCOL Defendants in violation of Rule 9(b)'s particularity requirement for averments of fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (holding that "particularity" under Rule 9(b) "means the who, what, when, where, and how: the first paragraph of any newspaper story.").

Armada counters that AMCOL, Volclay, and ACC appointed their senior executives, the John Doe Defendants, to Ashapura's board of directors and exercised control over Ashapura through them. *Id.* at ¶¶ 12-13. This allegation ties the AMCOL Defendants, individually and collectively, to Ashapura's alleged attempts to hide its assets from creditors. *See Emery*, 134 F.3d at 1325 ("If the scheme is actually hatched or directed by the board of directors or some other controlling group, whether the control is *de facto* or *de jure*, it will come close enough to the paradigmatic RICO case to pass muster[.]"). Armada also alleges that the AMCOL Defendants and Ashapura participated in two joint ventures through which Ashapura further attempted to hide its assets from creditors. *Id.* at ¶¶ 55-58.

Armada's complaint is a far cry from an unsupported "contention that 'the defendants looted the corporation'--without any details about who did what[.]" *Bank of America, N.A. v.*

7

*Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Aramada's allegations, taken together, adequately assert "who, what, when, where, and how" the AMCOL Defendants participated in a scheme to shield Ashapura's assets from creditors. *DiLeo*, 901 F.2d at 627. In any event, "[r]ule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery," *Katz v. Household Interns, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996).. *See also Emery,* 134 F.3d at 1323 (noting that Rule 9(b) should not be construed "to create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery...that she could not conduct before filing the complaint"). I conclude that Armada's allegations have satisfied Rule 9(b)'s particularity requirements.

## B.

Turning next to the AMCOL Defendants' attacks on the legal sufficiency of Armada's state law, I conclude that Counts I-V satisfy the federal pleading standards.

Count I alleges that the October 2008 dividend payment and December 2009 stock buy back were fraudulent as to Armada under Section 6(a) of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS §§ 160/6(a). "[A] transfer is fraudulent as to a creditor [under Section 6(a)] if: (1) the creditor's claim arose before the transfer; (2) the debtor made the transfer

8

without receiving a reasonably equivalent value in exchange for the transferred property; and (3) the debtor was either insolvent at the time of the transfer or became insolvent as a result of the transfer." *Heartland Bank and Trust Co. v. Goers*, No. 3-12-0854, 2013 WL 5593521, at *5 (Ill. App. Ct. 2013) (citing 740 ILCS § 160/6(a)).

Here, Armada alleges that it had multiple "claims" against Ashapura before the October 2008 dividend payment and December 2009 stock buy back.[3] Complaint at ¶ 15. Second, the arbitrator's warning of a "draconian penalty" against Ashapura in September 2009 makes it plausible that Ashapura paid more than "reasonably equivalent value" in the December 2009 stock buy back in an effort to shield assets from creditors. *Id*. at ¶¶ 46-48. It is also plausible that Ashapura was "insolvent" in October 2008 and December 2009 based on Armada's allegations that (1) the AMCOL Defendants valued their investment in Ashapura at zero for accounting purposes as of December 31, 2008 and (2) Ashapura commenced insolvency proceedings in India in May 2011 citing, *inter alia*, unpaid debts to shipping companies (including Armada) incurred in 2008. *Id.* at ¶¶ 28, 48. A debtor is presumed

---

[3] The AMCOL Defendants' suggestion that Armada did not have a claim until arbitration proceedings commenced is unavailing. *See* 740 ILCS 160/2(c) (defining "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

"insolvent" under the IUFTA when it stops paying debts as they come due, 740 ILCS § 160/3(b), so Armada need not plead particularized facts showing that Ashapura's debts exceeded its assets.  In sum, the allegations set forth in Count I are sufficiently particularized to state a plausible claim of constructive fraud under Section 6(a) of the IUFTA.

Count II also states a plausible claim that the October 2008 dividend payment and December 2009 stock buy back were fraudulent as to Armada under the "actual fraud" provision of the IUFTA.[4] Section 5(a) deems fraudulent a transfer where the debtor acted with "actual intent to hinder, delay, or defraud any creditor." 740 ILCS § 160/5(a)(1).  Armada has alleged several "badges of fraud" supporting a plausible claim of actual intent to defraud. *Id.* at § 160/5(b) (setting forth indicia of actual fraud).

With respect to the October 2008 dividend payment, Armada alleges that three badges of fraud support an inference of fraudulent intent: Ashapura made the transfer (1) to an "insider" (2) when it was "insolvent" and (3) legal action was imminent. *See* 740 ILCS §§ 160/5(b)(1), (4), (9).  These allegations are sufficient to state a plausible claim of actual fraud.  Armada's

---

[4] The AMCOL Defendants attack Armada's constructive fraud claim in Count II on the gound that Armada has failed to plead facts concerning Ashapura's financial condition at the time of the allegedly fraudulent transfers.  *See* Dkt. No. 23 at 12-13.  I rejected this argument as to Count I and need not revisit it as to Count II.

inability to plead which AMCOL entity received the dividend payment does not render the allegation of an "insider" transfer deficient. *See id.* at § 160/2(g) (defining "insider" of a corporate debtor to include a "director" or "person in control" of the debtor). Second, I have already determined that Armada's complaint contains particularized and plausible allegations concerning Ashapura's insolvency in October 2008. It is also plausible that Ashapura knew or should have known that Armada would commence legal action after Ashapura repudiated two multi-million dollar shipping contracts on September 30, 2008. Three badges of fraud are sufficient to state a plausible claim.

With respect to the December 2009 stock buy back, Armada alleges one additional badge of fraud: that the transfer was "concealed and opaque" as evidenced by the AMCOL Defendants' false characterization of the deal during the maritime attachment proceeding. Armada's contention that the AMCOL Defendants sought to conceal the true nature of the stock buy back during previous litigation is at least plausible at this stage. Thus, Armada's allegation in Count II that the December 2009 stock buy back constituted actual fraud is supported by a total of four badges of fraud: (1) a "concealed" transfer of assets (2) to an "insider" (3) when the debtor is "insolvent" and (4) legal action is pending. 740 ILCS §§ 160/5(b)(1), (3), (4), (9).

In sum, Armada has stated particularized and plausible claims of actual and constructive fraud in Counts I and II of its complaint. Count V also survives because it seeks injunctive relief based on the allegatinos in Counts I and II.

The AMCOL Defendants attack Count III, a common law claim for payment of a wrongful dividend, on two grounds that I have already rejected (i.e., Armada's alleged failure to plead sufficient facts relating to Ashapura's insolvency and the precise role of each AMCOL entity in approving the October 2008 dividend payment). Their arguments require no further discussion.

As for Count IV, the AMCOL Defendants argue that "wrongful assumption of debt" is not a cognizable claim. In response, Armada cites the fiduciary duty that a corporation's officers and directors owe to creditors. *See Central States, Southeast and Southwest Areas Pension Fund v. LaCasse*, 254 F.Supp.2d 1069, 1072 (N.D. Ill. 2003) (denying motion to dismiss common law claim brought under "trust fund" theory, pursuant to which corporate assets are held in trust for creditors). Armada's failure to articulate the breach of fiduciary duty theory in Count IV is not fatal at the pleading stage. *See O'Grady v. Village of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002) ("A plaintiff is not required to set forth a legal theory to match the facts, so long as some legal theory can be sustained on the facts pleaded in the complaint."). The important point is that Ashapura's

assumption of a subsidiary's debt may have impaired its ability to satisfy Armada and other creditors during the Indian insolvency proceeding. Thus, Count IV states a plausible claim that assumption of this debt was wrongful as to Armada and other creditors under a breach of fiduciary duty theory.

B.

The AMCOL Defendants seek dismissal of Armada's RICO claims, Counts VI through IX, on three grounds: Armada's purported failure to plead (1) a plausible mail or wire fraud scheme; (2) a pattern of racketeering activity; or (3) a casual link between each RICO violation and Armada's inability to collect on its $70 million judgment against Ashapura.

1.

The statutory provision at issue in Count VI, 18 U.S.C. § 1962(c), prohibits "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. V. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The predicate acts of "racketeering activity" alleged in Armada's complaint are mail and wire fraud. *See* 18 U.S.C. § 1961(1). "The requisite elements of these offenses...are three: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme." *U.S. v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006).

The AMCOL Defendants argue that the scheme alleged in Armada's complaint is facially implausible because it assumes that Ashapura started to shield its asests from creditors preemptively in 2008, well before Armada secured a $70 million arbitration award in February 2010. This attack on Armada's complaint is unpersuasive. According to well-pled and particularlized allegations in Armada's complaint, the AMCOL Defendants (1) knew as early as July 2008 that Ashapura faced significant exposure on two shipping contracts with Armada; (2) conducted or participated in a scheme to shield Ashapura's assets from creditors starting with the October 2008 dividend payment and continuing through the present; and (3) used the mail and wire transmissions to further this scheme. The plausibility of this scheme does not turn on whether the AMCOL Defendants knew precisely when Armada would commence arbitration proceedings or secure a judgment; the alleged scheme plausibly started when Ashapura's exposure on the shipping contracts was foreseeable.

The AMCOL Defendants attack Armada's specific allegations of mail and wire fraud on two grounds: (1) litigation activities, including arguments that a court ultimately rejects, never constitute mail or wire fraud (2) Armada's other allegations of mail and wire transmissions are not plead with sufficient particularity. Neither argument has merit. With regard to the first argument, the AMCOL Defendants have failed to cite any case

14

holding that a mail or wire fraud scheme cannot encompass, as a matter of law, alleged efforts to defraud a creditor through unsupported positions made in prior court filings. "[C]ourts have [indeed] refused to allow 'litigation activities' such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for RICO, but only in circumstances where such acts constitute the only allegedly fraudulent conduct." *Feld Entertainment Inc. v. Am. Soc. for the Prevention of Cruelty to Animals*, 873 F.Supp.2d 288, 318 (D.D.C. 2012) (collecting cases). Here, Armada's allegation that the AMCOL Defendants "obfuscated" the nature of the December 2009 stock buy back in court filings made during the maritime attachment proceeding and Chapter 15 bankruptcy case are simply two predicate acts in a larger scheme of fraudulent conduct. *See* Complaint at ¶ 84.

Armada's complaint also includes particularized allegations of fraudulent wire transmissions, including Ashapura's dividend payment in October 2009, stock buy back in December 2009, purchase of the AMCOL Defendants' allegedly worthless stake in a European joint venture in 2011, assumption of a subsidiary's debt in 2012, and ongoing payments to the AMCOL Defendants for profits generated from an Indian joint venture. Armada has also cited specific mailings allegedly sent in furtherance of the alleged scheme, including two e-mails relating to the December 2009 stock buy back and AMCOL's filing with the U.S. Securities and Exchange

Commission in March 2010 boosting the value of its investment in Ashapura from zero to $25 million based on a change in accounting methods. In short, Count VI contains sufficiently particularized allegations of mail and wire fraud to survive a motion to dismiss.

2.

The AMCOL Defendants next challenge whether Armada's complaint alleges a sufficient pattern of racketeering activity. *See* 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity" as at least two predicate acts over a ten year period). "To fulfill the pattern requirement, plaintiffs must satisfy the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (internal quotation omitted). The AMCOL Defendants focus their attack on the continuity prong.

Continuity under RICO can be open-ended or closed-ended. "[A] RICO plaintiff can prevail by either (1) demonstrating a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022-23 (7th Cir. 1992)). In

16

determining whether closed-ended continuity exists, "[r]elevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). "[N]o one factor...[is] necessarily determiniative." *Id*. at 976.

Applying the *Morgan* factors to this case, I conclude that Armada's complaint contains plausible allegations of closed-ended continuity. Armada's has alleged a wide variety of predicate acts within the general categories of mail and wire fraud--e.g., a dividend payment, stock buy back, assumption of a subsidiary's debt, fraudulent buy out of a joint venture partner, and ongoing backdoor dividend payments as "profits" from another joint venture. These alleged predicate acts started in October 2008 and continue through the present. Armada identifies itself as the principal victim of this scheme, but also identifies other creditors who suffered distinct harms. Complaint at ¶ 33; *see also id*. at Ex. G (¶ 9) (identifying two other shipping companies who obtained arbitration awards against Ashapura).

In sum, Armada has alleged that the AMCOL Defendants conducted or participated in a multi-year scheme to shield Ashapura's assets from creditors through a wide variety of fraudulent transactions. Whether these allegations amount to one

17

purported scheme is not dispositive. *See Morgan*, 804 F.2d at 975-76 ("[T]he mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement."). Although mail and wire fraud are the only predicate acts alleged in Armada's complaint, this is not a case alleging mere replication of a fraudulent mailing or wire transmission. *See Midwest Grinding*, 976 F.2d at 1024 (finding no continuity where "[t]he predicate acts consisted primarily of hundreds of invoices sent through the mails to former...customers"). "Perhaps the most important element of RICO continuity is its temporal aspect." *Roger Whitemore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659 (7th Cir. 2005). The scheme alleged in Armada's complaint spans almost five years and remains ongoing. Therefore, I conclude that Armada has alleged a plausible and particularlized "pattern of racketeering activity" under the closed-ended continuity test.

3.

The AMCOL Defendants' final attack is that Armada failed to plead a causal link between the alleged RICO violations and Armada's inability to collect on its $70 million judgment against Ashapura.

Armada must plead three things to establish a civil cause of action under RICO: "(1) an injury in its business or property (2)

18

by reason of (3) the defendants' violation of section 1962." *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 685 (7th Cir. 2080). The second element requires a showing that each alleged RICO violation proximately caused the plaintiff's injury. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).

With regard to Count VI, the AMCOL Defendants argue that the predicate acts alleged in Armada's complaint did not impair its ability to collect on its $70 million judgment against Ashapura. Armada counters that the alleged pattern of racketeering activity was intended to reduce the assets available to Ashapura after it breached and later repudiated two multi-million dollar shipping contracts. The fact that Armada did not secure arbitration awards against Ashapura until February 2010 is not dispositive as to causation because the triggering event for the alleged scheme was the foreseeability of multi-million dollar exposure as early as July 2008. This is not a case where Armada is indistinguishable from any other creditor who suffers harm after defendants loot a debtor corporation's assets. *Compare Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir. 1991) (affirming dismissal of RICO complaint where plaintiff "was a target of the fraud only in the sense that any corporate creditor is likely to be hurt if the people controlling the corporation so deplete it of assets that it cannot pay a large debt") *with Bankers Trust Co. v.*

*Rhoades*, 859 F.2d 1096 (2d Cir. 1993) (holding that creditors had standing under RICO where defendants allegedly made fraudulent conveyances to frustrate creditors and forced them to defend against frivolous lawsuits). Here, unlike in *Wooten*, Armada alleges that it was the direct target of a scheme to deplete Ashapura's assets as soon as liability to Armada was foreseeable. This allegation is sufficient for Count VI to survive a motion to dismiss based on the purported absence of a causal link between the RICO violation and Armada's inability to collect on its $70 million judgment against Ashapura.

Count VII alleges that the AMCOL Defendants used or invested racketeering income in violation of 18 U.S.C. § 1962(a). In its complaint, Armada asserts that the AMCOL Defendants used or invested racketeering income to operate their own businesses. Complaint at ¶ 103. What Armada fails to explain is how such use or investment of racketeering income--as opposed to the predicate acts of mail and wire fraud--impaired its ability to collect on a $70 million judgment owed by Ashapura. *See Vicom, Inc. v. Harbridge Merchant Servs. Inc.*, 20 F.3d 771, 778 n.6 (7th Cir. 1994) ("[T]he majority of circuits hold that the use or investment of the racketeering income must proximately cause the plaintiff's injury; injury caused by the predicate racketeering acts is inadequate."); *see also Cobbs v. Sheahan*, 385 F.Supp.2d 731, 736 (N.D. Ill. 2005) (collecting district court cases in the

20

Seventh Circuit applying the "investment injury rule"). In an effort to save Count VII, Armada argues that the AMCOL Defendants approved Ashapura's "transfer of business opportunities" to an Indian joint venture and purchase of AMCOL's stake in a "losing European joint venture." Dkt. No. 39 at 33. These allegations are simply two predicate acts in an alleged pattern of racketeering activity. Armada has failed to explain how the AMCOL Defendants' use or investment of income derived from these predicate acts *further* impaired Armada's ability to collect on its judgment against Ashapura. Therefore, Count VII must be dismissed for failing to state a plausible claim of investment injury under RICO.

Count VIII suffers from a similar flaw. "Like § 1962(a), a claim relying on § 1962(b) must allege that the plaintiff's injury resulted from the defendants' acquisition or control of the RICO enterprise, rather than from the predicate acts." *Carnegie v. Household Intern. Inc.*, 220 F.R.D. 542, 546 (N.D. Ill. 2004). Armada has not explained how the AMCOL Defendants' acquisition or control of Ashapura through a pattern of racketeering activity caused harm separate and apart from the predicate acts of wire and mail fraud. Therefore, Count VIII must be dismissed.

The AMCOL Defendants seek dismissal of Count IX on the ground that none of the "overt acts" in furtherance of the

21

alleged conspiracy to violate RICO's substantive provisions proximately caused Armada's inability to collect on its judgment against Ashapura. The "overt acts" alleged in Armada's complaint mirror the predicate acts of mail and wire fraud constituting a scheme to shield Ashapura's assets from creditors. I have already concluded in the context of Count VI that Armada's complaint contains sufficient allegations that the predicate acts of mail and wire fraud proximately caused Armada's inability to collect on its $70 million judgment. It follows that the same predicate acts--when framed as overt acts in furtherance of a conspiracy--constitute sufficient allegations that the alleged conspiracy to violate RICO injured Armada.

The AMCOL Defendants also argue in a footnote that Count IX should be dismissed because Armada fails to allege "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren*, 156 F.3d at 732. Armada's complaint contains particularized allegations that the AMCOL Defendants appointed their senior executives to Ashapura's board of directors and participated in a scheme to shield assets from Armada and other shipping company creditors. These allegations are more than sufficient to state a conspiracy

claim. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)

("The defendant need not personally commit a predicate act;

rather, a plaintiff must allege that the defendant agreed that

someone would commit at least two predicate acts in furtherance

of the conspiracy.").

IV.

The AMCOL Defendants' motion to dismiss is granted as to

Counts VII and VIII and denied as to Counts I-VI and IX for the

reasons stated above.

**ENTER ORDER:**

Elaine E. Bucklo
United States District Judge

Dated: October 25, 2013