**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARMADA (SINGAPORE) PTE LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  13 cv 03455 |
| | ) | |
| AMCOL INTERNATIONAL CORPORATION, | ) | Honorable Elaine E. Bucklo |
| AMERICAN COLLOID COMPANY, | ) | Magistrate Judge Jeffrey Cole |
| VOLCLAY INTERNATIONAL | ) | |
| CORPORATION (n/k/a Volclay International LLC | ) | |
| ASHAPURA MINECHEM | ) | |
| LIMITED, and JOHN DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, Armada (Singapore) Pte. Limited ("Armada"), by its below signed attorneys, for its Complaint against Defendants, Amcol International Corporation ("Amcol"), American Colloid Company ("ACC"), Volclay International Corporation (n/k/a Volclay International LLC) ("Volclay"), Ashapura Minechem Limited ("Ashapura"), and John Does 1-5 (the "John Doe Defendants"), upon knowledge as to its own acts and otherwise on information and belief, alleges as follows:

## PARTIES

1.     At all relevant times, Armada was and still is a corporation organized and existing under the laws of a foreign country with an office and place of business located in Singapore, Republic of Singapore.

2.      At all relevant times, Ashapura was and still is a corporation organized and existing under the laws of a foreign country with an office and place of business located at Jeevan Udyog Building, 3rd Floor, 278, Dr D.N. Road, Fort, Mumbai, 400 001, India.

Additionally, at all relevant times, Ashapura has been, and continues to be, insolvent, including within the meaning of 740 ILCS 160/3, because, amongst other things: (a) the sum of Ashapura's debts has exceeded its assets; and (b) Ashapura has generally not been paying its debts as they became due.

3.     At all relevant times, Amcol, ACC and Volclay (collectively, the "Amcol Defendants") were and still are corporations or other business entities doing business in Illinois and with offices and places of business located at 2870 Forbs Avenue, Hoffman Estates, Illinois.

4.     The John Doe Defendants are individuals residing in Illinois or otherwise subject to the jurisdiction of this Court.  The John Doe Defendants are past and/or present senior officers employed by the Amcol Defendants.  The John Doe Defendants were also appointed by the Amcol Defendants to serve as directors on Ashapura's board of directors in which capacity the John Doe Defendants acted on behalf of, and in accordance with instructions from, the Amcol Defendants.  The John Doe Defendants were, at all material times, agents for the Amcol Defendants.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this dispute pursuant to, 28 U.S.C. §§ 1331 and 1367(a).

6.     This Court also has subject matter jurisdiction over Armada's claims set forth in paragraphs 161 through 162 pursuant to 28 U.S.C. § 1333, and Armada hereby designates such claims as admiralty or maritime claims for purposes of FRCP Rule 9(b).  As such, pursuant to FRCP Rule 9(b) and Rule 38(e), there is no right to a jury trial on issues in those maritime claims.

7.      This court has personal jurisdiction over each of the Defendants in that the Amcol Defendants are doing business in Illinois;  upon information and belief, the John Doe Defendants reside in Illinois; and Ashapura transacts, and does business, in Illinois (as well as throughout the entirety of the United States).   Furthermore, assets which were fraudulent transferred by Ashapura to the AMCOL Defendants are sited in Illinois, and / or the arrangements which were made to effect those fraudulent transfers were negotiated, established and implemented by the AMCOL Defendants in Illinois.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3).

## FACTUAL ALLEGATIONS

*Relationship Amongst the Parties*

9.      At all relevant times, the Amcol Defendants and the John Doe Defendants knew that Ashapura was insolvent and that it did not have available funds to rightfully pay any form of dividends to Ashapura's shareholders (regardless of whether structured as ordinary dividends, stock buy-backs, pay-outs from failed joint ventures and other affiliates, the repayment of antecedent debts owed to insiders, or as proceeds funneled through other channels).

10.      At all material times, Amcol, ACC, Volclay, and the John Doe Defendants were affiliates and/or insiders of Ashapura within the meaning of 740 ILCS 160/2.

11.      Amcol owns 100% of ACC.  Amcol also owns 100% of Volclay.

12.      Through early December 2014 (and thereby after the commencement of this action), the Amcol Defendants, via Volclay, owned approximately 19.9% of Ashapura's stock shares. Until the end of 2009, the Amcol Defendants owned slightly more than 20% of Ashapura's stock.   At all relevant times, the Amcol Defendants were the single largest, non-"promoter group" shareholders of Ashapura.  (The so-called "promoter group" of shareholders is

comprised of members of an Indian family bearing the surname Shah, including Ashapura's managing director Chetan Shah.) Indeed, on information and belief, the Amcol Defendants were the single largest shareholders of Ashapura in all respects.

13. Ashapura was a joint-venture between the Amcol Defendants and the aforementioned Shah family. Indeed, the Amcol Defendants characterized Ashapura as being one of Amcol's joint-ventures in filings with the US SEC. A copy, in pertinent part, of a January 31, 2012 filing by Amcol which demonstrates the same, is attached hereto as **Exhibit A**. The Amcol Defendants exercised their control over Ashapura via directors whom the Amcol Defendants appointed to Ashapura's board and through close coordination between the respective, senior executives from the Amcol Defendants and Ashapura.

14. Accordingly, at time relevant hereto, the Amcol Defendants appointed their senior executives, the John Doe Defendants, to sit as directors on Ashapura's board of directors. The Amcol Defendants had control over the actions of the John Doe Defendants when they served as directors of Ashapura. As such, the John Doe Defendants served as agents for the Amcol Defendants.

15. Furthermore, the AMCOL Defendants' control rights over Ashapura were set forth in certain shareholders agreements amongst Ashapura, the Promoter Group and the AMCOL Defendants. The concerned shareholders agreements were executed in or about 1999 and 2009. (**Exhibit B** is a copy of the "1999 Shareholders Agreement," and **Exhibit C** is a copy of the "2009 Shareholders Agreement.")

16. The 1999 Shareholders Agreement provided, in pertinent part, that:

    a. At least one fifth of the directors on Ashapura's board would be directors nominated by and serving at the will of the AMCOL Defendants;

b. Any contracts between Ashapura and any affiliated entities required the affirmative approval of a director appointed by Volclay at a meeting of the board or the affirmative vote of a representative appointed by Volclay at any annual general meeting;

c. "Diverting any business" which could have been carried on by Ashapura required the affirmative approval of a director appointed by Volclay at a meeting of the board or the affirmative vote of a representative appointed by Volclay at any annual general meeting;

d. Diversifying Ashapura's business into new areas required the affirmative approval of a director appointed by Volclay at a meeting of the board or the affirmative vote of a representative appointed by Volclay at any annual general meeting;

e. The filing by Ashapura of any bankruptcy-type petitions required the affirmative approval of a director appointed by Volclay at a meeting of the board or the affirmative vote of a representative appointed by Volclay at any annual general meeting;

f. Recommending any dividend or distribution beyond 50% of the paid up capital of Ashapura (then stated as equal to Rs150,000,000 or about US$2.5 million) required the affirmative approval of a director appointed by Volclay at a meeting of the board or the affirmative vote of a representative appointed by Volclay at any annual general meeting; and

g. The giving of any guarantees with respect to the obligations of third-parties required the affirmative approval of a director appointed by Volclay at a meeting of the board or the affirmative vote of a representative appointed by Volclay at any annual general meeting.

**(Ex. B § 7)**

17.     The 2009 Shareholders Agreement continued to require that Ashapura obtain the AMCOL Defendants' approval before commencing any bankruptcy-type proceedings.  **(Ex. C § 7)**

18.     However, the 2009 Shareholders Agreement purported to eliminate similar restrictions on Ashapura's ability to divert business to, or otherwise enter into contracts with, its affiliates as well as with respect to various other actions.

19. The 2009 Shareholders Agreement accordingly served as the AMCOL Defendants' pre-approval for Chetan Shah and the other promoters to divert business (or give guarantees) however they deemed fit. The 2009 Shareholders Agreement even provided that the AMCOL Defendants would, if necessary, vote in favor of resolutions sponsored by the Promoter Group regarding such matters. **(Ex. C § 11)**

20. Furthermore, on information and belief, to the extent the AMCOL Defendants might have eventually stopped officially appointing directors to Ashapura's board, they continued to have director-like / board-level involvement in Ashapura's affairs. This was accomplished by virtue of the facts that:

    a. The AMCOL Defendants had entered into several joint ventures with Ashapura, and one such joint venture (Ashapura Volclay Limited or "AVL") simply held its board of directors meetings (i.e., meetings amongst directors appointed by Ashapura and the AMCOL Defendants respectively) on days which were the same or roughly the same as days for meetings of Ashapura's board; and

    b. The AMCOL Defendants thus used AVL board meetings as a vehicle for remaining apprised of, as well as for conducting and/or participating in and otherwise furthering, the conduct of Ashapura's affairs.

21. Indeed, on or about May 27, 2011, there was a meeting of AVL's board of directors. **(Exs. D and E)** In preparation for that meeting, Larry Washow (then Amcol's CEO) ("Washow") wrote that Amcol's goals for the meeting included:

AANV [referring to a then-existing European joint venture between Amcol and Ashapura] share transfer to them [i.e., to Ashapura], getting AMCOL name off AANV business, shipping company law suit [i.e., claims brought against Ashapura] shift to India, CETCO asset extraction from AVL, status of AVL expansion plan, dividend policy, status on "sick company" filing [i.e., Ashapura's plan to file for bankruptcy-type protection in India]

**(Ex. F)** Washow thus looked to, and did, use the AVL meeting(s) as a means for addressing board-level issues relating – not just to AVL – but to Ashapura itself.

22.     Similarly, an email which McKendrick wrote to the AMCOL Defendants' CFO on March 8, 2011 discussed a contemplated deal between Ashapura and the AMCOL Defendants, and stated that "[i]n preparation for the meeting with Ashapura scheduled for March 28, I have prepared the agenda attached.  We are going to make this an official board meeting." Plaintiff has not located the actual attachment to that email.  However, an agenda was sent to Chetan Shah on the same date.  While that agenda is captioned as relating to AVL's board, it expressly confirms that issues relating to Ashapura – as well as to other joint ventures – were to be addressed concurrently.

23.     Furthermore, AVL was not the only joint venture between Ashapura and the AMCOL Defendants.

24.     Specifically, Ashapura and the AMCOL Defendants entered into the following joint ventures:

   a.  AVL was a 50/50 joint venture, structured as an Indian entity, which was engaged in the business of producing and marketing bleaching earth;

   b.  AVL-Unit II was a 50/50 joint venture, structured as an unincorporated business, engaged in producing and marketing geosynthetic clay liners**;**

   c.  Ashapura Amcol NV ("AANV" or the "European JV") was a 50/50 joint venture, structured as a Belgian entity, which served, on information and belief, as a European marketing and/or logistics arm for Ashapura.

25.     As alleged above, Ashapura itself was a joint venture between its Promoter Group and the AMCOL Defendants.  On information and belief, as of 1999 when the AMCOL Defendants first invested in Ashapura, it was primarily focused on the business of producing and marketing bentonite.  However, in the years which followed, it became much more involved in

the business of producing and marketing bauxite. Bauxite eventually came to account for approximately 82% of Ashapura's revenue. **(Ex. G at 4)**

***Ashapura and its Bauxite Business***

26.     By 2007 and early 2008, Ashapura expected to sell large quantities of bauxite into the Chinese market. It therefore entered into two categories of contracts intended to complement those sales. In particular, it entered into numerous foreign exchange ("FX") contracts to hedge the dollars to rupees exchange rate. It also entered into long-term shipping contracts of affreightment (multi-year commitments for the transportation of bulk cargo) to ensure the availability of ocean going tonnage to carry its bauxite.

27.     However, in or about early 2008, Ashapura reportedly encountered problems with ***some of its bauxite sources***. It then defaulted on the corresponding contracts of affreightment and, without delivering on its bauxite sales, lacked sufficient cash flow to cover obligations on its FX contracts. All of this occurred during 2008 and Ashapura ceased to be a solvent entity at that time, at the latest.

28.     Moreover, the AMCOL Defendants knew that Ashapura was in dire financial straights amounting to insolvency, including that:

    a.  On March 19, 2008, Chetan Shah wrote to the AMCOL Defendants that Ashapura did not have sufficient cash flow with which to fund its obligation to finance AANV **(Ex. H)**;

    b.  In May 2008, at the latest, the AMCOL Defendants observed that Ashapura was late on paying commercial debts owed to various AMCOL affiliates **(Ex. I)**. Such late payments mounted and, by February 2009, stood at over $220,000 including amounts which were ***past due by over one year*** **(Ex. J)**;

    c.  On October 27, 2008, Amcol's then CEO, Larry Washow, informed its board that Ashapura's bauxite-related problems were going to cause its fourth quarter 2008 performance to involve a loss of at least $500,000 which was a $2 million change from the preceding quarter **(Ex. K)**;

    d.   On December 17, 2008, an Amcol representative / employee in India wrote to Scott Solotorovsky and Ryan Mckendrick (senior Amcol executives) that "Ashapura have major problems" **(Ex. L)**; and

    e.   During the course of late 2008 and through 2009, the AMCOL Defendants restated their financial reporting so as to address the impact on the AMCOL Defendants of Ashapura's losses on foreign exchange contracts which had previously gone unaccounted for **(Ex. M)**.

29.    At a minimum, by Spring 2008, the AMCOL Defendants knew that Ashapura could not pay its debts as they were becoming due.  Soon thereafter, they knew that its bauxite-related problems were very substantial.

30.    Given that, as of early 2008, Ashapura was not generally paying its debts as they became due, Ashapura was insolvent, and is presumed to have been insolvent, as of that time which began, more specifically, no later than March 2008.  Moreover, by August 2008, at the latest, the AMCOL Defendants were on notice of the bauxite-related problems at Ashapura.

31.    The AMCOL Defendants reacted to that knowledge by beginning to extract whatever value or assets they could out of their multiple commercial combinations with Ashapura, including by way of the following:

    a.   In mid-2008, the AMCOL Defendants implemented a program of "contra-charging" Ashapura on a group wide basis and without any respect for corporate separateness.  Basically, the AMCOL Defendants (and/or their affiliates) withheld payments which were admittedly due to Ashapura on the grounds that Ashapura's affiliates owed money to the AMCOL Defendants (and/or their affiliates).  By May 2009, the AMCOL Defendants' unilaterally imposed program of contra-charging had denuded Ashapura of approximately **$250,000** in revenues.  **(Ex. N)**

    b.   In October 2008, at a time when Ashapura was already insolvent and when the AMCOL Defendants had two of their executives sitting on Ashapura's board, Ashapura paid a dividend.  The dividend paid to the AMCOL Defendants was approximately **$550,000 (Ex. O)**, and the dividend paid to all shareholders was, on information and belief, approximately **$2.75 million.**

    c.   In December 2009, the AMCOL Defendants coordinated a further transfer in the amount of about **$800,000** made by way of a stock buyback from the AMCOL Defendants of about 1% of Ashapura's shares.

    d.   In June 2011, the AMCOL Defendants arranged for Ashapura to repay 50% of an antecedent debt. The total amount of that antecedent debt was approximately €7.1 million in principal plus additional sums for accrued interest. Ashapura made a payment-in-kind (assets and equity associated with AVL-Unit II) to pay-off 50% of that debt (or approximately **$5.3 million**).

    e.   Also in June 2011, the AMCOL Defendants realized the recovery of their €1.5 million (or approximately **$2.3 million**) equity investment in AANV. That money was either paid directly by Ashapura or indirectly via an offshore paying agent.

    f.   On information and belief, in late 2013 or early 2014, Ashapura repaid the remaining 50% (or approximately **$5.3 million**) of the aforementioned antecedent debt by way of another payment-in-kind.

    g.   Also in late 2013, the AMCOL Defendants arranged to sell their entire stake in Ashapura for about **$13 million**. Correspondence concerning that transaction reflects that Ashapura was intended to be (or may have been) the purchaser or beneficial interest standing behind the purchaser.

32. At a minimum, between 2008 and 2011 (*see* points 'a' through 'e' in the sub-paragraphs above), the AMCOL Defendants recovered approximately **$9 million** from Ashapura on account of dividends, stock buybacks, antecedent debts, the sale of a stake in an economically failed joint venture, and a legally baseless program of group-wide contra-charging. All of this was done while Ashapura was insolvent, and while the AMCOL Defendants were Ashapura insiders.

33. This action seeks, amongst other things, to void and recover, at a minimum and amongst other things, that **$9 million** on the grounds that it was transferred by way of a series of fraudulent transfers.

34. To the extent that any other sums were paid to the AMCOL Defendants by Ashapura (on account of stock buybacks, the further repayment of antecedent debts, or in any

other way falling within the scope of laws concerning fraudulent transfers), this action seeks recovery of the same. On information and belief, such additional fraudulent transfers (*see* points 'f' and 'g' of the sub-paragraphs above, and without prejudice to Armada's rights with respect to any other transfers) ranged from an additional $5.3 million to more than $18 million.

35.     Furthermore, not only did the AMCOL Defendants and Ashapura engage in a series of fraudulent transfers during Ashapura's insolvency but, the AMCOL Defendants otherwise conspired with Ashapura in furtherance of its plan to frustrate Armada's efforts to enforce its rights as a legitimate, unaffiliated creditor. Such aid ranged from expressly agreeing to help Ashapura circumvent its exposure to maritime attachment proceedings to facilitating Ashapura's commencement of a US bankruptcy proceeding which the AMCOL Defendants knew was a sham. The AMCOL Defendants' collaboration with Ashapura in furtherance of its sham bankruptcy proceedings advanced a process whereby Ashapura hid assets from creditors and such hidden assets were, on information and belief, equal to a sum in excess of **$30 million**. This, along with other wrongful actions, also caused Armada to incur expenses caused by the concerned sham bankruptcy.

36.     The Defendants engaged in such scheming for the purpose of frustrating the ongoing efforts made by Armada to enforce its rights as an unaffiliated creditor of Ashapura which rights sprung from Ashapura's repudiation of two long-term contracts of affreightment for the carriage of bauxite.

***The COAs between Armada and Ashapura***

37.     During April 2008, Armada and Ashapura entered into two long-term contracts of affreightment (the "COAs") for Armada to provide vessels to transport over 60 cargoes of bauxite for Ashapura. The first COA was dated April 4, 2008 (the "First COA") and its term ran

from April 2008 to April 2012. The second COA was dated April 12, 2008 (the "Second COA") and its term ran from September 2008 to March 2011.

38.     Ashapura breached the First COA early in its term. Specifically, an early voyage under the First COA was performed by the MV CAROLA. Ashapura failed to pay $886,024.00 in amounts which were due to Armada, on account of the CAROLA voyage, by September 16, 2008, at the latest.

39.     Ashapura also failed to nominate or provide any further cargoes for carriage under the First COA when it was obligated to do so. Ashapura additionally failed to nominate or provide any cargoes for carriage under the Second COA when it was obligated to do so.

40.     Moreover, by or before September 30, 2008, Ashapura wrongfully repudiated both COAs when it sent a message to Armada stating, in pertinent part, that Ashapura was giving "formal notice that we regard the COA[s] as terminated." Accordingly, by September 30, 2008, at the latest, Ashapura had wrongfully repudiated the COAs. Also, on information and belief, the decision that Ashapura would breach and repudiate the COAs was made well prior to September 2008.

41.     Armada therefore commenced two arbitration proceedings (a separate arbitration with respect to each COA) against Ashapura in London.

42.     Armada prevailed in both arbitrations by way of awards issued on February 16, 2010. A copy of the award issued with respect to the First COA is attached hereto as **Exhibit P**. A copy of the award issued with respect to the Second COA is attached hereto as **Exhibit Q**.

43.     Both awards were recognized, confirmed and entered as enforceable judgments, in a principal amount that exceeded $70 million, by the United States District Court for the Southern District of New York. A copy of the Order, dated July 29, 2011, which granted the

New York judgment is attached hereto as **Exhibit R**. The New York judgment was then registered with the United States District Court for the Northern District of Illinois pursuant to an Order, dated October 30, 2012. A copy of the Order granting Armada's petition to register the New York judgment is attached hereto as **Exhibit S**.

44. Despite holding a judgment in excess of $70 million against Ashapura, Armada has only been able to recover a fraction of that judgment.

45. Specifically, Armada previously commenced a maritime attachment proceeding against Ashapura in the Northern District of Illinois pursuant to FRCP Supplemental Rule B (the "Rule B Action"). The entities which were the garnishees in the Rule B Action included the entities which are named as the Amcol Defendants in this action. Property (in the form of debts owed by the Amcol Defendants to Ashapura) was successfully garnished and was eventually turned-over to Armada in the amount of approximately $687,000.00.

46. One of the transactions which gave rise to the debts garnished in the Rule B Action was a stock buy-back (the "Stock Buy-Back"). In connection with that transaction, Ashapura purchased its own stock from the Amcol Defendants at the end of December 2009. Shortly thereafter, the stock plummeted in value, as reflected in a stock price chart (hereafter annexed as **Ex. Ll**). This date was only a few weeks before issuance of the London arbitral awards which all concerned parties knew, or reasonably expected, would award massive amounts in favor of Armada.

47. The market price paid for the stock exceeded the price which had been agreed upon by the parties to the transaction. Amcol therefore owed a refund to Ashapura, which had a follow-on obligation to funnel the same funds to an Amcol subsidiary.

48.     That refund (hereinafter referred to as the "Excess Proceeds") is not at issue in this action but is described for background purposes.  Specifically, as determined by the Court in the Rule B Action, the Excess Proceeds constituted a debt which the Amcol Defendants owed to Ashapura.  Therefore, Armada successfully garnished, and eventually obtained the turn-over of, the Excess Proceeds.

49.     That turn-over did not occur immediately after the time at which the Court in the Rule B Action determined that the Excess Proceeds were owed to Ashapura.  Instead, there was a delay occasioned by, *inter alia*, Ashapura's filing of a Chapter 15 bankruptcy petition seeking United States recognition of an insolvency proceeding which Ashapura had commenced before India's Board of Industrial and Financial Reconstruction (the "BIFR").

### The BIFR Proceeding and the Chapter 15 Proceeding

50.     Ashapura's proceeding before the BIFR was commenced following a determination made in conjunction with the Amcol Defendants.  Such a determination would have required Ashapura to obtain the approval of the director(s) who had been appointed to Ashapura's board by the AMCOL Defendants and/or to obtain the AMCOL Defendants' approval by way of other approval mechanisms.  Also, that decision was part of a scheme planned by Ashapura and the Amcol Defendants, together with the John Doe Defendants, to hinder, delay and defraud Armada in pursuit of enforcing its judgment.

51.     Ashapura commenced its insolvency proceedings before the BIFR in May 2011 and it did so on the alleged grounds that claims (as Ashapura described them) asserted by shipping companies, including Armada, made Ashapura's losses exceed its net worth.   Notably, such "claims" represented debts which Ashapura incurred in 2008 and which have not (as to amounts owed to Armada) been included as debts scheduled for payment in connection with

Ashapura's BIFR proceedings. Accordingly, the status of such claims (pursuant to Ashapura's accounting methods) is the same today as it was in 2008. Ashapura's status as an insolvent entity therefore commenced, pursuant to Ashapura's own accounting methods, as early as 2008. That was also a time at which Ashapura stopped generally paying its debts as they became due and was therefore, in any event, presumed to be insolvent by that time. Ashapura was insolvent in 2008.

52.     Ashapura's commencement of the BIFR proceeding involved a determination made with the AMCOL Defendants or which was otherwise approved by the AMCOL Defendants, to wit:

a.  The 2009 Shareholders Agreement (as with the 1999 Shareholders Agreement) expressly required the approval or affirmative vote of a director or representative appointed by the AMCOL Defendants before any resolution could be passed concerning "amalgamation, consolidation, merger, termination, dissolution or liquidation [of Ashapura] . . . or filing of a voluntary petition in bankruptcy or similar relief . . ." **(Ex. C)**;

b.  According to the BIFR, Ashapura's decision to make that filing was based upon a determination made at Ashapura's May 30, 2011 Board of Directors Meeting ***and*** based upon a determination made at Ashapura's "AGM" or Annual General Meeting. **(Ex. T)**; and

c.  The AMCOL Defendants had advance notice that Ashapura intended to file for "sick company" status with the BIFR because Chetan Shah told the AMCOL Defendants' executives the same in April 2011, and that information was then reported to AMCOL's board of directors, noting that the intended filing was due to actions commenced by shipping companies plus Ashapura's problems with FX contracts. **(Ex. U)**

53.     The AMCOL Defendants also knew that Ashapura intended its BIFR proceeding to be a complete sham. That is so because, only a few days before Ashapura commenced its BIFR proceeding, it diverted its bentonite line of business to an affiliate known as Ashapura International Limited **(Ex. V)**. The most senior leadership at the AMCOL Defendants (including new CEO Ryan McKendrick and CFO Don Pearson) were aware of that diversion **(Ex. V)**.

Ashapura was thus shifting assets in order to prepare for a fraudulent bankruptcy proceeding. The Amcol Defendants concurrently knew it was readying a bankruptcy filing and, at the same time, shifting massive assets. Furthermore, in 2007, the AMCOL Defendants (who had an ongoing interest in acquiring the bentonite business) had valued Ashapura's bentonite sector at up to nearly $60 million (**Ex. W**) and, in 2013, the AMCOL Defendants valued a distinct portion of that business (foundry grade bentonite, bentonite reserves and some related equipment) at nearly $30 million (**Ex. X**). Regardless of the precise valuation for the business which Ashapura wrongfully transferred to an affiliate on the eve of a bankruptcy-type filing, it was nonetheless in the range of tens of millions of dollars.

54.     Not only were the AMCOL Defendants, at a minimum, on notice that Ashapura had wrongfully transferred its bentonite business to an affiliate on the eve on an Indian bankruptcy-type filing, but the AMCOL Defendants also facilitated Ashapura's furtherance of that sham by way of a parallel bankruptcy filing in the United States.

55.     At the time when Ashapura commenced its BIFR action, Armada's Rule B Action was still pending with respect to the attachment of the Excess Proceeds which the AMCOL Defendants had agreed to refund to Ashapura for follow-on payment to an AMCOL affiliate in Europe. The AMCOL Defendants wanted to see the Excess Proceeds used for that purpose because those funds related to a larger transaction by which the AMCOL Defendants intended to divest themselves of their interest in AANV and see Ashapura repay a substantial portion of the **€7.1 million** antecedent debt (plus accrued interest) it had incurred in connection with establishing AANV. (That larger transaction is further described hereinafter under the subsection concerning certain "Restructuring Transactions.")

56.     When it became apparent that the Court handling the Rule B Action would, by early September 2011, make a final ruling directing the AMCOL Defendants to pay the Excess Proceeds to Armada, the AMCOL Defendants warned Ashapura that it should be ready to commence a Chapter 15 bankruptcy proceeding in the United States.  Specifically, on September 17, 2011 (after the Court in the Rule B Action had entered judgment in favor of Armada, but while a stay of enforcement was in place), McKendrick wrote to Chetan Shah that:

> We received an update from our attorneys handling the matter of Armada's claim against the funds received from the Ashapura stock sale.  The judge hearing the case has granted a stay of several weeks for additional briefing on this matter. The Judge will probably issue another ruling on or around October 7.  I just wanted you to be aware of this development and the time frame.  You should contact Ashapura's US counsel to discuss any steps that you or Ashapura may want to take.  I will call you on Monday morning your time to discuss – if you are available.

**(Ex. Y)**

57.     Promptly thereafter, Ashapura (having already commenced its BIFR insolvency proceeding a few days after transferring its bentonite business to an affiliate), via its managing director, Chetan Shah ["Shah"] as its foreign representative, filed, on October 4, 2011, a Chapter 15 bankruptcy petition in the United Stated Bankruptcy Court for the Southern District of New York seeking US recognition of the BIFR proceeding.  A copy of the Declaration of Chetan Shah which was filed in support of the Chapter 15 petition is attached hereto as **Exhibit Z**.

58.     At about the same time, on October 5, 2011, Ashapura obtained a temporary restraining order prohibiting creditors, such as Armada, from commencing, continuing, or seeking discovery with respect to Ashapura or its assets in the United States.  Ashapura's Chapter 15 proceeding was just the latest salvo in its scheme, planned with the Amcol Defendants, to hinder, delay and defraud Armada.  That is so because the determination to seek Chapter 15 recognition would have required Ashapura to obtain the approval of the director(s)

who had been appointed to Ashapura's board by the Amcol Defendants. Furthermore, all of Ashapura's bankruptcy-type proceedings were fraudulently commenced because, *inter alia*, Ashapura (with the full knowledge of the AMCOL Defendants) had transferred its bentonite business to an affiliate merely days before initiating its various bankruptcy proceedings, and this was done in order to conceal assets from creditors. Furthermore, the AMCOL Defendants' CEO kept Ashapura's management abreast of developments in Armada's then-pending Rule B Action. That was done so that Ashapura could perfectly time the filing of its Chapter 15 action in order to maximize the resulting degree of frustration to Armada's efforts to secure / enforce its rights.

59.     That scheme worked.   Although the TRO which Ashapura obtained was terminated on or about October 24, 2011, the bankruptcy court thereafter granted Ashapura's petition and recognized the BIFR proceeding as a foreign main proceeding.  Ashapura's petition and request for recognition were granted on November 22, 2011, giving rise to an automatic stay against creditor actions within the territorial jurisdiction of the United States.  The automatic stay remained in effect until October 5, 2012 when the bankruptcy court terminated recognition of the BIFR proceeding and dismissed the Chapter 15 case.  Termination of the recognition of a foreign insolvency proceeding was an exceptional event in a Chapter 15 case and the record from that case highlights numerous instances of Ashapura's bad faith.

60.     Throughout, the Amcol Defendants were, on information and belief, actively coordinating with Ashapura regarding its wrongful conduct in furtherance of their joint scheme to hinder, delay and defraud Armada which had been ongoing since 2008 when it was first determined that Ashapura would breach contractual obligations owed to Armada but would nonetheless wrongfully pay dividends (or their equivalent) to its shareholders, including the

Amcol Defendants. Such coordination regarding Ashapura's bankruptcy filings is evidenced by,

*inter alia*:

a. Line 3105 of the AMCOL Defendants' Privilege Log (dated August 4, 2014) which asserts attorney-client and joint defense privilege over a May 19, 2011 email from Ajay Phalod (Ashapura's CFO) to Don Pearson (Amcol's CFO). That message purportedly concerned "a confidential telephone communication between Charles Cummin[gs] [an attorney for Ashapura though identified in the Privilege Log as an attorney for Amcol] and AMCOL's attorney regarding the Armada litigation." **Exhibit Aa**. This message approximately coincided with Ashapura's shift of its bentonite business to an affiliate, as well as with its commencement of the BIFR action. Moreover, Mr. Cummings' firm, Baker & McKenzie, represented Ashapura in the Chapter 15 case but was not overtly involved in the Rule B Action.

b. Line 880 of the AMCOL Defendants' Privilege Log **(Ex. Aa)** similarly asserts attorney-client privilege and work-product protection over a September 25, 2012 memo-to-file by Ira Reid, another attorney with Baker & McKenzie who served as lead counsel for Ashapura in the Chapter 15 action. That memo-to-file is described as a "confidential memorandum from attorney to client in regard to Chapter 15 protection." Notably, the memo-to-file's date falls roughly between (i) the date on which the Bankruptcy Court ordered Ashapura to, inter alia, post security equal to 10% of Armada's judgment and (ii) the date on which the Bankruptcy Court terminated its recognition of the BIFR proceeding and dismissed Ashapura's Chapter 15 action for, inter alia, Ashapura's failure to post the required security.

c. Additionally, in conjunction with its Chapter 15 action, Ashapura filed a brief on October 21, 2011 which annexed a declaration made by the attorney who served as counsel for the AMCOL Defendants in the Rule B Action (and who later appeared in the Chapter 15 proceeding on their behalf). The concerned brief was a reply made by Ashapura in further support of its application for provisional relief staying Armada's efforts to have the Excess Proceeds turned-over to it by the AMCOL Defendants. The basic argument made in the brief was that the Excess Proceeds (contrary to the position which the AMCOL Defendants had taken in the Rule B Action) belonged to Ashapura, and that the absence of provisional relief would cause immediate harm to Ashapura since the Excess Proceeds would otherwise be paid to Armada and the underlying obligation owed to Ashapura would be extinguished. The accompanying declaration by the AMCOL Defendants' counsel set forth certain positions being taken by the AMCOL Defendants. That included a statement that payment (of the Excess Proceeds) to Armada would mean that there would be "no remaining obligation to Ashapura." **(Ex. Bb)** However, that representation to the Bankruptcy Court in support of preventing Armada from recovering less than 1% of its judgment was misleading. That is so

because both Ashapura's brief and the AMCOL Defendants' declaration failed to inform the Bankruptcy Court that the debt underlying the Excess Proceeds *had already been extinguished in June 2011* by way of a series of other, interrelated transactions between Ashapura and the AMCOL Defendants. **(Ex. Cc [an August 4, 2011 memorandum by the AMCOL Defendants' comptroller providing that the debt underlying the Excess Proceeds was "relieved" by virtue of a June 30, 2011 transaction]).**

61. A primary purpose - if not the sole purpose - of Ashapura's Chapter 15 action was to prevent Armada from recovering $687 thousand and that purpose was pursued in order to benefit the AMCOL Defendants who would have avoided having to pay the Excess Proceeds to Armada.

62. The collaboration between Ashapura and the AMCOL Defendants constituted an abuse of the bankruptcy process in furtherance of an overall scheme to defraud Armada.

63. Neither Ashapura nor the AMCOL Defendants, despite having appeared in Ashapura's Chapter 15 action, ever informed the Bankruptcy Court that Ashapura had, days before commencing its BIFR proceeding, shifted its entire bentonite business to an affiliate. That is particularly notable because, since at least November 18, 2007, the AMCOL Defendants had been interested in acquiring the bentonite business (**Ex. W**) and, beginning in about 2013, they entered into extensive negotiations to do just that (at least with respect to that portion of the bentonite business which produced and marketed foundry-grade product).

64. When the AMCOL Defendants instructed or otherwise caused their attorney to submit a declaration in support of positions being taken by Ashapura's foreign representative, Chetan Shah, in the Chapter 15 action, they did so despite being on notice that Chetan Shah was an inappropriate person to be entrusted with the responsibilities of an approved foreign representative for Ashapura.

65. That is so because (amongst other things and as of March 10, 2011, at the latest) senior AMCOL executives (including Ryan McKendrick and Gary Castagna) were on notice that "the 'rumors' in Ashapura were that money from Bauxite sales were going into a private Chetan Dubai company at very favorable prices which may bankrupt Ashapura." (**Ex. Dd**). With such notice in hand, it was wrongful for the AMCOL Defendants to take any steps in furtherance of Chetan Shah's actions as Ashapura's foreign representative.

66. On information and belief, the AMCOL Defendants took steps in furtherance of Ashapura's fraudulent manipulation of the bankruptcy system because doing so also advanced the overall objective of their scheme which was to return capital to Ashapura's major shareholders (such as Chetan Shah and the AMCOL Defendants) while defrauding a legitimate creditor such as Armada.

***The Scheme to Defraud Armada while Returning Capital to Ashapura Shareholders***

67. The purpose underlying the aforementioned scheme was for Ashapura to return capital to shareholders, many of whom, including the Amcol Defendants, were affiliates and insiders of Ashapura, in order to frustrate creditors.

68. Ashapura's Chapter 15 action was just one part of that scheme. Other elements of that scheme are described in the sub-sections which follow.

- ***The AMCOL Defendants "Contra-Charging"Ashapura for Debts Owed to Affiliates***

69. By Spring 2008, at the latest, the AMCOL Defendants knew that Ashapura was not paying its debts as they became due.

70. Additionally, some Ashapura affiliates, such as AVL, were concurrently purchasing products from the AMCOL Defendants (and/or their affiliates) but were not making their corresponding payments as they became due.

71.     AVL was a joint venture between Ashapura and the AMCOL Defendants.  Thus, the AMCOL Defendants had a pecuniary interest in seeing that it could receive the products needed for its operations.  The solution was simple – though wrongful.  The AMCOL Defendants would just "contra charge" Ashapura.

72.     As an executive with the AMCOL Defendants wrote, on June 11, 2008, to their representative who was apparently seconded to Ashapura and AVL, AVL could just "order as much as you want from the USA on open credit at the normal terms.  CETCO USA [an AMCOL affiliate] will just contra charge Ashapura [Minechem] for any outstanding invoices."  **(Ex. Ee).**

73.     Basically, if a purportedly separate corporate entity (such as AVL) owed money to the AMCOL Defendants (or their affiliates), the AMCOL Defendants treated that debt as being owed by Ashapura.  The AMCOL Defendants would thus set-off the third-party debt against obligations which the AMCOL Defendants (or their affiliates) owed to Ashapura Minechem.

74.     This approach was implemented throughout the AMCOL group of companies and exhibited complete disregard for corporate separateness.

75.     As of May 2009, the amount owed to Ashapura by various companies within the AMCOL group on account of the contra-charging program exceeded $240 thousand **(Ex. Ff).**  (At roughly the same time, the corresponding amounts owed by AVL to various companies affiliated with the AMCOL Defendants exceeded $220 thousand **(Ex. J)**.

76.     Ashapura initially objected to the AMCOL Defendants' contra-charging program.  On information and belief, the defendants' disagreement over that program was eventually resolved.  However, Armada does not know whether any such resolution involved (a) direct

payment to Ashapura of the amounts owed to it or (b) Ashapura's acquiescence to the contra-charging program or some variation thereof.

77.     To the extent that any debts owed by the AMCOL Defendants (or their affiliates) were not satisfied by way of payments made *directly to Ashapura*, the adjustment or withholding of those debts constituted the economic equivalent of transfers from the insolvent Ashapura to its insiders.

- ***The AMCOL Defendants helped Ashapura Circumvent Maritime Attachment Proceedings***

78.     The grounds upon which Armada bases its belief that Ashapura and the AMCOL Defendants eventually resolved the contra-charging issue is that, at about the same time as when the AMCOL Defendants unilaterally implemented that program, they also came to decide that they should help Ashapura avoid its exposure to maritime attachment proceedings in the Southern District of New York which Armada had first commenced on or about September 25, 2008.  More specifically, Armada had commenced two such maritime attachment proceedings against Ashapura in the Southern District of New York.  One was commenced for each of the COAs and the concerned actions were assigned case numbers 08-cv-8257 and 08-cv-8258.

79.     In conjunction with those cases, Armada obtained attachment orders pursuant to which dollar denominated wire transfers involving Ashapura could be seized as security.

80.     Those orders were issued in September 2008.

81.     Soon thereafter (by January or February of 2009 ***at the latest***), the AMCOL Defendants agreed to help Ashapura avoid its exposure to such proceedings by making payments – not by way of dollar denominated wires – but by way of Euros.  This was done even if the underlying contracts or purchase orders called for dollars.

82.     Particular actions and documents which evidence the forgoing "Euro Payment Scheme" include the following:

a.  On January 12, 2009, an Ashapura accounting representative wrote to senior personnel with the AMCOL Defendants (including one, Gary Castagna, who was also an Amcol-appointed director of Ashapura). In that January 12, 2009 communication, Ashapura noted that "as you know we cannot accept any US dollars as of now – can you please convert [the invoiced] amount into equivalent Euro's at the prevalent exchange rate . . . and send us the payments in Euro's." **(Ex. J)**;

b.  The AMCOL Defendants' own records regarding meetings in India between AMCOL personnel and Ashapura personnel in March 2009 confirm that the agreement to make payments in Euros was in response to the effect caused by lawsuits commenced by various shipping companies. Indeed, the AMCOL Defendants' minutes regarding such meetings record that the shipping lawsuits had "resulted in [Ashapura's] Dollar denominated Account being 'frozen' and a request from them to conduct business in Euros" **(Ex. Gg)**;

c.  A May 20, 2009 message from Ashapura's accounting personnel to the AMCOL Defendants' corresponding personnel again requested that payment be made in Euros and that it be sent – not by the contractually obligated counter-party – but from any of the AMCOL Defendants' *European affiliates* **(Ex. Ff)**;

d.  Additionally, the AMCOL Defendants unequivocally consented to this scheme and took steps to further it. Indeed, Euros were used (even where contracts called for dollars) not only for payments going to Ashapura but also for payments being made by Ashapura to any of the AMCOL Defendants and/or their affiliates. All of the defendants went to great lengths to ensure that such transactions would avoid the maritime attachment nets which had been cast in New York to seize wire transfers involving Ashapura. For instance, in connection with a particular August 2009 payment which Ashapura owed to CETCO (US), the plan was that Ashapura would make a payment in Euros to CETCO (Europe) which would then tell CETCO (US) that the funds had been received and CETCO (US) would then tell its bank to inform Ashapura's bank that documents of title could be released to Ashapura. This complex web was planned, approved and implemented by senior executives of the AMCOL Defendants. **(Ex. Hh)**.

83.     If the AMCOL Defendants had not agreed with Ashapura to circumvent such maritime attachment proceedings during 2009, then some or all of such payments would have been seized.

84. The Defendants' conduct deprived Armada of security in the form of seized transfers.

85. Furthermore, seizing transfers between the AMCOL Defendants and Ashapura would have alerted Armada to the extent of commercial dealings between those entities such that Armada would have looked to garnish the AMCOL Defendants earlier than it ultimately did. Thus, the underlying debts owed by the AMCOL Defendants to Ashapura would have been seized, not while being processed by an intermediary bank, but while in the hands of the actual debtor.

86. Armada does not know the full amount which would have been seized but it would have been at least $90,000. That is because, in connection with the Rule B Action, the AMCOL Defendants controller signed a declaration stating that, from May 29, 2009 through September 8, 2010, the AMCOL Defendants paid approximately $90,000 to Ashapura (**Ex. Ii**).

87. On information and belief, given that substantially more than $90,000 was owed to Ashapura as of May 20, 2009 (**Ex. Ff**), but had been withheld in connection with the contra-charging program, either: (a) additional sums were paid by affiliates of the AMCOL Defendants during the same period of time and the defendants' conniving enabled such sums to circumvent the various maritime attachments; or (b) such sums were withheld from, and never paid to, Ashapura pursuant to the contra-charging program.

88. Either way: (a) any and all debts which the AMCOL Defendants (or their affiliates) paid to Ashapura, from January 2009 onwards via Euros transfers, are recoverable as damages by Armada because the AMCOL Defendants were wrongfully helping Ashapura avoid maritime attachments; or (b) any and all debts which the AMCOL Defendants (or their affiliates) withheld from Ashapura, at anytime pursuant to the contra-charging program, are recoverable by

Armada because such withholdings constitute Ashapura's property which the AMCOL Defendants wrongfully transferred to themselves.

89.     On information and belief, the total amount of such debts exceeded $220,000.00.

90.     The conduct underlying the contra-charging program and the Euros payment program (as well as the aforementioned collaboration relating to Ashapura's bankruptcy-type proceedings) is reflective of the manner in which Ashapura and the AMCOL Defendants mutually endeavored to defraud Armada as one of Ashapura's unaffiliated creditors. Both before and afterwards, there was other wrongful conduct by which the defendants ultimately defrauded Armada of substantially larger sums.

- ***The 2008 Dividend and the 2009 Stock Buyback***

91.     From the time at which Ashapura breached the COAs in 2008 through the present, it has repeatedly and wrongfully made pay-outs to the Amcol Defendants while depleting its own assets and failing to pay Armada.

92.     The Amcol Defendants knew this was occurring. They also willfully directed and facilitated the same. This pattern of conspiring with respect to wrongful and deceitful conduct, much of which was carried-out through mail and wire transmissions, began at or before the time of the decision to breach the COAs and has continued through the present.

93.     Notably, Ashapura held an Annual General Meeting ("AGM") of shareholders on September 24, 2008. Larry Washow and Gary Castagna, as directors appointed by the AMCOL Defendants were present for that AGM during which the topics addressed included Ashapura's bauxite-related problems **(Ex. Jj)**. Six days later, on September 30, 2008, Ashapura repudiated the COAs. By the time when Armada exercised its right to accept Ashapura's repudiation of the First COA as yielding termination (May 1, 2009 as is set forth at paragraph 7 of the First

Award's Reasons), the AMCOL Defendants had already agreed to help Ashapura avoid maritime security actions by way of the aforementioned Euros payment plan.

94.     Thus, beginning in October 2008 and over the course of several years which followed, Ashapura made multiple, wrongful payouts to the AMCOL Defendants' benefit.

95.     In or about October 2008, Ashapura transferred funds, equal to, at least, $550,000.00, to the Amcol Defendants in connection with the payment of a dividend to Ashapura's shareholders (the "Dividend Fraudulent Transfer"). That payment was received on October 10, 2008 in the form of a wire transfer.

96.     The Amcol Defendants owned approximately 20% of Ashapura's shares; thus the total amount paid to all shareholders in connection with the aforementioned dividend was upwards of $2,750,000.00 (the "Wrongful Dividend").

97.     Thereafter, in or about December 2009, Ashapura effectively paid a further dividend. That dividend was only paid to the Amcol Defendants and was made by way of the Stock Buy-Back. The net amount paid to the Amcol Defendants in connection with the Stock Buy-Back was equal to, at least, $820,000.00 (the "Buy-Back Fraudulent Transfer").

98.     The Amcol Defendants sought to obfuscate the nature of the Buy Back Fraudulent Transfer when they stood as garnishees in the Rule B Action.

99.     The Stock Buy-Back obligated the Amcol Defendants to refund the Excess Proceeds to Ashapura which was to then funnel the same Excess Proceeds to an Amcol subsidiary.

100.     In order to obfuscate the nature of that transaction during the Rule B Action, the garnishees, who are now the Amcol Defendants in this case, contended that the Excess Proceeds

were owed to Ashapura's managing director, Shah, rather than to Ashapura itself.  The Court in

the Rule B Action rejected that contention and noted that:

> [The garnishees] would benefit greatly from a determination that the excess stock proceeds are not due to Ashapura.  Testimony at the hearing revealed that Shah is no longer demanding return of the excess stock proceeds [as the garnishees contended he previously was] and that the AMCOL Garnishees would keep this amount if [Armada] failed to prove its entitlement to the funds.  (*Armada v. Ashapura*, 10 cv 5509, at 5 n. 6 [NDIll Aug. 29, 2011].

 A copy of that decision is attached hereto as **Exhibit Kk**.

101.    The Amcol Defendants were seeking to conceal the true nature of their dealings

with Ashapura.  Nonetheless, a series of email exchanges  between Ashapura and the Amcol

Defendants (which were quoted by the Court in its August 29, 2011 decision in the Rule B

Action [Exhibit H]) aptly set forth what the Stock Buy-Back entailed by providing, in pertinent

part, that:

> As agreed between AMCOL and Ashapura in 2009 and finalized in December, AMCOL's 950,000 shares of Ashapura were sold to Ashapura at Rs38.  The price on the open market at the time of the sale was Rs 69.70.  The excess price above Rs 38, after adjusting for selling costs, will be transferred to the account identified by Ashapura.  AMCOL will absorb the US tax on the gain.  Ashapura will forward the same amount [referring to the Excess Stock Proceeds] in USD to AANV [a European joint venture between Ashapura and the Amcol Defendants], within four weeks of AMCOL's initial transmission to the Ashapura named account, and the amount will be applied to debt that V has to AMCOL's subsidiary, AMCOL Minerals Europe Ltd.  **(Exhibit Kk at 2)**; and

> On December 30, 2009, Ashapura purchased 950,000 shares from AMCOL at a total price of 69.70 rupees before Rs 129,725 in fees.  As agreed by the parties, for any price greater than Rs. 38, e.g., Rs 31.70 net of fees, AMCOL would forward this amount to Ashapura, who would then remit the amount to AANV to pay down debt by AANV to AMCOL.  This amount totals Rs 30,006,782 and is referred to as the excess amount or excess proceeds.  **(Exhibit Kk at 3)**.

102.    In light of the foregoing and related considerations, the Court in the Rule B

Action determined, in pertinent part, that:

As noted above, there are numerous emails, sent after the sale was completed, which state that Ashapura was the buyer of the stock and was owed the excess proceeds. Given that there is no written document to refer to here, I conclude that the emails which post-date the sale more accurately reflect the agreement concerning the stock sale and the excess proceeds. **(Exhibit Kk at 7-8)**.

103.  The Excess Proceeds, representing less than 1% of the judgment owed to Armada, were thus set to be recovered.

104.  However, as set forth above, Ashapura filed its Chapter 15 proceeding only a few weeks after the Court in the Rule B Action rejected the contention by the garnishees therein (*i.e.*, the Amcol Defendants) that the Excess Proceeds were owed to Chetan Shah and that Chetan Shah had been, but then stopped, claiming those funds. On information and belief, Ashapura and the Amcol Defendants jointly coordinated the timing for filing of the Chapter 15 case in order to cause maximum frustration to Armada by denying Armada recovery of a small amount which it had diligently pursued in furtherance of its judgment. Notably, on day-one of the Chapter 15 case, Chetan Shah filed a declaration which, contrary to the arguments made by the Amcol Defendants in the Rule B Action, specifically described the Excess Proceeds as "belonging to Ashapura." **(Exhibit Z ¶ 15)**.

105.  Accordingly, if the Amcol Defendants had prevailed on their arguments regarding ownership of the Excess Proceeds, they would have benefitted (to Armada's detriment) by keeping those funds. Once the Amcol Defendants failed in that respect, the defendants engaged in an alternative course of action to prevent Armada's recovery by having Ashapura claim the Excess Proceeds as its own in the Chapter 15 case. This was overtly intended to present Armada with a "heads we win – tails you lose" dilemma which was jointly planned by the defendants.

106.  Furthermore, in the short period of time which immediately followed the Stock Buy-Back (i.e., during the early months of 2010), the market value of Ashapura's stock

plummeted dramatically. (**Ex. Ll**). On information and belief, Ashapura and the Amcol Defendants expected that Ashapura's stock price was about to collapse and that was, in part, why they arranged for the Amcol Defendants to receive a partial pay-out of their investment in Ashapura.

107. Given the dramatic degree to which the stock price fell (as expected by the defendants) following the Stock Buy-Back, the proceeds paid to the Amcol Defendants were not paid in exchange for a reasonably equivalent value. That is all the more so given that Ashapura could not have rightfully paid any further dividends on account of its stock, and the expectation of future dividends is a key factor in valuing stock. The stock declined greatly in value on Indian exchanges and was worthless when considered as constituting the right to receive future dividends because such dividends could not be paid.

108. That is because, prior to the Stock Buy-Back, the Amcol Defendants recorded their investment in Ashapura as an investment in a joint venture having zero value. (*See* **Ex. A**). However, after the Stock Buy-Back, the Amcol Defendants recorded that investment as available-for-sale securities valued at market price.

109. This change in accounting represented a $25 million gain for the Amcol Defendants. (**Ex. Kkk**.)

110. That accounting practice is particularly noteworthy because, on information and belief, the Amcol Defendants (which were publicly traded in the US) did not disclose the true nature of the Stock Buy-Back to the public. If they had done so, investors might have questioned whether it was a fair valuation for the Amcol Defendants to value their Ashapura shares at market price when, in fact, the Amcol Defendants had agreed to sell 950,000 Ashapura shares at a price which was substantially below the quoted market price.

111.    Accordingly, the Stock Buyback was fundamentally non-transparent from conception.  Moreover, the AMCOL Defendants remained intent on seeing the Excess Proceeds from that transaction funneled back to them – even after commencement of the Rule B Action. In that respect, they went to lengths to conceal the true nature of the Excess Proceeds as well as to conceal the extent to which the Excess Proceeds related to other deals which they were, during pendency of the Rule B Action, negotiating and executing with Ashapura.

- ***The AMCOL Defendants Non-Disclosures During the Rule B Action***

112.    Notwithstanding the fact that their own emails, *and accounting systems*, confirmed that the Excess Proceeds were owed to Ashapura, the AMCOL Defendants initially attempted to conceal that debt and then to obfuscate its true nature.

113.    In that respect, although the AMCOL Defendants' comptroller provided an early declaration in response to the garnishment papers (and that declaration briefly referenced the Excess Proceeds **[Ex. Ii]**), the answers which the AMCOL Defendants thereafter served in response to Armada's garnishment interrogatories made no mention of the Excess Proceeds **(Exs. Mm, Nn, Oo)**.  Armada had to ask for clarification **(Ex. Pp),** and if it had not done so the AMCOL Defendants would have succeeded with their attempt to conceal the existence of that debt.

114.    Thereafter, document demands served by Armada sought all documents relating to, amongst other things, any commercial or financial transactions between Ashapura and the AMCOL Defendants (then garnishees).  However, discovery in this action has demonstrated that the AMCOL Defendants failed to produce documents which related to a variety of financial transactions between Ashapura and the AMCOL Defendants even though such documents existed or came into existence during the pendency of the Rule B Action.

115.   On information and belief, the AMCOL Defendants did so for at least two reasons.

116.   First, they wanted to conceal how opaque some of their dealings with Ashapura were, including dealings relating to the Excess Proceeds.  As such, during the Rule B Action, the AMCOL Defendants never produced documents which showed that the Excess Proceeds were supposed to be paid in a non-transparent manner.  Basically, the Defendants contemplated that, pursuant to their arrangements, the Excess Proceeds would be paid to an offshore account not readily identifiable as associated with Ashapura, to wit:

    a.   In a March 15, 2011 email from Ryan McKendrick (then an Amcol executive and its future CEO) to Chetan Shah and Ajay Phalod (Ashapura's CFO), McKendrick discussed the process for remitting the Excess Proceeds.  He wrote that there were "some challenges and risks that we should discuss" and accordingly requested a conference call so that "we all understand the risks." That call was scheduled for 7:30 AM Chicago time on March 16, 2011.  Don Pearson (Amcol's CFO) was copied on the message.  **(Ex. Qq)**

    b.   The following morning (March 16, 2011) at approximately 6:50 AM (shortly before the scheduled conference call), Mr. Pearson received an email from BSFZone@gmail.com (apparently sent by an organization calling itself Best Solution FZE) which stated that "the fund" should be sent to a particular bank account with the Dubai branch of Habib Bank Zurich AG.  **(Ex. Rr)**

    c.   Each of the five ensuing messages regarding the communication from Best Solution FZE has been redacted by the AMCOL Defendants on the grounds that those messages concerned a "confidential email communication to Ryan McKendrick from Don Pearson about an email to Jim Ashley regarding an Indian transaction for AMCOL."  **(Ex. Rr)**  (Armada reserves all rights regarding the AMCOL Defendants' assertion of privilege over redacted portions of the aforementioned email string.)

    d.   On information and belief, the aforementioned payment instructions were sent on behalf of Ashapura to identify its "named account" for payment of the Excess Proceeds, and those payment instructions were deliberately crafted to exclude any reference to Ashapura because making such a payment to Ashapura could have complicated or undone the position which the AMCOL Defendants had taken in the still pending Rule B Action (i.e., that the Excess Proceeds were owed – not to Ashapura – but to Chetan Shah).

117.    Second, the AMCOL Defendants wanted to conceal the fact that during the pendency of the Rule B Action they were concurrently negotiating a large transaction with Ashapura which was also executed and performed during the pendency of the Rule B Action.

118.    In that respect, the AMCOL Defendants never disclosed that they were negotiating – and on June 30, 2011 executed and performed – an agreement with Ashapura by which they: (a) divested their stake in AANV and thereby recovered their initial equity investment of €1.5 million (or about **$2.3 million**); and (b) arranged for the insolvent Ashapura to make a payment-in-kind (using part of Ashapura's interest in the assets and equity of AVL-Unit II) of approximately **€3.75 million (or $5.3 million)** to reduce an antecedent debt which the insolvent Ashapura owed to the insider AMCOL Defendants.

119.    If the AMCOL Defendants had disclosed in the Rule B Action the existence of negotiations or performance relating to the foregoing transaction with Ashapura, then Armada would have looked to garnish or otherwise address the resulting proceeds within the context of the Rule B Action.  On information and belief, such disclosure was not made because the AMCOL Defendants wanted to enable completion of the transaction and to minimize the *quasi in rem* jurisdiction of the Court sitting in admiralty in the Rule B Action.

120.    That agreement was the first step in a broad reaching plan by which Ashapura and the AMCOL Defendants sought to restructure their relationship through a series of interrelated restructuring transactions (the "Restructuring Transactions").

### *The Restructuring Transactions*

121.    Throughout the Restructuring Transactions, the AMCOL Defendants leveraged an outstanding, antecedent debt of approximately Euros 7.1 million (plus interest accrued thereon)

which Ashapura owed to the AMCOL Defendants on account of start-up funding which had been

provided in connection with the establishment of AANV (the "AANV Related Debt").

122. Additional facts regarding that debt include the following:

    a. The AANV Related Debt involved a loan which was made in or about December 2007 as set forth in a March 19, 2008 email from Chetan Shah to Larry Washow and Gary Castagna**.** In connection with that loan, "AMCOL had agreed to fund Ashapura's share of investment [in AANV] which was to be repaid over a three year period." **(Ex. Ss)**.

    b. From its inception through June 30, 2011, the loan was undocumented. Even after June 30, 2011, the AMCOL Defendants described the loan as being kept off their books for tax reasons. **(Ex. Tt)**

    c. Notwithstanding the fact that the loan was related to the establishment of AANV, its purpose was to finance Ashapura so that Ashapura could meet its funding obligations with respect to the JV. As such, the AANV Related Debt was owed by Ashapura. The same is evidenced by the fact that invoices relating to the debt were directed to Ashapura in India **(Exs. Uu and Vv)**.

    d. Also, on information and belief, the AMCOL Defendants were the parties which ultimately provided the funds to make the loan and were the parties to whose benefit its repayment would ultimately accrue. As such, any involvement of the AMCOL Defendants' European affiliate in transferring the loan funds or issuing the resulting invoices for repayment amounted to nothing more than such affiliate serving as an agent on behalf of the AMCOL Defendants as principal. As such, the agent was instructed to keep the loan off of its books and the agent queried whether the loan would be included in group-level accounts **(Exs. Ww and Xx)**.

123. Furthermore, by the start of 2011, the AMCOL Defendants considered the AANV Related Debt to be worthless **(Ex. Yy)**. Nonetheless, they arranged for Ashapura to repay the loan by way of the Restructuring Transactions which involved Ashapura's use of payments-in-kind to repay the AANV Related Debt.

124. The first such Restructuring Transaction was executed on June 30, 2011 and involved:

    • Establishment of CETCO Environmental Technologies Private Limited ("CETCO India") as an entity which was 80% owned by the AMCOL

Defendants and 20% owned by Ashapura (via a special purpose vehicle called Manico Minerals);

- Transfer to CETCO India of AVL-Unit II's assets; and

- Ashapura's repayment of the Euros 1.5 million which the AMCOL Defendants had initially invested in AANV as equity. That repayment was to be made either directly by Ashapura or via a special purpose vehicle which Ashapura nominated **(Exs. Zz, Aaa)**.

125. In purported exchange for all of the above benefits running to them, the AMCOL Defendants agreed to "forgive" 50% of Ashapura's AANV Related Debt.

126. As such, the AMCOL Defendants did not pay a penny to Ashapura for such benefits because they deemed the AANV Related Debt to be worthless. Furthermore, they repeatedly insisted that the first Restructuring Transaction had to be a no cash deal **(Ex. Bb)**.

127. Instead, the economic reality was that Ashapura repaid 50% of the AANV Related Debt by making a payment-in-kind to the AMCOL Defendants which payment was comprised of an 80% stake in the assets and equity of AVL-Unit II. Any complexity regarding the overall deal between the AMCOL Defendants and Ashapura was well clarified by pre-deal correspondence from McKendrick to Shah. That correspondence confirmed that the underlying intent was for Ashapura and AMCOL to swap the AANV Related Debt for AVL-Unit II's assets **(Ex. Ccc)**.

128. Ashapura also included, as a bonus, a €1.5 million ($2.3 million) payment to buy-out the AMCOL Defendants' interest in the failed AANV joint venture which amounted to another quasi-dividend being paid to the AMCOL Defendants.

129. The first Restructuring Transaction only paid-off 50% of the AANV Related Debt. The AMCOL Defendants leveraged the remainder of that debt during a second Restructuring Transaction which was negotiated and performed during 2013 and into early 2014.

130. On information and belief, Ashapura repaid the AMCOL Defendants for the remaining 50% (or approximately Euros 3.75 million) of the AANV Related Debt in connection with various transfers which made up the Second Restructuring Transaction and/or via other dealings between Ashapura and the AMCOL Defendants.

131. In or about June 2013, Ashapura and the AMCOL Defendants commenced discussions concerning a second Restructuring Transaction, to wit:

> AMCOL would transfer the following assets and enter agreements with Ashapura as follows:
>
> - Transfer AMCOL 19% equity in [Ashapura] to Ashapura
> - Elimination of loan repayment obligation from AANV
> - $9 million cash payment
> - Enter supply agreement for all India bentonite requirements (domestic and export)
>
> Ashapura would transfer following assets and enter agreement with AMCOL as follows:
>
> - Assign exclusive distribution rights and enter tolling agreement for foundry business
> - Transfer 20% equity in CETCO India to AMCOL
> - Bentonite mines / permits with 2 million MT proven reserves.

**(Ex. Ddd)**

132. Discussions proceeded and, in September 2013 (during the pendency of this action), Amcol's CEO reported the results of a meeting he had held with Chetan Shah as follows:

> - They are ready to proceed with the AML transaction. Have a third party buyer *appointed* in Mauritius. We need to identify our "channel" as an authorized rep replacing [Ashapura's CFO] . . .
> - AVL loan to be maintained as is – not written off.
> - Discussed 10 year non-compete – term okay . . .
> - They have prepared extensive geo and QC data on reserves we want
> - Can proceed with CETCO transaction immediately – some discussion on tax treatment of AANV loan – but told him I need to defer to Don on this
> - . . . Tolling arrangement if we chose to proceed needs review and approval
> - Foundry due diligence complete in his view – he thinks our foundry team needs several more people if we Re [sic] to succeed.

**(Ex. Eee) (emphasis added)**

133.    On information and belief, the foregoing meant that Ashapura and the AMCOL

Defendants:

> a.  Agreed that Ashapura, via one or more "appointed" companies acting on its behalf, would repurchase the AMCOL Defendants' 19.9% ownership stake (i.e., there would be another stock buyback);
>
> b.  Agreed that the AMCOL Defendants would acquire Ashapura's 20% stake in CETCO India in exchange for "forgiveness" of the remaining AANV Related Debt (i.e., there would be another payment-in kind on account of that antecedent debt owed to an insider); and
>
> c.  The parties would continue to discuss and conduct due diligence on the possibility of the AMCOL Defendants acquiring Ashapura's foundry grade bentonite business.

134.    The sale of the AMCOL Defendants 19.9% ownership in Ashapura occurred in

December 2013, and the AMCOL Defendants' acquisition of Ashapura's 20% ownership in

CETCO India occurred in May 2014.

135.    Furthermore, the AMCOL Defendants' December 2013 sale of Ashapura stock

"yield[ed] a $13.9 million cash inflow" **(Ex. Fff)**.

136.    Likewise, filings with the US SEC state that the minority ownership stake in

CETCO India was acquired in May 2015 for approximately $2.1 million.

137.    On information and belief, the defendants' performance of this second

Restructuring Transaction also involved repayment (whether directly or via a payment-in-kind)

of the outstanding 50% due on the AANV Related Debt (equal to another €3.75 million).  The

basis for that belief is that two of the agreed upon prongs of the second Restructuring

Transaction were performed such that it is entirely logical to believe that the third agreed-upon

prong was also performed.

### *Other Wrongful Conduct*

138.    In addition to the Dividend Fraudulent Transaction (in 2008) and the Stock Buy-Back Fraudulent Transaction (in 2009), as well as their wrongful conduct with the Rule B Action and the Chapter 15 case (2010 and 2011), and the subsequent Restructuring Transactions, Ashapura and the Amcol Defendants pursued their scheme to hinder or defraud Armada in other ways.

139.    For instance, Ashapura's financial report issued for the period ending December 31, 2012 advised that:

> One of the overseas step-down subsidiary disposed of its shipping vessel during the second quarter and incurred a loss of US$66.99 lacs [Indian numbering for 100,000].  The corresponding liability of $US98.63 lacs on account of the term loan from a banker was settled for US$40.00 lacs [i.e., $4 million] as a final settlement of this liability.  Based on a Letter of Comfort provided by the Parent Company [i.e., Ashapura], at the instance of the banker and subject to necessary approvals, the said liability of US$40.00 lacs has been included in the Draft Rehabilitation Scheme of the Parent Company to be submitted to the BIFR [sic, generally].

**(Ex. Ggg)**.

140.    On information and belief, the foregoing means that Ashapura assumed the debt of a subsidiary and will treat that assumed debt as an amount for payment in connection with Ashapura's Indian insolvency proceedings in which Ashapura has, to date, refused to schedule the debt which it (as opposed to a subsidiary) actually owes to Armada.  Notably, Ashapura's failure to schedule its debt to Armada in the BIFR proceeding contributed to dismissal of the Chapter 15 case.  Moreover, on information and belief, Ashapura could not have assumed a subsidiary's debts without coordinating the same with, and obtaining the approval of, the Amcol Defendants. Those Defendants had, yet again, arranged to hinder or defraud Armada.  Even if there was not contemporaneous coordination amongst the Defendants, the 2009 Shareholders

Agreement constituted the AMCOL Defendants' pre-authorization for Ashapura to guarantee the debts of its affiliates.

141.    There have been further instances of such wrongful conduct and scheming.

142.    In 2010, the Amcol Defendants recorded a loss of $6.9 million on account of AANV. Yet, as set forth above with respect to the first Restructuring Transaction, in 2011, they sold their 50% stake and recorded a gain of over $2 million. Those sale proceeds were directly paid or otherwise funded by Ashapura, and such proceeds (for a worthless investment) were the functional equivalent of a further dividend paid by Ashapura to the Amcol Defendants and constituted a fraudulent transfer, as to Armada.

143.    Likewise, the Amcol Defendants continue to receive substantial revenues from another joint venture called Ashapura Volclay Limited ("AVL"). On information and belief, some of the business being performed by AVL is business which Ashapura would have previously performed.

144.    For example, attached hereto as **Exhibit Hhh** is an internet publication concerning AVL which lists bauxite, barytes, and bentonite as products available from AVL. The declaration which Chetan Shah filed in the Chapter 15 proceeding identified Ashapura as being "engaged in the business of mining, processing and trading minerals and ores . . . [including] Bentonite . . . Bauxite . . . [and] Barytes." **(Exhibit Z ¶ 6)**.

145.    As such, the revenues received by the Amcol Defendants from AVL, to the extent attributable to any such transferred business, are the functional equivalent of further dividends paid by Ashapura to the Amcol Defendants and constitute fraudulent transfers, as to Armada.

146.    Furthermore, disregard for legal norms was not abnormal within the corrupt relationship between the AMCOL Defendants and Ashapura.

147.   On information and belief, during the course of 2013, the AMCOL Defendants were willing to do practically anything to appease Ashapura and thereby avoid upsetting their close coordination regarding the second Restructuring Transaction.

148.   For instance, in 2013, senior executives with the AMCOL Defendants readily complied with Chetan Shah's request, conveyed via Ashapura's CFO (Ajay Phalod) to aid a rather questionable process of facilitating a US visa request for a friend of Chetan Shah's.  In that respect, on information and belief:

     a.   On August 8, 2013, Ajay Phalod asked one Amcol executive "to send an invitation letter for [a young Indian woman's] US visa processing purposes." The concerned individual, who was also an Ashapura employee, was "known to Mr. Chetan Shah through a family friend."  Phalod suggested that the invitation prepared by Amcol could "be for business discussions and meetings for various sales and administration matters or any such matters as you feel more comfortable."  **(Ex. Iii)**

     b.   On August 13, 2013, another Amcol executive signed such an "invitation" for presentment to the American Consulate General in India.  That invitation represented that the concerned individual would be in the US for approximately three weeks, arriving in Chicago for meeting(s) with "management team members" and that "[d]uring her stay, her conduct will be strictly professional."  **(Ex. Jjj)**

     c.   The concerned individual's name was Nilam Jagdish Malode.  Coincidentally, on September 21, 2013, the Columbia Daily Tribune of Columbia, Missouri reported that someone named Nilam Jagdish Malode (of Columbia, Missouri) applied for what appears to have been a marriage license (http://www.columbiatribune.com/for_the_record/marriage-licenses/article_3f596442-226e-11e3-af12-001a4bcf6878.html).

149.   Furthermore, throughout the period at issue, the AMCOL Defendants and Ashapura have engaged in numerous transactions which were undocumented.   Those transactions often involved Ashapura's use of vague offshore entities (and accounts) or other non-transparent vehicles, coupled with the AMCOL Defendants' acquiescence in the use of such

methods. The defendants' ultimate objectives throughout these transactions remained clear and such objectives, together with the outcomes, are alleged above.

150. All of this was done notwithstanding that, by mid-2008 at the latest, the AMCOL Defendants knew that Ashapura was not paying its debts as they became due. Pursuant to the Uniform Fraudulent Transfer Act, such circumstances give rise to a presumption that Ashapura was insolvent from mid-2008 onwards.

151. Accordingly, Armada seeks relief (based upon fraudulent transfer claims and others causes of action) relating to, amongst other things: (a) the total value of Ashapura's 2008 dividend (approximately $2.75 million); (b) the portion of that dividend paid to the AMCOL Defendants (approximately $550,000); (c) the 2009 Stock Buy-Back (approximately $800,000); (d) funds withheld via the contra-charging program (approximately $250,000) together with damages caused by the AMCOL Defendants having aided Ashapura in circumventing Rule B attachments; (e) all value transferred for the purposes of paying-off the AANV Related Debts (at least $5.3 million and up to over $10.6 million); (f) the AMCOL Defendants' recovery of their $2.3 million equity investment in AANV; (g) the amount of subsidiary debt assumed by Ashapura during the pendency of its bankruptcy-type proceedings (at least $4 million); (h) the value of the bentonite line of business which Ashapura transferred to an affiliate on the eve of its bankruptcy-type filing in India (tens of millions of dollars); (i) any portion of AVL dividends attributable to business transferred from Ashapura to AVL; (j) any funds paid in connection with the AMCOL Defendants' 2013 sale of Ashapura stock to the extent that Ashapura was the beneficial interest standing behind any purchasers and/or to the extent that the sales price realized by the AMCOL Defendants reflected the monetary benefit of Ashapura's wrongful transfer of its bentonite business to an affiliate; (k) additional damages or other relief as may be

appropriate (including, but not limited to, damages on account of all harm caused to Armada by the misleading, false and/or frivolous positions taken by the AMCOL Defendants in various proceedings involving Ashapura); (l) treble damages for violations of the Racketeer Influenced and Corrupt Organizations Act; and (m) attorneys' fees and costs.

### COUNT I
### Fraudulent Transfers Pursuant to 740 ILCS 160/6(a)
### (Ashapura and the Amcol Defendants)

152.     Armada repeats and realleges Paragraphs 1 through 151 above, as if fully set forth herein.

153.     The Dividend Fraudulent Transfer, the Buy-Back Fraudulent Transfer, all repayments made on account of the AANV Related Debt, the proceeds paid by Ashapura for acquisition of the AMCOL Defendants' 50% stake in AANV, all value realized by the AMCOL Defendants by virtue of the contra-charging plan, and any payments which were directly or indirectly made by Ashapura for the December 2013 sale of the AMCOL Defendants' stock in Ashapura were fraudulent transfers, as to Armada, and within the meaning of 740 ILCS 160/6(a), because:

    a.     Armada already had a claim against Ashapura at the time when the transfers were made;

    b.     Ashapura made the transfers without receiving a reasonably equivalent value in exchange; and

    c.     Ashapura was insolvent at the time when it made the transfers or became insolvent as a result thereof.

**WHEREFORE**, Armada respectfully requests that the Court issue a judgment: (a) avoiding the Dividend Fraudulent Transfer (equal to a value of, at least, $550,000.00), the Buy-Back Fraudulent Transfer (equal to a value of, at least, $800,000.00), all repayments on account of the AANV Related Debt (equal to a value of, at least, $5.3 million and potentially up to or

over $10.6 million), the purchase price paid for the AMCOL Defendants' 50% stake in AANV (a failed / worthless joint venture), all value realized by the AMCOL Defendants on account of their contra-charging plan (equal to approximately $250 thousand), and any payments which were directly or indirectly made by Ashapura for the December 2013 sale of the AMCOL Defendants' stock in Ashapura (up to some $13 million or more); (b) ordering that Armada may levy execution against the same assets transferred or their proceeds or that the AMCOL Defendants shall otherwise pay the equivalent to Armada; and (c) ordering that Armada shall have levy of execution against all other funds or property fraudulently transferred by Ashapura to the Amcol Defendants (in amounts to be established); and (d) granting Armada its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

## COUNT II
### Fraudulent Transfers Pursuant to 740 ILCS 160/5(a)(1) and (2)
### <u>(Ashapura and the Amcol Defendants)</u>

155. Armada repeats and realleges Paragraphs 1 through 151 above, as if fully set forth herein.

156. The Dividend Fraudulent Transfer, the Buy-Back Fraudulent Transfer, all repayments made on account of the AANV Related Debt, the proceeds paid by Ashapura for acquisition of the AMCOL Defendants' 50% stake in AANV, all value realized by the AMCOL Defendants by virtue of the contra-charging plan, and any payments which were directly or indirectly made by Ashapura for the December 2013 sale of the AMCOL Defendants' stock in Ashapura were fraudulent transfers, as to Armada and within the meaning of 740 ILCS 160/5(a)(1), because they were made with actual intent to hinder, delay, or defraud Armada as a creditor of Ashapura.

157.   Such intent is evidenced by numerous factors, including that:

a.   All such transfers were made to the Amcol Defendants as insiders;

b.   All such transfers were concealed and opaque in that, amongst other things, Ashapura and the Amcol Defendants endeavored to falsely characterize the Stock Buy-Back as a deal between the Amcol Defendants and Shah when, in fact, it was a deal between the Amcol Defendants and Ashapura. Indeed, the Amcol Defendants failed to disclose the actual price for the deal to the investing public and instead shifted to valuing their Ashapura investment as available-for-sale securities accounted for as an asset at market price (which far exceeded the immediately preceding deal price for the Stock Buy-Back);

c.   Before the Dividend Fraudulent Transfer was made, Ashapura, the John Doe Defendants, and the Amcol Defendants all knew that Armada would commence arbitration proceedings against Ashapura and that Armada would obtain an award and resulting judgment against Ashapura in a massive amount exceeding Ashapura's ability to pay;

d.   On information and belief, Ashapura has removed or concealed assets including by way of transferring business opportunities to affiliates) in order to hinder Armada's judgment enforcement efforts. This includes, but is not limited to, the shift of Ashapura's bentonite line of business (valued at tens of millions of dollars) to an affiliate;

e.   The AMCOL Defendants agreed with Ashapura to engage in the Euro payments plan in order to circumvent maritime attachments.

f.   The AMCOL Defendants took steps in furtherance of Ashapura's abuse of the bankruptcy system.

g.   The AMCOL Defendants never disclosed during the Rule B Action that they were negotiating with Ashapura regarding the Restructuring Transactions or that, during the same time frame, they concluded those transactions, and

e.   Ashapura was, at all material times, insolvent.

158.   All such transfers were also fraudulent, as to Armada and within the meaning of 740 ILCS 160/5(a)(2), because:

a.   All such transfers were made without receiving a reasonably equivalent value in exchange;

      b.      Ashapura was engaged or was about to engage in a business or transaction (here, the breach and repudiation of its obligations owed to Armada) for which its remaining assets were unreasonably small in relation to the business or transaction; and

      c.      Ashapura intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

      **WHEREFORE**, Armada respectfully requests that the Court issue a judgment: (a) avoiding the Dividend Fraudulent Transfer (equal to a value of, at least, $550,000.00), the Buy-Back Fraudulent Transfer (equal to a value of, at least, $800,000.00), all repayments on account of the AANV Related Debt (equal to a value of, at least, $5.3 million and potentially up to or over $10.6 million), the purchase price paid for the AMCOL Defendants' 50% stake in AANV, all value realized by the AMCOL Defendants on account of their contra-charging plan (equal to approximately $250 thousand), and any payments which were directly or indirectly made by Ashapura for the December 2013 sale of the AMCOL Defendants' stock in Ashapura (up to some $13 million or more); (b) ordering that Armada may levy execution against the same assets transferred or their proceeds or that the AMCOL Defendants shall otherwise pay Armada for the same; (c) ordering that Armada shall have levy of execution against all other funds or property fraudulently transferred by Ashapura to the Amcol Defendants (in amounts to be established); and (d) granting Armada its reasonable attorney's fees and costs, applicable pre and post judgment interest,  and such other and further relief as this Court deems just.

### COUNT III
### Fraudulent Transfers Pursuant to 740 ILCS 160/6(b)
### (Ashapura and the Amcol Defendants)

      159.     Armada repeats and realleges Paragraphs 1 through 151 above, as if fully set forth herein.

160. All repayments made on account of the AANV Related Debt were fraudulent transfers as to Armada and within the meaning of 740 ILCS 160/6(b) because:

a. such transfers were made after Armada's claim arose; and

b. Such transfers were made to an insider for an antecedent debt while Ashapura was insolvent and the AMCOL Defendants were Ashapura insiders who had reasonable cause to believe that Ashapura was insolvent.

**WHEREFORE**, Armada respectfully requests that the Court issue a judgment: (a) avoiding all repayments on account of the AANV Related Debt (equal to a value of, at least, $5.3 million and potentially up to or over $10.6 million); (b) ordering that Armada may levy execution against the same assets transferred or their proceeds or that the AMCOL Defendants shall otherwise pay Armada for the same; (c) ordering that Armada shall have levy of execution against all other funds or property fraudulently transferred by Ashapura to the Amcol Defendants (in amounts to be established); and (d) granting Armada its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

### COUNT IV
### Maritime Fraudulent Transfer
### (Ashapura and the AMCOL Defendants)

161. Armada repeats and realleges Paragraphs 1 through 160 above, as if fully set forth herein.

162. All repayments made on account of the AANV Related Debt as well as the proceeds paid by Ashapura for acquisition of the AMCOL Defendants' 50% stake in AANV, together with any other amounts paid by Ashapura (or anyone acting on its behalf) during times at which Armada's Rule B Action was pending, were maritime law fraudulent transfers because

the intended purpose of such transfers was to frustrate a maritime debt and/or to minimize the extent of an admiralty court's quasi in rem jurisdiction.

**WHEREFORE**, Armada respectfully requests that the Court issue a judgment: (a) avoiding all repayments on account of the AANV Related Debt (equal to a value of, at least, $5.3 million and potentially up to or over $10.6 million) as well as the purchase price paid for the AMCOL Defendants' 50% stake in AANV and any other amounts paid by Ashapura (or anyone acting on its behalf) to the AMCOL Defendants during times when the Rule B Action was pending; (b) ordering that Armada may levy execution against the same assets transferred or their proceeds or that the AMCOL Defendants shall otherwise pay Armada for the same; (c) ordering that Armada shall have levy of execution against all other funds or property fraudulently transferred by Ashapura to the Amcol Defendants (in amounts to be established); and (d) granting Armada its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

### COUNT V
### Wrongful Dividend
### (The Amcol Defendants and the John Doe Defendants)

163.    Armada repeats and realleges Paragraphs 1 through 151 above, as if fully set forth herein.

164.    On information and belief, the dividend which Ashapura paid to all of its shareholders in or about October 2008 was in the total amount of, at least, $2,750,000.00.

165.    Ashapura was insolvent at the time when that dividend was paid. Moreover, the dividend was solely intended to return capital to Ashapura's equity investors before massive debts owed to Armada could be reduced to arbitral awards and enforceable judgments. Indeed,

Ashapura did not even make any meaningful attempt to defend its meritless position arising from the breach and repudiation of the COAs.

166.    All of this was intended to wrongfully, illegally, and inequitably benefit investors to the detriment of creditors.

167.    Moreover, on information and belief, the John Doe Defendants and the AMCOL Defendants knew that the 2008 dividend was illegal, wrongful, and/or inequitable.

168.    Nonetheless, on information and belief, the John Doe Defendants and the AMCOL Defendants approved of, and assented to, payment of the 2008 dividend.

169.    As such, the John Doe Defendants and the AMCOL Defendants are liable to Armada in the amount of, at least, $2,750,000.00.

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants liable to Armada and award Armada  damages in the principal sum of at least $2,750,000.00, together with its reasonable attorney's fees, applicable pre and post judgment interest, and costs and such other and further relief as this Court deems just.

**COUNT VI**
**Breach of Fiduciary Duties**
**(Amcol Defendants and John Doe Defendants)**

170.    Armada repeats and realleges Paragraphs 1 through 151 above, as if fully set forth herein.

171.    Ashapura wrongfully assumed debts (in the amount of, at least, $4,000,000.00) of a subsidiary in order to give the subsidiary's creditor (a bank) preference in Ashapura's insolvency proceedings before the BIFR even though Ashapura continues to refuse to schedule its debt to Armada in those proceedings.

172.    On information and belief, Ashapura has assumed the aforementioned subsidiary debt following coordination with, and approval from, the John Doe Defendants and the AMCOL Defendants because the transaction would have required such approval.

173.    On information and belief, Ashapura, together with the AMCOL Defendants and the John Doe Defendants, acted in similar manner when Ashapura (on notice to the AMCOL Defendants and on the eve of filing its BIFR action) shifted its bentonite line of business (valued at upwards of $30 million) to an affiliate so as to shield it from creditors.

174.    The only reason for such actions was to benefit Ashapura and the Amcol Defendants who thereby benefitted at the expense of Armada which should certainly be paid, in full, before a creditor of an Ashapura subsidiary is paid, at all.

175.    Even if the AMCOL Defendants did not have an appointed director(s) officially serving on Ashapura's board at the time in question, the AMCOL Defendants were continuing to engage with Ashapura's board in a director-like manner by, amongst other things, having representatives attend AVL board meetings at which Ashapura board-related issues were concurrently addressed.

176.    Furthermore, the AMCOL Defendants and the John Doe Defendants affirmatively gave their approval for Ashapura to assume third-party liabilities and/or to shift valuable assets to affiliates. That approval was given, amongst other times and in further ways, when the AMCOL Defendants agreed to remove their veto rights regarding precisely such actions from the applicable shareholders agreement despite being on notice of Ashapura's inherent corruption. Indeed, they even agreed to support any resolutions sponsored by Ashapura's Promoter Group and they eventually came to appoint Ashapura executives (such as Hemul Shah and Ajay Phalod) as the representatives for the AMCOL Defendants to attend Ashapura's Annual General

Meetings. Basically, the AMCOL Defendants gave a green light to Ashapura to do anything it thought best for purposes of defrauding its creditors while still delivering value to its insider shareholders.

177. At least with respect to the shifting of the bauxite line of business (which was done in Spring 2011 and with notice to the AMCOL Defendants), the AMCOL Defendants also affirmatively endorsed such fraudulent conduct when they took multiple steps to support Ashapura's commencement of a Chapter 15 bankruptcy action in the United States.

178. As such, the John Doe Defendants and the AMCOL Defendants breached fiduciary duties and/or other legal obligations owed to Ashapura's creditors. Accordingly, the John Doe Defendants and the AMCOL Defendants are liable to Armada in the amount of, at least, $4,000,000.00 (on account of Ashapura's wrongful assumption of a subsidiary's debt) plus an amount to be proven at trial but believed to be in excess of $30,000,000 (on account of Ashapura's shifting its bentonite line of business to an affiliate on the eve of a bankruptcy-type filing).

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants liable to Armada in an amount equal to the sum of subsidiary or affiliate debts which Ashapura wrongfully assumed in its BIFR proceedings (an amount equal to, at least, $4,000,000.00) plus an amount to be proven at trial but believed to be in excess of $30,000,000 (on account of Ashapura's shifting its bentonite line of business to an affiliate on the eve of a bankruptcy-type filing); and award it damages in the principal sum of at least $34,000,000.00, together with its reasonable attorney's fees, applicable pre and post judgment interest, and costs and such other and further relief as this Court deems just.

## COUNT VII
### Injunctive Relief Pursuant to Uniform Fraudulent Transfer Act
### 740 ILCS 160/1 et seq.
### (All Defendants)

179.    Armada repeats and realleges Paragraphs 1 through 151 above, as if fully set forth herein.

180.    At any time in the imminent future, Ashapura might pay a dividend, or otherwise transfer the economic equivalent of a dividend, to some or all of its shareholders or former shareholders, including to the Amcol Defendants.  On information and belief, this has already happened by way of funds or other proceeds funneled to the Amcol Defendants, or for their benefit, via various Ashapura subsidiaries, affiliates, and joint ventures.

181.    For all of the reasons set forth  in Counts I through IV, above, any such a dividend would constitute a fraudulent transfer, as to Armada, pursuant to 740 ILCS 160/6(a), 160/5(a)(1) and (2), and/or 740 ILCS 160/6(b).

**WHEREFORE**, Armada respectfully requests that the  Court  issue a judgment, pursuant to 740 ILCS 160/8(a)(3)(A): (a) declaring that any future (or previously made, but currently concealed) dividends (or other payments economically analogous to dividends) paid by Ashapura to the Amcol Defendants shall be deemed fraudulent transfers subject to immediate levy of execution by Armada; (b) permanently enjoining the Amcol Defendants from selling any of their shares of Ashapura stock until such time as Armada's judgment against Ashapura is satisfied, in full (and subjecting such shares to attachment during the interim); and (c) granting Armada its reasonable attorney's fees and costs and such other and further relief as this Court deems just.

## COUNT VIII
## RICO 18 U.S.C. § 1962(c)
## <u>(The Amcol Defendants and the John Doe Defendants)</u>

182.     Armada repeats and realleges Paragraphs 1 through 181 above, as if fully set forth herein.

183.     This count is against the Amcol Defendants and the John Doe Defendants for violations of 18 U.S.C. § 1962(c).

184.     Ashapura is an enterprise engaged in and whose activities affect interstate and foreign commerce.  The Amcol Defendants and the John Does Defendants are associated with that enterprise.

185.     The Amcol Defendants and the John Doe Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

186.     The Amcol Defendants and the John Doe Defendants formed a scheme or artifice to defraud Armada and to obtain funds which should have remained assets of Ashapura, available for payment to, or judgment enforcement by, Armada.  They did so by, *inter alia*:

    a.    arranging for Ashapura to transfer its property and funds to the Amcol Defendants, which effectively constituted payment of wrongful dividends by an insolvent entity to an insider for no legitimate purpose other than returning capital (or profit) to an insider at the expense of a creditor;

    b.    obfuscating the nature of such transactions and advancing a ridiculous, and judicially rejected story, that debts were owed to Ashapura's managing director rather than to Ashapura (which theory the managing director himself expressly contradicted in subsequent filings with a US bankruptcy court);

    c.    facilitating the filing of bad faith, insolvency-related proceedings which, as to the US Chapter 15 case, was ultimately dismissed;

    c.    approving Ashapura's assumption of a subsidiary's debt as a debt scheduled for payment in its BIFR proceedings even though Ashapura has continued to refuse to schedule its debt to Armada;

d.   approving Ashapura's shifting of its entire bentonite line of business to an affiliated company on the eve of a bankruptcy-type filing and/or thereafter supporting the same;

e.   misrepresenting the fair valuation of Ashapura's shares held by the Amcol Defendants which was done by representing that a fair valuation could be based on market price when, in fact, the Amcol Defendants and Ashapura had just recently executed an opaque transaction which valued the shares at a fraction of market price; and

f.   engaging in numerous other acts in furtherance of that scheme and as alleged above.

185.   The foregoing scheme originated as early as mid-2008, or soon thereafter, with the determinations that Ashapura should, and would, breach and repudiate the COAs while continuing to funnel money to the Amcol Defendants.

186.   The Amcol Defendants and the John Doe Defendants, in furtherance of their scheme or artifice to defraud Armada and to enrich the Amcol Defendants, at various times, (a) used and/or caused use of United States mails and/or private or commercial interstate carriers, and/or (b) transmitted or caused to be transmitted various writings by means of wire communications in interstate or foreign commerce, in the forms of faxes and emails.

187.   The foregoing acts by the Amcol Defendants and the John Doe Defendants were committed willfully.

188.   The foregoing acts by the Amcol Defendants and the John Doe Defendants constituted violations of 18 U.S.C. § 1341.

189.   The foregoing acts by the Amcol Defendants and the John Doe Defendants constituted violations of 18 U.S.C. § 1343.

190.   The Amcol Defendants' and the John Doe Defendants' use of the United States mails and/or private or commercial interstate carriers and/or transmittals by means of wire communications was a natural and probable consequence of their scheme or artifice to deceive or

defraud Armada and to obtain property for the Amcol Defendants which should have remained an Ashapura asset available for payment to, or judgment enforcement by, Armada.

191.    The foregoing predicate acts by the Amcol Defendants and the John Doe Defendants constitute racketeering activity as defined by 18 U.S.C. § 1961(1).

192.    The foregoing predicate acts were related and undertaken repeatedly and continuously over the course of several years.

193.    The foregoing predicate acts were undertaken with respect to Armada and for the related purposes of defrauding Armada and obtaining the improper control of property which should have remained an Ashapura asset, available for judgment enforcement.

194.    In view of the foregoing, the Amcol Defendants and the John Doe Defendants have engaged in a pattern of racketeering activity.

195.    The Amcol Defendants and the John Doe Defendants have directly and indirectly conducted, participated in, controlled, directed and managed the foregoing affairs of Ashapura (which is an enterprise engaged in or whose activities affect interstate and foreign commerce) through the above-described pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

196.    But for the Amcol Defendants' and the John Doe Defendants' violations of 18 U.S.C. § 1962(c), Armada would not have suffered damages.  Amongst other considerations, but for such violations of 18 U.S.C. § 1962, the aforementioned funds and property would still be held by Ashapura and available for payment to, or judgment enforcement by, Armada.

197.    The Amcol Defendants' and the John Doe Defendants' violations of 18 U.S.C. § 1962(c) proximately caused Armada's damages, with respect to its business and property, which are equal, to at least: (a) all of the funds and property which have been fraudulently and wrongfully transferred from Ashapura's possession to the Amcol Defendants or otherwise paid-

out as wrongful dividends plus (b) all of the debts, otherwise owed by affiliates and subsidiaries, which have been wrongfully assumed by Ashapura in its BIFR proceedings or otherwise plus (c) all assets otherwise transferred to Ashapura affiliates with the support and/or approval of the AMCOL Defendants, including the transfer of Ashapura's bentonite line of business on the eve a bankruptcy-type filing plus (d) the legal fees which the defendants' conduct wrongfully caused Armada to incur in connection with the Rule B Action and Ashapura's Chapter 15 action.

198.    The total principal amount of such damages is to be proven at trial but is in the range of $40 million to $60 million and Armada is entitled to an award equal to: (a) at least, that amount; (b) together with treble damages yielding, at least, $120 million to $180 million; plus (c) reasonable attorney's fees and costs.

199.    The total recovery should equal treble damages on Armada's existing judgment against Ashapura (yielding an amount in excess of $210,000,000.00) because the decision to breach the COAs was part of the scheme to defraud Armada.

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants jointly and severally liable to Armada and award Armada  damages in the principal sum ranging from $40 million to $60 million together with treble damages in the range of $120 million to $180 million, and its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

### COUNT IX
### RICO 18 U.S.C. § 1962(d)
### (The Amcol Defendants and  the John Doe Defendants)

200.    Armada repeats and realleges Paragraphs 1 through 199, above, as if fully set forth herein.

201.    This count is against the Amcol Defendants and the John Doe Defendants for violations of 18 U.S.C. § 1962(d).

202.    The Amcol Defendants and the John Doe Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(c) and/or other substantive prohibitions set forth in the RICO Act. Specifically, they agreed and conspired with Ashapura and members of the Shah family, including Chetan Shah, to violated 18 U.S.C. § 1962(c) in furtherance of a scheme to defraud Armada. Indicia of the existence of such a scheme can be gleaned from prior judicial decisions addressing the consequences of Ashapura's dealings, including, as follows:

> [T]he case presents a history of Ashapura's active resistance and evasion of payment, played over a world-wide canvas. (*Americas Bulk Transp. Ltd. v. IMT*, 08 CIV.6970 [AKH], 2010 WL 1047674, 2010 AMC 1629, 1643 [S.D.N.Y. Mar. 19, 2010] [*vacated in part (and on other grounds) sub nom.*, *Eitzen Bulk A/S v. Ashapura Minechem, Ltd.*, 632 F.3d 53 (2d Cir. 2011)]); and

> This Court will not continue to be used as one of Mr. Shah's chess pieces. (*In re Ashapura Minechem, Ltd.*, Case No. 11-14668 (S.D.N.Y. Bankr. Aug. 21, 2012) (Transcr. at 50:2-3).

203.    The Amcol Defendants and the John Doe Defendants have also intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate and foreign enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

204.    The Amcol Defendants and the John Doe Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

205.    That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. § 1962(d).

206. But for the Amcol Defendants' and the John Doe Defendants' violations of 18 U.S.C. § 1962(d), Armada would not have suffered damages.

207. The Amcol Defendants' conspiracy, overt acts in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d) directly and proximately caused Armada damages, with respect to its business and property, which are equal, to at least: (a) all of the funds and property which have been fraudulently and wrongfully transferred from Ashapura's possession to the Amcol Defendants or otherwise paid-out as wrongful dividends plus (b) all of the debts, otherwise owed by affiliates and subsidiaries, which have been wrongfully assumed by Ashapura in its BIFR proceedings or otherwise plus (c) all assets otherwise transferred to Ashapura affiliates with the support and/or approval of the AMCOL Defendants, including the transfer of Ashapura's bentonite line of business on the eve a bankruptcy-type filing plus (d) the legal fees which the defendants' conduct wrongfully caused Armada to incur in connection with the Rule B Action and Ashapura's Chapter 15 action.

208. The total principal amount of such damages is to be proven at trial but is in the range of $40 million to $60 million and Armada is entitled to an award equal to: (a) at least, that amount; (b) together with treble damages yielding, at least, $120 million to $180 million; plus (c) reasonable attorney's fees and costs.

209. The total recovery should equal treble damages on Armada's existing judgment against Ashapura (yielding an amount in excess of $210,000,000.00) because the decision to breach the COAs was part of the scheme to defraud Armada.

**WHEREFORE**, Armada respectfully requests that the Court hold each of the John Doe Defendants and the Amcol Defendants jointly and severally liable to Armada and

award Armada  damages in the principal sum ranging from $40 million to $60 million together with treble damages in the range of $120 million to $180 million, and its reasonable attorney's fees and costs, applicable pre and post judgment interest, and such other and further relief as this Court deems just.

Respectfully submitted,

**ARMADA (SINGAPORE) PTE LIMITED**

By:/s/ Edward W. Floyd
    Edward W. Floyd
    Alan Van Praag

Eaton & Van Winkle LLP
3 Park Avenue
16th Floor
New York, New York 10016
(212) 779-9910
Facsimile (212) 779-9928
efloyd@evw.com
*Pro Hac Vice*

*Local Counsel:*

By:/s/ Shari L. Friedman_____
    Dennis Minichello (03122059)
    Shari L. Friedman(6193095)

Marwedel, Minichello & Reeb, P.C.
10 S. Riverside Plaza
Suite 720
Chicago, Illinois 60606
(312) 902-1600
Facsimile (312) 902-9900
dminichello@mmr-law.com
sfriedman@mmr-law.com