IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ARMADA (SINGAPORE) PTE          )
LIMITED,                        )
          Plaintiff,            )
                                )
                                )
     v.                         )  No. 13 C 3455
                                )
AMCOL INTERNATIONAL             )
CORPORATION, ET AL.,            )
                                )
          Defendants.           )
                                )
                                )


MEMORANDUM OPINION AND ORDER

Armada (Singapore) Pte. Ltd. ("Armada") has sued Amcol

International Corporation ("Amcol") and two of its wholly-owned

subsidiaries, American Colloid Company ("ACC") and Volclay

International Corporation ("Volclay") (Amcol, ACC, and Volclay

collectively, "the defendants"), for causes of action under

federal law, Illinois law, and maritime law. The claims arise in

connection with the insolvency of Ashapura Minechem Limited

("Ashapura"), an Indian company with respect to which the

defendants are alleged to be affiliates and/or insiders.[1] The

defendants have moved for a judgment on the pleadings pursuant

---

[1] Ashapura is also named as a defendant in the suit but is not a
party to the instant motion. In addition, Armada's complaint
lists several Doe Defendants, who are identified as past and/or
present senior officers employed by the defendants. *See* First
Amended Complaint ¶ 4.

to Rule 12(c) of the Federal Rules of Civil Procedure. For the
reasons below, the motion is granted in part and denied in part.

I.

Armada's complaint alleges[2] that in April 2008, it entered
into two contracts of affreightment (COAs) with Ashapura.[3] Under
the COAs, Armada agreed to ship loads of Ashapura's bauxite from
India to various foreign ports. Armada's complaint alleges that
in September 2008, after encountering difficulties with its
bauxite suppliers, Ashapura breached the COAs.

Shortly thereafter, Armada began efforts to collect on the
debt it was owed by Ashapura as a result of the breach. In
September 2008, Armada initiated two separate maritime
attachment proceedings against Ashapura in the Southern District
of New York pursuant to Rule B of the Supplemental Rules for
Certain Admiralty and Maritime Claims of the Federal Rules of
Civil Procedure. And in August 2010, Armada commenced Rule B
attachment proceedings in this court, naming the defendants --

---

[2] For purposes of a Rule 12(c) motion, I take all facts alleged
in the complaint as true and draw all reasonable inferences in
the plaintiff's favor. *See, e.g.*, *Matrix IV, Inc. v. Am. Nat.
Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011).

[3] "A contract of affreightment is a charter to carry multiple
cargoes of a given commodity along the same route during a given
period of time lasting anywhere from a few weeks to several
years." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F.
Supp. 2d 404, 415 n.7 (S.D.N.Y. 2009).

who until 2014 owned roughly twenty percent of Ashapura's stock -- as garnishees.

Armada also instituted two arbitration proceedings against Ashapura in London, England. In February 2010, the arbitrator issued default judgments in Armada's favor totaling roughly $70 million. In May 2011, Ashapura sought protection from India's Board of Industrial and Financial Reconstruction (BIFR), and in October 2011, Ashapura commenced Chapter 15 bankruptcy proceedings in the Southern District of New York. Armada was an objecting creditor in the Chapter 15 proceedings.

Armada alleges that the defendants exercised control rights over Ashapura, and that once they learned of Ashapura's impending insolvency, they engaged in various machinations to deplete Ashapura's assets, thereby hindering Armada's and other creditors' collection efforts. In particular, Armada alleges that the defendants engaged in the following schemes:

**The Euro-Payment Scheme**: in the Southern District of New York attachment proceedings, Armada obtained an order providing for the seizure of, inter alia, wire transfers received by Ashapura. In order to avoid detection, the defendants arranged with Ashapura for wire payments to Ashapura to be made in euros -- even when the relevant contracts required payment in dollars.

**The Contra-Charging Plan**: once the defendants became aware of Ashapura's insolvency, they adopted a practice of charging Ashapura for purchases made by other Amcol affiliates. Specifically, from roughly Spring 2008 to Spring 2009, if an Amcol affiliate owed a debt to the defendants, it was treated as being owed by Ashapura. In turn, any payments the defendants owed Ashapura were set-off against the amounts Ashapura was deemed to owe the defendants.

**The Dividend Fraudulent Transfer**: in October 2008, despite its looming insolvency, Ashapura paid a $2.75 million dividend to its shareholders. The defendants' portion of the dividend was approximately $550,000.

**The Buy-Back Fraudulent Transfer:** in December 2009, Ashapura purchased some of its own stock from the defendants, shortly before the stock's price dropped precipitously.

**Bankruptcy Proceedings**: the defendants coordinated the filing of Ashapura's Chapter 15 bankruptcy petition in order to stay creditors' actions. In addition, the defendants deliberately misled the bankruptcy court by failing to disclose that certain of Ashapura's assets (i.e., Ashapura's bentonite line of business, which the defendants had valued at up to $60 million) had been diverted to one of Ashapura's affiliates shortly before Ashapura's BIFR filing.

**The AANV-Related Debt**: at some point around 2007, Ashapura entered into a joint venture called "Ashapura Amcol NV" ("AANV") with one of the defendants' European affiliates. In December 2007, the defendants lent Ashapura €7.1 million to cover Ashapura's portion of AANV's start-up funding ("the AANV-related debt"). Although by January 2011, the defendants considered the debt to be worthless, they arranged for Ashapura to repay it by way of two "restructuring transactions." The first of these took place on June 30, 2011. In exchange for forgiving half of Ashapura's AANV-related debt, Ashapura gave the defendants an increased stake in another joint venture, Ashapura Volclay Limited-Unit II ("AVL-Unit II"). In addition, Ashapura made a €1.5 million ($2.3 million) payment to buy out the defendants' interest in AANV. The remainder of the AANV-related debt was forgiven by a series of transactions in 2013-2014. These essentially involved Ashapura's buy-back of the defendants' remaining Ashapura stock and the defendants' acquisition of Ashapura's twenty percent ownership of another joint venture.

Armada's original complaint alleged several claims under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS §§ 160/1 *et seq*., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964. It also asserted common-law claims for wrongful payment of dividends and wrongful

4

assumption of a debt. The defendants filed a motion to dismiss,
which I granted as to two of the RICO counts but otherwise
denied. *Armada (Singapore) PTE Ltd. v. AMCOL Int'l Corp.*, No. 13
C 3455, 2013 WL 5781845, at *8 (N.D. Ill. Oct. 25, 2013)
("*Armada I*").

Armada subsequently filed an amended complaint that
realleged the IUFTA counts, the surviving RICO counts, and the
wrongful-dividend claim. Additionally, the amended complaint
abandoned the claim alleging wrongful assumption of a debt and
added a claim for breach of fiduciary duty. Armada also added a
cause of action styled "maritime fraudulent transfer." The
defendants now move pursuant to Rule 12(c) for a judgment on the
pleadings with respect to each of Armada's claims.

## II.

"Under Rule 12(c), a party can move for judgment on the
pleadings after the filing of both the complaint and answer."
*Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 718 (7th
Cir. 2002). "Rule 12(b)(6) and Rule 12(c) employ the same
standard: the complaint must state a claim that is plausible on
its face." *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir.
2016) (quotation marks omitted). "A claim has facial
plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id*. (quotation marks omitted).

## A.   RICO

Congress enacted RICO in an attempt to eradicate criminal racketeering activity. *See, e.g.*, *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). In addition to the criminal provisions set forth in § 1962 of the statute, § 1964 provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of the statute's criminal provisions. 18 U.S.C. § 1964(c). In Count VIII of the amended complaint, Armada alleges that the defendants violated RICO § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). According to Armada, the defendants engaged in a pattern of racketeering activity by committing numerous acts of mail fraud and wire fraud in stripping Ashapura of its assets. In Count IX, Armada alleges a violation of RICO § 1962(d), which makes it a crime to conspire to violate RICO's other criminal provisions.

The defendants argue that Armada's RICO claims must be dismissed in light of the Supreme Court's recent decision in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016),

which held that the civil RICO statute does not apply extraterritorially. The suit in *RJR Nabisco* was brought by the European Community and several of its member states, alleging that RJR Nabisco had participated in a global money-laundering scheme in association with various organized crime groups. *Id.* at 2098. RJR Nabisco moved to dismiss the RICO claims on the ground that they required an improper extraterritorial application of the statute. *Id.* at 2099.

The Court began by observing that it is "a basic premise of our legal system that, in general, United States law governs domestically but does not rule the world." *Id.* at 2100 (quotation marks omitted). This principle, the Court explained, gives rise to a presumption that federal statutes do not apply extraterritorially. Thus, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).

The Court first considered RICO § 1962(c) and concluded that the statute applies extraterritorially in some cases -- namely, where the underlying racketeering activity involves violation of a predicate statute that itself applies extraterritorially. *Id.* at 2102. However, the Court separately considered whether RICO's private right of action under §

7

1964(c) applied extraterritorially, and concluded that it did not. To state a claim under § 1964(c), therefore, a "plaintiff [must] allege and prove a domestic injury to business or property." *Id.* at 2111.

The defendants contend that Armada has failed to allege a domestic injury to its business or property. I agree. *RJR Nabisco* itself did not address the question of how to determine whether an injury was foreign or domestic for purposes of § 1964, and the Court acknowledged that the application of its holding "in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'" *Id.* Nevertheless, language in the opinion strongly suggests that the inquiry turns on where the plaintiff's injury was *suffered*. Throughout its discussion of § 1964(c), the Court repeatedly frames the question as whether the statute applies to injuries suffered outside of the United States. *See, e.g.*, 136 S. Ct. at 2099 (describing the question presented as whether "RICO's private right of action, contained in § 1964(c), appl[ies] to injuries that are suffered in foreign countries"); *id.* at 2108 ("Nothing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States."); *id.* at 2109 ("The question is ... whether the court has authority to recognize a cause of action under U.S. law for

injury suffered overseas.") (emphasis omitted). In contrast, in its discussion of the extraterritoriality of RICO's underlying criminal provisions, the Court consistently frames the inquiry as whether the statute reaches "*conduct* that occurs in foreign countries." *Id*. at 2099 (emphasis added); *see also id*. at 2101 (addressing "whether RICO's substantive prohibitions in § 1962 may apply to foreign conduct").

Armada's injury was not suffered in the United States. Indeed, Armada does not dispute this point. The harm it alleges -- its inability to collect on the arbitral award it obtained against Ashapura -- is pecuniary. A corporate entity generally suffers economic harm in its principal place of business. *See, e.g.*, *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 805 (7th Cir. 1997) (place of injury was Saudi Arabia, where plaintiff's business would suffer as a result of defendant's tortious conduct); *Czarobski v. St. Kieran's Church*, 851 F. Supp. 1219, 1221 (N.D. Ill. 1994) (economic injuries suffered at the party's principal place of business); *see also Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1388-89 (8th Cir. 1991) ("[Plaintiff] has its principal place of business in the forum state and thus suffered the economic injury there."). Since Armada's principal place of business is in Singapore, any harm resulting from the defendants' alleged racketeering activity was suffered there.

This line of analysis has been applied by several other courts addressing RICO's domestic-injury requirement following *RJR Nabisco*. *See, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Devine*, No. 215CV328FTM29MRM, 2017 WL 519066, at *20 (M.D. Fla. Feb. 8, 2017); *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (AJN), 2016 WL 7756629, at *9 (S.D.N.Y. Dec. 23, 2016); *Exeed Indus., LLC v. Younis*, No. 15 C 14, 2016 WL 6599949, at *1 (N.D. Ill. Nov. 8, 2016); *Garcia v. Lion Mexico Consol., L.P.*, No. 5:15-CV-1116-DAE, 2016 WL 6157436, at *3 (W.D. Tex. Oct. 21, 2016); *Bascuñan v. Daniel Yarur ELS Amended ComplaintA*, No. 15-CV-2009 (GBD), 2016 WL 5475998, at *6 (S.D.N.Y. Sept. 28, 2016). In each of these cases, the courts held that the plaintiffs' RICO claims failed because their injuries had not been suffered in the United States. And in each of the cases (with the exception of *Bascuñan*, which was brought by an individual), the plaintiffs were foreign corporations and were deemed to have suffered their injuries in their principal places of business.

Armada argues that the property at issue in its RICO counts consists of the legal claims and judgments it sought to enforce in the U.S. attachment and bankruptcy proceedings. According to Armada, the defendants injured its property by thwarting its attempts to pursue these claims and judgments. Since the

proceedings were based in the U.S., Armada maintains, it
suffered harm a domestic harm to its property.

As an initial matter, this argument is not entirely
consistent with the allegations underlying the RICO counts,
which cite not only the defendants' activities during the
attachment and bankruptcy proceedings, but also conduct
occurring before the proceedings were commenced (e.g., the
contra-charging program), and after they were concluded (e.g.,
the restructuring transactions in 2013). The more fundamental
problem, however, is Armada's premise that the relevant issue is
"whether Armada's business or property was injured in the United
States," and not whether "Armada felt its injuries in the United
States or abroad." Resp. Br. at 14. As previously discussed, *RJR
Nabisco* indicates implicitly, and later cases have held
explicitly, that the reverse is true: the salient fact is where
the injury was suffered. Since Armada's injury was suffered in
Singapore instead of the U.S., it has not alleged a domestic
injury for purposes of its RICO claims. Armada's RICO claims
must therefore be dismissed.[4]

---

[4] The foregoing analysis centers on Armada's RICO claim based on
violations of § 1962(c) (Count VIII) rather than the claim based
on violations of § 1962(d) (Count IX). Like the parties in *RJR
Nabisco*, the parties here do not discuss the two RICO claims
separately. Hence, like the Court in *RJR Nabisco*, I assume
without deciding that the two should be treated identically. *See
RJR Nabisco*, 136 S. Ct. at 2103; *cf. Domanus v. Locke Lord LLP*,
847 F.3d 469, 482–83 (7th Cir. 2017) (noting that although *RJR*

**B.  Claims Under Illinois Law**

In addition to its RICO claims, Armada asserts six causes of action under Illinois law. Four of these (Counts I-III & VII) arise under Illinois' Fraudulent Transfer Act.[5] The remaining two claims -- for wrongful dividend (Count V) and breach of fiduciary duty (Count VI) -- arise under common law.

**1.  IUFTA Claims**

As with Armada's RICO claims, the defendants contend that its IUFTA claims must be dismissed because they require an impermissible extraterritorial application of the statute. I agree.

Like federal courts, Illinois courts employ "the long-standing rule of construction ... which holds that a statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute."

---

*Nabisco* did not specifically decide the issue, "a person asserting a private right under subsection (d) to recover for foreign injuries may have an uphill battle after *RJR Nabisco*").

[5] Counts I and II are based on the same underlying transactions but are brought under different IUFTA provisions. Count I is based on 740 ILCS 160/6(a), which applies to claims arising prior to the fraudulent transfers; and Count II is based on 740 ILCS 160/5(a)(1) and (2), which apply to claims arising both before or after the transfers. Count III is based on 740 ILCS 160/6(b), which applies to payments to insiders for antecedent debts made during a debtor's insolvency. Unlike Counts I and II, Count III seeks redress solely for repayments made on account of transactions relating to the AANV-Related Debt. Count VII, which the parties do not discuss in any depth, seeks injunctive relief under the IUFTA.

*Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (2005) (quotation marks omitted). IUFTA contains no express provision indicating that it was intended to apply extraterritorially. Nor does Armada point to any case authority suggesting that IUFTA was intended to apply beyond the state's borders. Further, Illinois' versions of other uniform statutes have been held not to apply extraterritorially. *See, e.g.*, *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, No. 15 C 9955, 2016 WL 3194445, at *11 (N.D. Ill. June 9, 2016) (Illinois' Deceptive Trade Practices Act); *Liaquat Khan v. Van Remmen, Inc.*, 756 N.E.2d 902, 913 (Ill. App. Ct. 2001) (Illinois Wage Payment and Collection Act); *Graham v. Gen. U.S. Grant Post No. 2665, V. F. W.*, 248 N.E.2d 657, 660 (1969) (Illinois' Dram Shop Act).

Armada responds by citing cases holding that New York's fraudulent conveyance statute applies extraterritorially. *See, e.g.*, *Eclaire Advisor as Tr. to Daewoo Int'l (Am.) Corp. Creditor Trust v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 268 n.4 (S.D.N.Y. 2005). The question here, however, is whether the Illinois legislature intended for IUFTA to apply extraterritorially, and whether that intention is clearly evinced in the express provisions of the statute. That the New York legislature might have intended its version of a similar statute to apply extraterritorially is beside the point. I therefore conclude that IUFTA does not apply extraterritorially.

13

This does not end the inquiry, however. Armada's IUFTA claims fail only if they in fact require extraterritorial application of the statute. To determine whether a particular claim requires a statute to be applied extraterritorially, Illinois courts consider whether the circumstances relevant to the claim are alleged to have occurred "primarily and substantially" in Illinois. *See, e.g.,* *Avery*, 835 at 853; *see also IPOX Schuster*, 2016 WL 3194445, at *11.

Armada's argument on this point is perfunctory. It makes only the general assertion that the defendants "acted in Illinois ... when they orchestrated and received (or received the benefit) of fraudulently transferred property," Pl.'s Resp. Br. at 18. This contention ignores the fact that the transactions at issue involved the transfer of assets between and among a number of foreign entities, including not only Ashapura, but a variety of foreign subsidiaries, joint-ventures, and special purpose vehicles. It also ignores the fact that the transactions required the assistance of individuals located in India and other countries. For example, the Dividend Fraudulent Transfer was issued by Ashapura, an Indian corporation, with the assistance of Chetan Shah ("Shah"), Ashapura's managing director, a citizen of India. While Armada asserts that the defendants received $550,000 as a result of the dividend, the amended complaint also states that during the relevant time

period, the defendants owned only about twenty percent of Ashapura's stock. Thus, the lion's share of the dividend, which totaled $2.75 million, was reaped by other shareholders (including, for example, Mr. Shah) who are not alleged to be citizens of Illinois.

Similarly, the circumstances concerning the transactions relating to the payment of the AANV-Related Debt also took place primarily and substantially in India. For example, the transfer was paid in part by Ashapura's transfer to the defendants of its stake in AVL-Unit II, an Indian joint venture between the parties. And Ashapura transferred its interest in AVL-Unit II via the creation of CETCO Environmental Technologies Private Limited ("CETCO"), another joint venture between the parties in India.

In short, in light of the complaint's allegations concerning the transactions in question, I cannot conclude that the relevant circumstances took place primarily and substantially in Illinois. It follows that Armada's IUFTA claims require extraterritorial application of the statute. Since the statute does not apply extraterritorially, Armada's IUFTA claims must be dismissed.

### 2. Common Law Claims

With respect to Armada's claims for wrongful dividend (Count V) and breach of fiduciary duty (Count VI), defendants'

appeal to the presumption against extraterritoriality loses force. The presumption is, after all, a canon of statutory construction. *See, e.g.*, *RJR Nabisco*, 136 S. Ct. at 2100. The defendants cite no authority to suggest that the principle should apply to claims fashioned through common-law adjudication. *See, e.g.*, *Leibman v. Prupes*, No. 2:14-CV-09003-CAS, 2015 WL 3823954, at *6 (C.D. Cal. June 18, 2015) (noting defendant's failure to cite "authority supporting the proposition that the presumption against extraterritoriality applies to common law claims"); Jeffrey A. Meyer, *Extraterritorial Common Law: Does the Common Law Apply Abroad?*, 102 Geo. L.J. 301 (2014) ("To date, the presumption against extraterritoriality has been applied to curb geographical extension of statutes but not the common law.").

In fact, common-law causes of action have been applied to conduct occurring extraterritorially. *See, e.g.*, *Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 762–63 (N.D. Ill. 2014) (declining to dismiss state-law conspiracy claim brought against private military contractor by Serbian survivors of military operations Croatia); *see also Norex Petroleum Ltd. v. Blavatnik*, 22 N.Y.S.3d 138 (N.Y. Sup. 2015) ("New York courts have historically found that there is no territorial limit to New York common law causes of action, as there is with federal and

state statutes."). Nevertheless, for separate reasons, Armada's wrongful-dividend and breach-of-fiduciary-duty claims fail.

### a. Wrongful Dividend

Armada's wrongful-dividend claim seeks to hold the defendants liable for the dividend issued by Ashapura in October 2008. This claim must be dismissed because, as the defendants point out, there is no cause of action for "wrongful dividend" under Illinois law. Armada maintains that I held "wrongful dividend" to be a viable claim in *Armada I*. That is not so. The defendants' Rule 12(b)(6) motions did not squarely challenge whether the wrongful-dividend claim was cognizable, but instead argued that Armada had failed to "plead sufficient facts relating to Ashapura's insolvency and the precise role of each AMCOL entity in approving the October 2008 dividend payment." *Armada I*, 2013 WL 5781845, at *5. Having already rejected those contentions as a basis for dismissing certain of Armada's other claims, I rejected them with respect to the wrongful-divided claim without further discussion. *Id*.

In their Rule 12(c) motion, however, the defendants expressly question the basis for the wrongful-dividend claim. Armada has cited no case or other authority recognizing such a cause of action under Illinois law, and I have found none. In its previous response to the defendants' motions to dismiss, Armada argued that the claim was based on the so-called "trust

fund" theory of liability, according to which corporate assets
are held in trust for the benefit of a corporation's creditors.
Specifically, Armada cited *Central States, Southeast & Southwest
Areas Pension Fund v. LaCasse*, 254 F. Supp. 2d 1069 (N.D. Ill.
2003), for the proposition that "it is a basic tenet of
corporate law that if a corporation transfers funds to its
shareholders leaving corporate debts unpaid, the shareholders
become liable to the corporation's creditors." *Id*. at 1072.
Armada also cited *Central States, Southeast & Southwest Areas
Pension Fund v. Minneapolis Van & Warehouse Co.*, 764 F. Supp.
1289 (N.D. Ill. 1991), which further explained that "[t]his
'trust fund' theory ... is a matter not merely of state but also
of federal common law." *Id*. at 1294.

But neither *LaCasse* nor *Minneapolis Van* suggests that
Illinois law recognizes a stand-alone claim for "wrongful
dividend." Rather, each case invoked the "trust fund" theory in
connection with other claims. *LaCasse* addressed whether a state-
law claim for fraudulent transfer/conveyance was preempted by
ERISA, and discussed the trust fund theory in concluding that
even if the claim were preempted, it would remain viable as a
federal claim for fraudulent conveyance. 254 F. Supp. 2d at
1072. *Minneapolis Van* invoked the trust fund theory in the
context of imposing a constructive trust on one of the
defendants. 764 F. Supp. at 1295-96. Moreover, in *Minneapolis*

18

*Van*, the trust fund theory came into play because (unlike Ashapura here) the corporation alleged to have issued the improper dividend had been dissolved. *Id*. at 1294.

Because Armada has failed to show that Illinois recognizes a claim for "wrongful dividend," Count V of the amended complaint must be dismissed.

### b. Breach of Fiduciary Duty

In Count VI, Armada seeks to hold the defendants liable for breach of fiduciary duty based on their approval and coordination of Ashapura's assumption in 2012 of a $4 million debt incurred by one of its subsidiaries. *See* Am. Compl. ¶¶ 139, 140, 171. According to Armada, Ashapura's assumption of the debt had the effect of giving priority to the subsidiary's creditor over Armada in Ashapura's insolvency proceedings before the BIFR.

As with its wrongful-dividend claim, Armada argues that I held in *Armada I* that it had stated a valid claim for breach of fiduciary duty. Again, this contention is not accurate. Originally, Armada advanced its breach-of-fiduciary-duty claim as one for "wrongful assumption of a debt." In their motions to dismiss, the defendants argued that Illinois law recognized no such cause of action, and in response, Armada contended that the claim was cognizable under a breach-of-fiduciary-duty theory. Specifically, Armada cited *Phipps v. Harding*, 70 F. 468 (7th

Cir. 1895), which held that "[w]hen a private corporation is dissolved, or becomes insolvent, and determines to discontinue the prosecution of business, its property is thereafter affected by an equitable lien or trust for the benefit of creditors." *Id*. at 479 (quotation marks omitted). *Phipps* additionally stated that "[a]lthough such directors and officers are not technical trustees, they hold, in respect of the property under their control, a fiduciary relation to creditors." *Id*. (quotation marks omitted). Based on the arguments before me at that point, I concluded that Armada had stated a plausible claim that assumption of the debt was wrongful under a breach-of-fiduciary-duty theory.

Despite its initial plausibility, however, the breach-of-fiduciary-duty theory does not hold up under scrutiny. While the officers and directors of an insolvent corporation may owe a fiduciary duty to creditors, Illinois law does not permit individual creditors to bring claims for breaching that duty. Rather, such claims may be brought only by the corporation or its representative in bankruptcy. *See, e.g.*, *Fisher Tool Co. v. Stampede Tool Co.*, No. 13 C 7252, 2014 WL 2932168, at *2 (N.D. Ill. June 27, 2014).

Although the Illinois Supreme Court has not addressed the issue, and there has been some disagreement on the question among lower courts, *compare Prime Leasing, Inc. v. Kendig*, 773

N.E.2d 84, 97 (Ill. App. Ct. 2002) ("The special-circumstance fiduciary duty runs to all creditors as a group, and not to any individual creditor."), *with O'Connell v. Pharmaco, Inc.*, 493 N.E.2d 1175, 1182 (Ill. App. Ct. 1986) ("When an officer breaches his fiduciary duty by wrongfully converting or misappropriating funds and thereby adversely affecting the relation between the corporation and its creditors, a creditor can maintain an action against the officer personally."), a consensus has gradually converged on the proposition that individual creditors do not have standing to bring breach-of-fiduciary-duty claims. *See, e.g., Fisher Tool Co.*, 2014 WL 2932168, at *3 ("Consistent with what appears to be the trend among courts in this district, we predict that the Illinois Supreme Court would not permit an individual creditor to pursue a direct action for breach of the 'special circumstances' fiduciary duty."); *GoHealth, LLC v. Simpson*, No. 13 C 02334, 2013 WL 6183024, at *5 (N.D. Ill. Nov. 26, 2013); *RMB Fasteners, Ltd. v. Heads & Threads Int'l, LLC*, No. 11 CV 02071, 2012 WL 401490, at *15 (N.D. Ill. Feb. 7, 2012). Thus, while a claim may lie against the defendants for breach of fiduciary duty, the claim cannot be asserted by Armada.[6] Accordingly, Count VI of the amended complaint must be dismissed.

---

[6] A related question exists as to whether Illinois law -- as opposed to, say, the law of India or Singapore -- would be used

In sum, Armada's IUFTA claims fail because they require an improper extraterritorial application of the statute; its wrongful-dividend claim fails because there is no such cause of action under Illinois law; and its breach-of-fiduciary-duty claim fails for lack of standing. As a result, the defendants' motion for a judgment on the pleadings is granted with respect to Armada's state-law claims.

## C.   Maritime Fraudulent Transfer[7]

Finally, the defendants seek a judgment on the pleadings as to Count IV of Armada's First Amended Complaint, which asserts a claim for "Maritime Fraudulent Transfer."

The defendants first argue that there is no substantive cause of action for fraudulent transfer under maritime law. This contention is correct, *see, e.g. Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 589 (4th Cir. 2015) (no federal admiralty rule governs claims for fraudulent conveyance); but it is beside the point. It is well-settled that federal maritime jurisdiction may be invoked to avoid or set aside fraudulent transfers made for the purpose of circumventing a judgment entered by a court

---

in adjudicating Armada's claim for breach of fiduciary duty. Since the claim must be dismissed, however, it is unnecessary to address the issue.

[7] In the relevant case law, the terms "admiralty" and "maritime" are generally used interchangeably. *See, e.g.*, *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 381 n.2 (7th Cir. 2001). I use the terms synonymously here as well.

sitting in admiralty. *See, e.g.*, *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987) ("Ordinarily, federal admiralty jurisdiction is strictly limited to claims traditionally raised in admiralty. A notable exception to this rule extends that jurisdiction to encompass equitable claims, such as that of fraudulent transfer... [to set] aside a fraudulent transfer aimed at evading a judgment entered in admiralty."); *see also Flame*, 807 F.3d at 582; *Fertilizantes Fosfatados Mexicanos, S.A. v. Chen*, No. 91 CIV. 2048 (MJL), 1992 WL 204394, at *3 (S.D.N.Y. Aug. 11, 1992).

In such actions, it is unnecessary to rely on substantive admiralty law, for courts sitting in admiralty look to state law in cases where there is no applicable admiralty law on point. *See, e.g.*, *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 70 (2d Cir. 2009) ("When there is no federal maritime law to guide our decision, we generally look to state law to determine property rights."); *Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998) ("[I]n an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point.").

Here, Armada has properly invoked the court's admiralty jurisdiction because it seeks in Count IV to set aside transfers that the defendants allegedly made to avoid garnishment in the

23

prior attachment proceedings in this court. The fact that there is no substantive cause of action for fraudulent transfer under admiralty law means only that Illinois law will supply the rule of decision. *See, e.g.*, *Flame*, 807 F.3d at 589 ("Given no federal admiralty rules govern such a claim [for fraudulent conveyance], the district court appropriately looked to Virginia law.").

Next, the defendants argue that, as with Armada's other claims, its maritime fraudulent transfer claim should be dismissed because it would entail an impermissible extraterritorial application of state and/or federal law. But the defendants fail to explain why concerns over extraterritoriality remain relevant to causes of action premised on the court's maritime jurisdiction, which by its very nature extends to matters beyond the nation's borders. *See, e.g.*, *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1131 (9th Cir. 2008) ("Hardly any area of law could be viewed as more extraterritorial than admiralty law.... Save for inland navigable waters, ports, and a few other locations, admiralty jurisdiction by definition extends beyond United States territorial boundaries."). The defendants have cited no case or any other authority to indicate the existence of territorial limits on actions to avoid fraudulent transfers pursuant to federal maritime jurisdiction.

In passing, the defendants also appear to suggest that
Armada cannot rely on maritime jurisdiction to set aside the
transfers at issue in Count IV because those transfers did not
take place in Illinois and thus were not subject to the
attachment proceedings in this court. As indicated above, the
court's maritime jurisdiction may be invoked to set aside
fraudulent transfers only in the case of transactions made for
the purpose of thwarting the court's maritime jurisdiction.
Thus, if the transfers in question involved assets that were not
subject to garnishment, the maritime fraudulent transfer claim
fails.

This argument is contradicted by the complaint's
allegations. Armada specifically contends that the defendants
incurred debts and obligations to Ashapura as a result of the
AANV-related debt, and that these were subject to garnishment in
the attachment proceedings. The amended complaint details the
transactions at length and specifically alleges that if the
transfers had been disclosed, Armada "would have looked to
garnish or otherwise address the resulting proceeds" of the
transactions. Am. Compl. ¶ 119. Taking the allegations and
inferences in Armada's favor, it has alleged transactions
subject to garnishment in the attachment proceedings.

Finally, the defendants argue that the maritime fraudulent
transfer claim must fail because the party alleged to have

loaned the AANV start-up funds (one of the defendants' European affiliates) has not been named as a defendant in this suit. The defendants further maintain that Armada has failed to allege any reason why any of the named defendants might be held liable for the affiliate's wrongdoing. This argument again ignores the complaint's allegations. Armada specifically asserts that the affiliate's role in the transaction was "nothing more than such affiliate serving as an agent on behalf of the AMCOL Defendants as principal." Am. Compl. ¶ 122(d). At this stage, it is not possible to determine the affiliate's culpability vis-à-vis that of the defendants. Despite the defendants' insistence to the contrary, the exhibits attached to Armada's amended complaint do not establish that the affiliate is the only potentially liable party.

Thus, insofar as the defendants seek dismissal of Armada's maritime fraudulent transfer claim, their motion is denied.

III.

For the reasons discussed above, I grant the defendants' motion for a judgment on the pleadings with respect to Armada's RICO and state-law claims, and I deny the motion with respect to its maritime fraudulent transfer claim.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 21, 2017