IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Armada (Singapore) PTE Limited  )
                                    )
          Plaintiff,       )
                                    )
                                    )
     v.                 )  No. 13 C 3455
                                    )
Amcol International         )
Corporation, American Colloid  )
Company, Volclay International  )
Corporation, n/k/a Volclay    )
International LLC, Ashapura    )
Minechem Limited,          )
                                    )
          Defendants.     )

MEMORANDUM OPINION AND ORDER

Since 2008, the shipping company Armada (Singapore) PTE Limited has been pursuing recovery for losses it suffered when the Indian company Ashapura Minechem Limited failed to perform under a contract of affreightment requiring Ashapura to provide cargos of bauxite for Armada to carry in its vessels. In early 2010, Armada obtained arbitral awards totaling about $70 million against Ashapura in proceedings conducted in London. *See* Mem. Op. and Order of 03/21/17 at 3; Def.'s Summary Judgment Appendix, Tab 1 (arbitral awards). Later that year, Armada sought to enforce those awards in this court, filing a maritime action for attachment and garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *See*

*Armada (Singapore) PTE Limited v. Ashapura Minechem Limited*, et al., 10-CV-5509 (N.D. Ill.) (the "Rule B Proceedings").

Rule B proceedings allow plaintiffs to obtain jurisdiction over, and to enforce a judgment against, a party not found within the district but whose property is present in the district. *See Western Bulk Carriers (Australia), Pty. Ltd. v. P.S. Intern., Ltd.*, 762 F. Supp. 1302, 1306 (S.D. Ohio 1991) (citing cases). Armada named defendants Amcol International Corp. ("Amcol"), American Colloid Company ("ACC"), and Volclay International Corp. ("Volclay") (collectively, the "Amcol Defendants") as garnishees in the Rule B Proceedings and sought the turnover of assets that Armada claimed belonged to Ashapura and were held by the Amcol Defendants in this district. Armada largely prevailed in the Rule B Proceedings, which culminated in an order directing the Amcol Defendants to pay to Armada the $687,356.52 that I concluded they owed to Ashapura in unpaid stock proceeds and open invoices. *See* Rule B Proceedings, Mem. Op. and Order of 08/29/2011 at 8-9.

In the present action, Armada alleges that the Amcol Defendants engaged in fraud in the Rule B Proceedings by orchestrating a complex series of corporate transactions among related entities, the purpose of which was to shield additional assets belonging to Ashapura from turnover. I dismissed Armada's claims pursuant to the Racketeer Influenced and Corrupt

Organizations Act ("RICO") and the Illinois Uniform Fraudulent Transfer Act on the pleadings, *see* 244 F. Supp. 3d, 750 (N.D. Ill. 2017), *aff'd* 885 F.3d 1090 (7th Cir. 2018), but I allowed its claim for maritime fraudulent transfer to proceed. The Amcol Defendants now seek summary judgment of that claim, arguing that Armada has not come forward with sufficient evidence to establish: 1) that the assets it faults the Amcol Defendants for failing to disclose and turn over belonged to Ashapura; 2) that the Amcol Defendants controlled those assets; or 3) that the assets were within this district. For the reasons that follow, the motion is granted with respect plaintiff's claim against ACC and Volclay but denied with respect to its claim against Amcol.

At all relevant times, Amcol was the parent company in a global group of related entities, several of which were involved in the constellation of transactions that Armada calls the "2011 Restructuring Transaction." Distilled to its essence, Armada's fraudulent transfer theory is that the corporate operations involved in the 2011 Restructuring Transaction created an intangible asset belonging to Ashapura and controlled by Amcol, which Amcol camouflaged in a multitude of transactions it puppeteered among its controlled entities. Specifically, Armada

claims that through its UK affiliate, AME,[1] Amcol extended a loan to Ashapura to fund a Belgian joint-venture called AANV; and that rather than call in the loan (which it knew the insolvent Ashapura was unable to repay), Amcol converted the debt into a *credit* by forgiving repayment and using the debt relief as consideration for the transfer of certain assets from AVL (an entity Ashapura co-owned with defendant Volclay) to Cetco India, an entity Amcol would then control. Armada argues that by choreographing these transactions from its corporate headquarters in Hoffman Estates, Illinois, Amcol created and controlled an intangible asset—the credit used to purchase AVL's assets—in this district. And because that asset belonged to Ashapura, Armada contends, it was subject to attachment and turnover in the Rule B Proceedings.

There is evidence to support Armada's theory. All agree that AME and Ashapura were fifty-fifty co-venturers in AANV, and that through an undocumented loan transaction, an Amcol entity (the parties dispute which) funded "the entire amount" of both sides' initial investment in AANV. Def.'s 30(b)(6) Dep., Pl.'s Exh. A at 140:20-21. The Amcol Defendants insist that it was AME, acting independently from its UK headquarters, that extended the loan,

---

[1] For readability and following the parties' conventions, I refer to entities involved in the transactions by their acronyms. Wherever used in this opinion, "AME" stands for Amcol Minerals Europe, "AANV" stands for Ashapura Amcol N.V., and "AVL" stands for Ashapura Volclay Limited.

and that AANV, not Ashapura, was the loan recipient. But a jury could conclude that Amcol itself was the source of the loan, with AME acting only as an "intermediary." Pearson Dep., Pl.'s Exh. D, at 93:16-18 ("The loan was made essentially from AMCOL via an intermediary, AME, and to fund AANV, for both parties"). Moreover, while the loan proceeds were undisputedly disbursed to AANV, a fact-finder could also conclude that it was Ashapura who owed the obligation to repay the loan. *See*, e.g., Def.'s 30(b)(6) Dep., Pl.'s Exh. A at 139:15-17, 140:16-19 (invoices sent to Ashapura for interest on the loan "to establish that Ashapura ultimately needed to pay out for the money ultimately that they were supposed to be putting into the entity"); Kodosky Dep., Pl.'s Exh. E at 77-78.

The Amcol Defendants deride Armada's theory as "contrived," Reply at 3, and insist that it "ignore[s] corporate form." Br. at 14. But having failed to document the € 7 million loan transaction to fund AANV at any point prior to AME's divestment from that entity in the 2011 Restructuring Transaction, Amcol is ill-placed to rely upon corporate formalities to establish which entities were the real parties in interest with respect to the intra-corporate movement of assets. Moreover, there is evidence in the record that raises doubts about the independence of the Amcol affiliates involved. For example, Amcol's CEO Ryan McKendrick

directed AME's accountant, Phil Mealor, to "prepare an invoice for Ashapura that includes interest and the full amount of the advance we made on their behalf" and confirmed that Mealor should not "book" the loan because the invoice—while ostensibly from AME—was "outside of [AME's] system." Pl.'s Exh. W. The Amcol Defendants insist that McKendrick's directives cannot be taken as evidence of Amcol's control over AME because McKendrick was also "a member of the AME board and acted in his capacity as an AME board member when he negotiated the AANV Loan Agreement." Reply at 9. But a jury need not accept that interpretation and could conclude that McKendrick was acting in Amcol's interest rather than AME's. In addition, testimony by Amcol's Comptroller and by the Amcol Defendants' Rule 30(b)(6) witness offers additional grounds for questioning AME's independence with respect to its role in the transactions at issue and its observance of corporate formalities in general. *See* Def.'s Rule 30(b)(6) Dep., Pl.'s Exh. A at 94 ("[u]ltimately all transactions of this nature, investments, have to be approved by the board of directors of AMCOL International"); Kodosky Dep., Pl.'s Exh. E at 51:3 ("[u]ltimately, at the end of the day, it's all owned by AMCOL International Corporation").

Nor am I persuaded that documents memorializing the 2011 Restructuring Transaction establish beyond dispute that Ashapura and Amcol exchanged nothing of value. The Amcol Defendants make

much of provisions in the "Cetco India Share Subscription & Shareholders Agreement" stating the amount Amcol paid for its eighty-percent interest in that entity and confirming that payment of that amount constitutes "full, final and complete discharge" of Amcol's payment obligation. But nothing about these provisions indicates how Amcol valued its stake in Cetco India or excludes the possibility that Amcol's cash payment reflected a discount commensurate with the value of the credit it received in exchange for AANV-related loan. Indeed, there is evidence that once it became clear that Ashapura would be unable to repay the loan, Amcol began considering other ways to extract value from the company in the 2011 Restructuring Transaction. *See* Interoffice Memorandum from Kodosky to Pearson, Pl.'s Exh. F, at 1-2 ("From our perspective, the loan had a zero book value and more importantly a zero economic value since the business is bankrupt... We do not believe AME will ever collect any amounts due under the loan. However, we could use the loan as leverage in other areas of negotiation...").

And there is evidence that Amcol did, in fact, "leverage" the AANV-related loan in the course of the 2011 Restructuring Transaction. Amcol's corporate representative, Gary Castagna, and its Chief Financial Officer, Don Pearson, both testified that the forgiveness of Ashapura's portion of the loan was part of the

7

consideration it used to increase its stake in CETCO India. *See* Def.'s 30(b)(6) Dep., Pl.'s Exh. A at 125:9-14 ("we were going to apply that asset that we had, which was the form of a loan to the joint venture in AANV, as part of the consideration to pay – to fund, again the ultimate purchase of the remaining shares of CETCO India"); *id.* at 147:9-16 ("Q: Are you saying, sir, that the debt in AANV was reduced by 50 percent so that AMCOL could acquire or hold 80 percent of the shares in CETCO India? A: Yes."); Pearson Dep., Pl.'s Exh. D at 84:20-85:1 ("Q: What was the consideration received by the AMCOL Defendants in exchange for reducing that debt by approximately 50 percent? A: As I recall, we received 30 percent interest or 80 percent of the new CETCO India operation."). The Amcol Defendants' invocation of the parol evidence rule as a basis for ignoring this testimony is misplaced. "[F]raud is a tort, and the parol evidence rule is not a doctrine of tort law and so an integration clause does not bar a claim of fraud based on statements not contained in the contract[s]." *Vigortone AG Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 968 (Ill. App. Ct. 1st Dist. 2004) (same).

For the foregoing reasons, I conclude that Armada is entitled to try its claim that Amcol—acting from its headquarters in this district—effectuated a fraudulent transfer of assets that belonged

to Ashapura and that should have been disclosed in the Rule B Proceedings. I agree with the Amcol Defendants, however, that the record does not reasonably support its claim against ACC or Volclay. Accordingly, the motion for summary judgment is granted in part.

**ENTER ORDER:**

**Elaine E. Bucklo**

United States District Judge

Dated: October 10, 2019